BRUCE A. WAGMAN (CSB No. 159987)
bwagman@rshc-law.com
RILEY SAFER HOLMES & CANCILA LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone: (415) 275-8540
Facsimile: (415) 275-8551
*Counsel for Proposed Defendant-Intervenors*
*Humane World for Animals, Animal Legal*
*Defense Fund, Animal Equality,*
*The Humane League, Farm Sanctuary,*
*Compassion in World Farming, Inc., and Animal*
*Outlook*

REBECCA CARY (CSB No. 268519)
rcary@humaneworld.org
MELISSA ALPERT
malpert@humaneworld.org
HUMANE WORLD FOR ANIMALS
1255 23rd St., NW, Suite 450
Washington, D.C. 20037
Telephone: (202) 676-2330
Facsimile: (202) 676-2357
*Counsel for Proposed Defendant-Intervenor*
*Humane World for Animals*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRIUMPH FOODS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and ERICA PAN, in her official capacity as Director of the California Department of Public Health<br><br>Defendants. | Case No. 2:25-cv-09063- CAS-AJR<br><br>**[PROPOSED] NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>The Honorable Christina A. Snyder<br><br>Date: To Be Determined<br>Time: 10:00 am<br>Location: Courtroom 8D<br>Trial Date: None<br>Action Filed: September 23, 2025 |

1

## **TABLE OF CONTENTS**

2

**Page(s)**

3    TABLE OF AUTHORITIES..................................................................ii

4    NOTICE OF MOTION AND MOTION...........................................1

5    MEMORANDUM OF POINTS AND AUTHORITIES ..........................2

6    I.      INTRODUCTION...............................................................2

7    II.     LEGAL STANDARD ..........................................................3

8    III.    FACTUAL BACKGROUND ..................................................4

9    IV.     ARGUMENT ....................................................................5

10    A.    Triumph Has Not Established Injury or this Court's Jurisdiction .............5

11    B.    Triumph Has Not Stated a Plausible Claim of FMIA Preemption .............7

12        1.    Proposition 12 is Not Expressly Preempted Under the "Operations"

13             Provision of the Preemption Clause.......................................8

14        2.    Proposition 12 is Not Expressly Preempted Under the "Labeling"

15             Provision of the Preemption Clause.......................................15

16        3.    Proposition 12 Implementing Regulations Are Not Expressly

17             Preempted.......................................................................16

18        4.    Proposition 12 is Not Impliedly Preempted by the FMIA.................17

19    C.    Triumph Has Not Stated a Plausible Claim under the Dormant Commerce

20         Clause .............................................................................19

21        1.    Plaintiff's "Lead Time" Theory Fails ................................19

22        2.    Plaintiff's "Slaughterhouse Exception" Theory Fails........................20

23    D.    Triumph Has Not Stated a Plausible Claim under the Due Process

24         Clause ............................................................................22

25    E.    Triumph Has Not Stated a Plausible Import-Export Clause Claim ...........23

26    V.     CONCLUSION ................................................................23

27    CERTIFICATE OF COMPLIANCE .....................................................24

28

NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
  107 F.4th 934 (9th Cir. 2024) ................................................................. 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................ 3

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
  870 F.3d 1140 (9th Cir. 2017) ................................................... 9, 14, 18

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005) .............................................................................. 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................... 3, 21

*Cal. Hispanic Chambers of Comm. v. Ross*,
  No. 34-2021-80003765 (Sup. Ct. Cal., County of Sacramento, June
  16, 2023) ................................................................................................. 4

*Calfarm Ins. Co. v. Deukmejian*,
  48 Cal. 3d 805 (1989) ........................................................................... 21

*California v. Texas*,
  593 U.S. 659 (2021) ................................................................................ 7

*Carson v. Monsanto Co.*,
  92 F.4th 980 (11th Cir. 2024) ............................................................... 14

*Cavel Int'l, Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) .......................................................... 10, 18

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011) .............................................................................. 17

*Day v. Henry*,
  152 F.4th 961 (9th Cir. 2025) ............................................................... 21

- ii -

1   *Dworkin v. Hustler Mag. Inc.*,

2     867 F.2d 1188 (9th Cir. 1989) .................................................................. 3

3   *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,

4     476 F.3d 326 (5th Cir. 2007) ................................................... 10, 17, 18

5   *Eng. v. Gen. Elec. Co.*,

6     496 U.S. 72 (1990) ...................................................................................... 18

7   *Hardeman v. Monsanto Co.*,

8     997 F.3d 941 (9th Cir. 2021) ........................................................ 14, 16

9   *Iowa Pork Producers Ass'n v. Bonta*,

10     No. 2:21-CV-09940-CAS, 2022 WL 613736 (C.D. Cal. Feb. 28,

11     2022) .................................................................................. 4, 20, 22

12   *Iowa Pork Producers Ass'n v. Bonta*,

13     No. 22-55336, 2024 WL 3158532 (9th Cir. June 25, 2024) ............... 2, 6, 19, 22

14   *Lujan v. Defs. of Wildlife*,

15     504 U.S. 555 (1992) .................................................................................. 5, 6

16   *Medtronic, Inc. v. Lohr*,

17     518 U.S. 470 (1996) ...................................................................................... 7

18   *N. Am. Meat Inst. v. Becerra*,

19     825 F. App'x 518 (9th Cir. 2020)........................................................ 2, 14, 19

20   *Nat'l Meat Ass'n v. Harris*,

21     565 U.S. 452 (2012) ................................................................... *passim*

22   *Nat'l Pork Producers Council v. Ross*,

23     598 U.S. 356 (2023) ................................................................... *passim*

24   *People v. Santorsola*,

25     170 Cal. Rptr. 3d 819 (Cal. App. Dep't Super. Ct. 2014)................... 10

26   *In re Pork Antitrust Litigation*,

27     No. 0:18-cv-01776, Doc. 3165 (Oct. 22, 2025) ............................... 6, 13

28

*Safe Air for Everyone v. Meyer*,

    373 F.3d 1035 (9th Cir. 2004) ................................................................. 4

*Tenn. Wine & Spirits Retail. Ass'n v. Thomas*,

    588 U.S. 504 (2019) ............................................................................ 23

*Triumph Foods, LLC v. Campbell*,

    156 F.4th 29 (1st Cir. Oct. 3, 2025) ............................................. *passim*

*Triumph Foods, LLC v. Campbell*,

    715 F. Supp. 3d 143 (D. Mass. 2024) .................................................. 21

*Triumph Foods, LLC v. Campbell*,

    742 F. Supp. 3d 63 (D. Mass. 2024) ............................................. *passim*

*United States v. Williams*,

    533 U.S. 295 (2008) ............................................................................ 22

*Va. Uranium, Inc. v. Warren*,

    587 U.S. 761 (2019) ..................................................................... 7, 10

**Constitutions**

U.S. CONST. Art. III ...................................................................... 4, 5, 6

**Statutes**

21 U.S.C. §§ 601 *et seq.* ................................................................. 12, 14

21 U.S.C. § 601(m) ........................................................................ 12, 14

21 U.S.C. § 601(m)(2) ........................................................................ 14

21 U.S.C. § 601(m)(2)(A) ................................................................... 14

21 U.S.C. § 601(o) ............................................................................. 17

21 U.S.C. § 602 ............................................................................ 9, 18

21 U.S.C. § 603(a) ............................................................................. 14

21 U.S.C. § 678 ..................................................................... 8, 11, 12, 15

Cal. Health & Safety Code § 25990 ....................................................... 4

Cal. Health & Safety Code § 25991 ....................................................... 5

Mass. Gen. Law. 129 App. §§ 1-1–1-5 ................................................... 7

Proposition 2, Text of Proposed Laws 82 (Nov. 4, 2008),

    https://vig.cdn.sos.ca.gov/2008/general/text-proposed-laws/text-of-

    proposed-laws.pdf#prop2 ...........................................................................4

Proposition 12, Text of Proposed Laws 87 (Nov. 6, 2018),

    https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf ...........................................2

**Court Rules**

Fed. R. Civ. P. 12(b)(1) ...........................................................................4

Fed. R. Civ. P. 12(b)(6) ...........................................................................3

Fed. R. Civ. P. 12(c) ...........................................................................3

**Other Authorities**

9 C.F.R. §§ 300.1 *et seq*...........................................................................9

9 C.F.R. § 320.1(b) ...........................................................................17

USDA FSIS, *Labeling Guideline on Documentation Needed To*

    *Substantiate Animal Raising Claims for Label Submission*, 84 Fed.

    Reg. 71359, 71361 (Dec. 27, 2019) ...................................................9

Understanding FSIS Food Recalls, USDA,

    https://www.fsis.usda.gov/food-safety/safe-food-handling-and-

    preparation/food-safety-basics/understanding-fsis-food-recalls .......................16

1

## NOTICE OF MOTION AND MOTION

2     **PLEASE TAKE NOTICE** that on a date to be determined by the Court, as

3 soon as the matter may be heard before the Honorable Christina A. Snyder in

4 Courtroom 8D of the United States Courthouse located at 350 W. 1st Street, 8th

5 Floor, Los Angeles, California 90012, Proposed Defendant-Intervenors Humane

6 World for Animals, Animal Legal Defense Fund, Animal Equality, The Humane

7 League, Farm Sanctuary, Compassion in World Farming, Inc., and Animal Outlook

8 will move this Court, pursuant to Rules 12(c), 12(b)(1) and 12(b)(6) of the Federal

9 Rules of Civil Procedure, for an order dismissing Plaintiff's complaint with

10 prejudice. The grounds for this motion are that Plaintiff lacks standing to bring this

11 suit, and fails to state any viable claim for relief under any of its legal theories.

12     Proposed Defendant-Intervenors are filing this Proposed Motion shortly after

13 Defendants filed their dispositive motion, so that if the Court grants intervention, the

14 Defendant-Intervenors do not unnecessarily delay the case with their briefing. If

15 granted intervention, Proposed Defendant-Intervenors will follow all Court-ordered

16 guidelines and schedules to continue to minimize the impact on the Court and parties.

17     Pursuant to Local Rule 7.3, on December 1, counsel for Proposed Defendant-

18 Intervenors and counsel for Plaintiff met and conferred with respect to this Motion,

19 but were unable to reach a consensus to avoid the filing of this Motion.

20

21

22

23

24

25

26

27

28

- 1 -

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

In conventional pork production, breeding female pigs spend most of their lives immobilized in "gestation crates" so small they are unable to turn around or fully extend their limbs. In 2018, California voters overwhelmingly passed Proposition 12, the Prevention of Cruelty to Farm Animals Act, to rid California markets of products connected to this cruel practice.[1] California voters did not act first or alone: other states have also passed laws banning cruel confinement and the sale of cruel products. Pork companies desperate to continue these cruel practices have responded with failed lawsuit after failed lawsuit, asking the federal courts to overturn the will of California voters and invalidate Proposition 12. But both the Ninth Circuit and the Supreme Court have upheld the law against these challenges. *See N. Am. Meat Inst. v. Becerra*, 825 F. App'x 518 (9th Cir. 2020) ("*NAMI*"), *cert. denied sub. nom. N. Am. Meat Inst. v. Bonta*, 141 S. Ct. 2854 (2021); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ("*NPPC*"); *Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532 (9th Cir. June 25, 2024) ("*IPPA II*"), *cert. denied*, 145 S. Ct. 2866 (2025).

Seven years after Proposition 12 was passed, six years after the first pork industry lawsuit was filed, a year after Plaintiff Triumph Foods, LLC ("Triumph") lost its District Court challenge to Massachusetts' materially-identical law, and two weeks before that loss was affirmed by the First Circuit,[2] Triumph filed this suit

---

[1] Cal. Health & Safety Code §§ 25990 *et seq.*; A. Padilla, Cal. Sec'y of State, Text of Proposed Laws 87 (Nov. 6, 2018), https://vig.cdn.sos.ca.gov/2018/general/pdf/topl.pdf. This law also covers cruel confinement of veal calves and egg-laying hens, not at issue here.

[2] *Triumph Foods, LLC v. Campbell*, 742 F. Supp. 3d 63 (D. Mass. 2024) ("*Triumph I*"); *Triumph Foods, LLC v. Campbell*, 156 F.4th 29 (1st Cir. Oct. 3, 2025) ("*Triumph II*").

seeking a fifth pork industry bite at the apple.[3] Triumph's claims largely resurrect challenges already dismissed by this Court, the Ninth Circuit, and the First Circuit. *See generally* Compl. Its voluminous allegations are mostly legal assertions misrepresenting the text of Proposition 12 and federal laws: "full of sound and fury, signifying nothing."[4]

Proposition 12 falls well within California's authority to regulate public health and morals, prevent animal cruelty, and keep cruel products out of its markets. As with the pork industry's prior attempts, Triumph has not identified any constitutional basis to invade California's sovereign authority and invalidate its duly enacted law. "While the Constitution addresses many weighty issues, the type of pork chops California merchants may sell is not on that list." *NPPC*, 598 U.S. at 364.

## II.    **LEGAL STANDARD**

Proposed Defendant-Intervenors move to dismiss Triumph's Complaint for failing to state a claim for relief under Federal Rules of Civil Procedure 12(c), 12(b)(1), and 12(b)(6). "[T]he same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog." *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" and "raise a right to relief above the speculative level." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Twombly*, 550 U.S. at 555. While courts will accept well-pled allegations as true, mere "conclusions . . . are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The reviewing court can "draw on its experience and common sense" to assess

---

[3] Triumph's Complaint is conspicuously silent on the holdings of these other lawsuits, even though the same law firm here filed the *IPPA* case and Triumph's Massachusetts lawsuit.

[4] William Shakespeare, Macbeth, act 5, sc. 5.

plausibility. *Id*. at 663–64. Under Rule 12(b)(1), the plaintiff bears the burden to show it has Article III standing. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

## III.  FACTUAL BACKGROUND

California has a rich history of protecting farmed animals from cruel treatment. As relevant here, in November 2008, voters enacted Proposition 2, a ballot measure prohibiting California farmers from confining breeding pigs "in a manner that does not allow them to turn around freely, lie down, stand up, and fully extend their limbs."[5] Ten years later, voters enacted Proposition 12, containing both a new confinement standard and a sales restriction, to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California."[6] Proposition 12 bars in-state pig farmers from confining breeding sows "in a cruel manner," and businesses from engaging in the in-state sale of "[w]hole pork meat that [they] know[ ] or should know is the meat of a [breeding pig] who was confined in a cruel manner, or . . . of [her] immediate offspring." Cal. Health & Safety Code §§ 25990-25991. "Confinement in a cruel manner" means "confining an animal in a manner that does not allow the animal to turn around freely, lie down, stand up, or fully extend their limbs (the 'Turn Around Requirements'), and also, as of January 1, 2022,[7] . . . confining a breeding pig in a space with less than twenty-four square feet of usable floorspace per pig (the 'Square Footage Requirements')." *Iowa Pork*

---

[5] California General Election, Official Voter Information Guide, Text of Proposed Laws 82 (Nov. 4, 2008), https://vig.cdn.sos.ca.gov/2008/general/text-proposed-laws/text-of-proposed-laws.pdf#prop2. This law also banned cruel confinement of veal calves and egg-laying hens, not at issue here.

[6] Text of Proposed Laws (2018), *supra* n.1, Proposition 12 § 2.

[7] This compliance deadline was extended in subsequent unrelated litigation. *Cal. Hispanic Chambers of Comm. v. Ross*, No. 34-2021-80003765, Joint Stipulation of All Parties (Sup. Ct. Cal., County of Sacramento, June 16, 2023).

*Producers Ass'n v. Bonta*, No. 2:21-CV-09940-CAS, 2022 WL 613736, at *2 (C.D. Cal. Feb. 28, 2022) (Snyder, J.) ("*IPPA I*") (*quoting* Cal. Health & Safety Code §§ 25990(a), 25991(e)).

## IV.  ARGUMENT

Triumph's relitigation of Proposition 12 is as meritless as the earlier challenges. Its claims are either foreclosed by existing Ninth Circuit law, rejected by persuasive First Circuit authority, or misstate the applicable law. Its Complaint is rife with baseless assertions that Proposition 12 imposes requirements found nowhere in its text, or that federal laws mean the opposite of what they say and the opposite of what the Supreme Court has said they mean.

Triumph's Complaint raises no viable claim for relief. Proposition 12 is neither expressly nor impliedly preempted by the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.* ("FMIA"), because that Act governs conduct at federally-regulated slaughterhouses, not husbandry practices at farms raising pigs. Proposition 12 does not discriminate under the dormant Commerce Clause, because its even-handed sales ban applies equally to all pork, regardless of where the pigs are raised. Triumph's Due Process and Import-Export Clause arguments are specious, because Proposition 12 is clear and Triumph is a domestic entity. Moreover, the Complaint does not even establish that Triumph has constitutional standing to bring this case in the first place. Therefore, Triumph's Complaint should be dismissed with prejudice.

### A.  Triumph Has Not Established Injury or this Court's Jurisdiction

Plaintiffs cannot invoke this Court's jurisdiction without demonstrating "the irreducible constitutional minimum of standing" under Article III of the U.S. Constitution: injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Triumph's Complaint fails at the gate.

Triumph challenges Proposition 12's sales ban, but does not allege that it directly sells covered products in California. *See generally* Compl. It merely alleges that "Triumph processes pigs into pork and the pork is sold directly and indirectly

- 5 -

to customers in California." *Id*. ¶ 15. This use of passive voice ("is sold") and reference to "indirect" sales render it unclear <u>who</u> sells Triumph-slaughtered pork to California customers. But, under Proposition 12, "[u]pstream entities, by virtue of being upstream, are not engaging in the ultimate sale in California." *IPPA II*, 2024 WL 3158532, at *4. Triumph's allegations at most suggest it is an entity "upstream" from any California "sale[s]," outside the scope of Proposition 12's sales ban. *Id*.

This omission may reflect the fact that all Triumph-processed pork is actually sold by a separate entity: Seaboard Foods. *See, e.g.*, *In re Pork Antitrust Litigation*, No. 0:18-cv-01776, Doc. 3165 at 1 (Oct. 22, 2025) ("[N]o one disputes that Seaboard, not Triumph, sells, markets, and prices Triumph's pork . . . Seaboard [has] the exclusive right to do so and gives Triumph no right to control those activities"); *Triumph Foods, LLC v. Campbell*, No. 1:23-cv-11671, Dkt. 17 ¶¶ 99-100 (Jul. 31, 2023) ("Seaboard has the exclusive right to market all Triumph pork, and Seaboard makes all sales decisions on behalf of Triumph for its pork products including who and where it sells the product.").

If Triumph is not a California pork seller, and has no control over where its pork is sold, it cannot establish Article III injury-in-fact and causation. Triumph's claims assume injuries to California pork sellers: *e.g.* that Proposition 12 benefits in-state slaughterhouses by allowing noncompliant on-site pork sales; that Proposition 12 imposes "duties" on pork sellers; that it subjects sellers to vague inspection processes; and that it imposes "different" or "additional" requirements on in-state pork sales compared to FMIA requirements. Compl. ¶¶ 145, 179-81, 233, 266-69, 288-90. If Triumph does not sell pork in California, it does not suffer these alleged injuries. If Triumph instead supplies California-bound pork to a third-party seller (*e.g.* Seaboard), then its injuries are "th[e] result [of] the independent action of some third party," and do not establish causation. *Lujan*, 504 U.S. at 560. While standing is not always precluded when "a causal relation . . . depends upon

- 6 -

the decision of an independent third party," it is "substantially more difficult to establish" and must be accompanied by specific factual allegations about that third party—but Triumph's Complaint makes no mention of any third party at all. *See California v. Texas*, 593 U.S. 659, 675 (2021) (internal quotations omitted); *see generally* Compl.

### B.    Triumph Has Not Stated a Plausible Claim of FMIA Preemption

Congressional intent "is the ultimate touchstone" in preemption analysis. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Preemption claims are viewed carefully, because "[t]he preemption of state laws represents a serious intrusion into state sovereignty." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (internal quotation omitted).

Triumph's argument that the FMIA preempts Proposition 12, Compl. ¶¶ 201, 224, has no basis in the text of either law. The FMIA establishes a system of livestock and meat inspection at regulated slaughterhouses; Proposition 12 bans the in-state sale of certain cruelly-produced pork, based on confinement practices at pig farms. As the Supreme Court already stated with respect to Proposition 12: "Everyone agrees . . . that congressional enactments may preempt conflicting state laws . . . But everyone also agrees that *we have nothing like that here*." *NPPC*, 598 U.S. 368 (emphasis added). Triumph has not plausibly alleged that "everyone" is wrong, and that Proposition 12 is either expressly or impliedly preempted by the FMIA. Proposition 12 falls outside the FMIA preemption clause's plain text, and poses no obstacle to the achievement of the FMIA's purposes.

Triumph already challenged Massachusetts' materially-identical law on these same grounds, and lost. *Triumph I*, 742 F. Supp. 3d 63; *Triumph II*, 156 F.4th 29. Like Proposition 12, Massachusetts' Question 3 bans in-state cruel confinement of sows and the sale of products derived from cruelly-confined sows and their offspring. *Compare* Mass. Gen. Law. 129 App. §§ 1-1–1-5 *with* Cal. Health & Safety Code §§

25990(a)-(b)(2), 255991(e)(1) (using near-identical language).[8] The district court and First Circuit ruled that the FMIA does not preempt Question 3. *Triumph I*, 742 F. Supp. 3d at 70-73; *Triumph II*, 156 F.4th at 51-53. Triumph's FMIA claims here fail for the same reasons.

### 1.    Proposition 12 is Not Expressly Preempted Under the "Operations" Provision of the Preemption Clause

"Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024). The FMIA's "operations" preemption clause plainly does not encompass Proposition 12.

The FMIA's "operations" preemption clause bars a narrow subset of state laws: those that impose "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any establishment at which inspection is provided under [the FMIA], which are in addition to, or different than those made under [the FMIA]." 21 U.S.C. § 678. Triumph has not established that Proposition 12 satisfies any—let alone all—of these elements. Proposition 12 concerns *on-farm* practices, not slaughterhouses; it is outside the FMIA's scope and imposes no "requirements" "with respect to" slaughterhouses.

Proposition 12 is also insulated from preemption by the "operations" clause's recordkeeping exception and its savings clause. *See id.* These provisions expressly permit state laws that, respectively, impose "recordkeeping and other requirements within the scope of [the FMIA], if consistent therewith," and "mak[e] requirement[s] or tak[e] other action, consistent with [the FMIA], with respect to any other matters regulated under [the FMIA]." *Id.*

---

[8] Question 3 only imposes Turnaround Requirements, not Square Footage Requirements. This distinction is irrelevant here.

NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES

a. **Proposition 12 Is Outside the Scope of the FMIA**

The FMIA "regulates the inspection, handling, and slaughter of livestock for human consumption" at covered "establishment[s]": facilities conducting the "slaughtering, packing, meat-canning, [or] rendering" of meat. 21 U.S.C. § 603; *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455 (2012) ("*National Meat*"). It establishes a system of on-site inspection of animals and their carcasses, to ensure meat sold interstate is "wholesome, not adulterated, and properly marked, labeled, and packaged," and that animals are slaughtered humanely. 21 U.S.C. § 602; *see also generally* 21 U.S.C. §§ 601 *et seq.*; 9 C.F.R. §§ 300.1 *et seq.* Its "rules apply from the moment a truck carrying livestock 'enters, or is in line to enter,' a slaughterhouse's premises." *National Meat*, 565 U.S. at 457; *see also Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1151 (9th Cir. 2017) ("*Éleveurs*") ("the heart of the FMIA's regulatory scope" is "the activities of slaughterhouses").

Unlike the FMIA, Proposition 12 establishes on-farm animal confinement standards, and regulates in-state pork sales. Pig farms are not regulated "establishment[s]" under the FMIA.[9] The USDA does not regulate on-farm animal husbandry, and acknowledges it "does not have the authority to regulate on-farm animal production." USDA Food Safety and Inspection Service (FSIS), *Labeling Guideline on Documentation Needed To Substantiate Animal Raising Claims for Label Submission*, 84 Fed. Reg. 71359, 71361 (Dec. 27, 2019); *see also Éleveurs,* 870 F.3d at 1148 (USDA reported it "has no authority to regulate the care or feeding of birds prior to their arrival at the slaughter facility" under the similar Poultry Product Inspection Act ("PPIA")).

---

[9] The FMIA imposes no requirements on pig farms at all: farmers may choose to send their pigs wherever they want for slaughter, including non-FMIA slaughter options. Triumph's argument would mean that the FMIA covers pig farmers having nothing to do with any "establishment."

Courts regularly decline to extend the FMIA's preemptive scope to state laws operating outside of official "establishment[s]." For instance, state bans on the slaughter of horses or sale of horsemeat, *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007); *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326 (5th Cir. 2007); *see also National Meat*, 565 U.S. at 467 (distinguishing horsemeat bans as laws that "work[ ] at a remove from the sites and activities that the FMIA most directly govern"); state animal cruelty laws applied at a livestock auction, *People v. Santorsola*, 170 Cal. Rptr. 3d 819 (Cal. App. Dep't Super. Ct. 2014); and, of course, Massachusetts' near-identical ban on the sale of cruel pork, *Triumph II*, 156 F.4th at 51-53. Congress's choice to regulate one element of a supply chain does not extend preemptive reach to the entire chain. *See Va. Uranium*, 587 U.S. at 790-91 (Ginsburg, J., concurring) ("The distinction drawn in *National Meat* thus supports this conclusion: A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field.").

Notwithstanding the FMIA's plain text, Triumph alleges it preempts "laws like Proposition 12" that "interfere with FMIA establishments," citing *National Meat*, 565 U.S. 452. Compl. ¶¶ 6-8. But this argument misreads *National Meat*, which held that a state law requiring slaughterhouses to euthanize non-ambulatory animals *in slaughterhouses*, was preempted by the FMIA. Because the FMIA allowed those same animals to be slaughtered, the state law "substitut[ed] a new regulatory scheme for" the FMIA *in the slaughterhouse*. *National Meat*, 565 U.S. at 458-60.[10] As the First Circuit explained: "the [law] at issue in *National Meat* is fundamentally different than" Question 3 (and by extension, Proposition 12). Question 3 (like Proposition 12) "only bans the sale of noncompliant pork meat; it

---

[10] The Court also invalidated the law's ban on the sale of non-ambulatory pigs, because it functioned as "a criminal proscription calculated to help implement and enforce each of the [law's] other regulations." *National Meat*, 565 U.S. at 463-64.

- 10 -

does not regulate how a slaughterhouse operates." *Triumph II*, 156 F.4th at 52.

Moreover, Question 3 (like Proposition 12) "*explicitly* applies 'beyond the

slaughterhouse gate.'" *Id*. (quoting *National Meat*, 565 U.S. at 462-63) (emphasis

in original). In both laws, compliance is determined entirely before pigs arrive at

the slaughterhouse, based on on-farm conditions.

### b.   Proposition 12 Imposes No Requirements With Respect to Triumph's Operations

Proposition 12 imposes no requirements "with respect to premises, facilities,

or operations of any establishment at which [FMIA] inspection is provided," let

alone requirements "in addition to, or different than" any FMIA requirement. *See*

21 U.S.C. § 678. It "does not regulate how a slaughterhouse operates or prohibit a

slaughterhouse from processing meat that does not comply with" Proposition 12.

*Triumph II*, 156 F.4th at 51. It imposes no requirement on slaughterhouses *at all*.

Instead, its standards operate upstream of slaughterhouses, requiring pork sold in

California to come from *farms* which provide their sows a minimum amount of

space.

Triumph seeks to stretch the "premises, facilities, or operations" referenced

in this clause to cover any act, anywhere, by Triumph. *See, e.g.*, Compl. ¶¶ 148,

172, 181. But the relevant "premises, facilities and operations" in the FMIA's

preemption clause are "at bottom, the slaughtering and processing of animals at a

given location." *National Meat*, 565 U.S. at 463. This is consistent with the FMIA's

plain text, which only preempts laws "within the scope of this chapter," *i.e.*, within

the scope of activities actually regulated by the FMIA: *on-site* slaughter and meat

inspection. 21 U.S.C. § 678.

As *National Meat* explained, the FMIA's preemptive scope does not

encompass all state laws that may impact a slaughterhouse: it only preempts laws

directed at FMIA-regulated activities. "[T]he distinction between a slaughterhouse's

site-based activities and its more far-flung commercial dealings is . . . a

fundamental feature of the FMIA's preemption clause." *National Meat*, 565 U.S. at 463. This clause "does not usually foreclose 'state regulation of the commercial sales activities of slaughterhouses,'" nor "state laws of general application (workplace safety regulations, building codes, etc.)." *Id.* (citing Brief for United States as *Amicus Curiae*); *id.* at 467 n.10; *see also* 21 U.S.C. § 678 (permitting concurrent state recordkeeping requirements and regulation "with respect to any other matters regulated under this chapter" that are "consistent with" the FMIA). The FMIA does not insulate Triumph or its business partners from needing to "comply with the laws of those various States" where its products are sold. *See NPPC*, 598 U.S. at 364.

c.      **Triumph Has Identified No State Requirements "Additional To" or "Different Than" FMIA Requirements**

Triumph has not identified any preempted state "requirements" nor any applicable federal "requirements"; it simply mischaracterizes Proposition 12 and the FMIA.

Triumph asserts that Proposition 12 imposes "additional" or "different" "requirements" because it creates a new category of "adulterated" meat under the FMIA. Compl. ¶¶ 152, 164, 203. The First Circuit soundly rejected this argument. *Triumph II*, 156 F.4th at 52. The FMIA specifically defines "adulterated," meaning meat that is, among other things, "filthy, putrid, or decomposed." 21 U.S.C. § 601(m). Proposition 12 does not create a new category of "adulterated" meat or even mention the word "adulterated." Instead, its sales ban operates on a separate determination that Californians do not want cruelly-produced meat on their shelves. Triumph points to Proposition 12's public health purpose to suggest that, because the FMIA is also motivated by health concerns, it must preempt the law. *Id.* ¶¶ 3,

- 12 -

78.[11] But California voters' independent judgment that cruel confinement leads to public health concerns is not a judgment about "adulteration." Indeed, at inspection, Proposition 12-compliant pork can be deemed "adulterated" and barred from sale, just like other pork. *Triumph II*, 156 F.4th at 52.

Triumph further asserts that this alleged new "adulteration" category "has a direct effect" on Triumph's "operations" "additional to" or "different than" FMIA requirements by affecting "what pigs can enter the plant" and "what pigs can be procured by the plant." Compl. ¶ 203. But the FMIA only determines which animals and meat will pass inspection, not which pigs slaughterhouses may accept. If anything, the FMIA *assumes* that "some kinds of livestock delivered to a slaughterhouse's gates will *not* [pass inspection and] be turned into meat." *National Meat*, 565 U.S. at 465 (emphasis in original).

Triumph identifies no federal requirements specifying which pigs slaughterhouses can purchase, because none exist. *See* Compl. ¶¶ 33, 37-39, 42, 148-152; 21 U.S.C. §§ 601 *et seq.*; *see also National Meat*, 565 U.S. at 463 (slaughterhouses' "commercial activities" generally not covered by the FMIA's preemption clause).[12] Triumph has apparently negotiated various terms with its pig farmers, like specifying pigs with certain characteristics or the transfer of title only after pigs pass FMIA inspection. Compl. ¶¶ 161-62. But those commercial

---

[11] Triumph also disputes the science behind those motivating health concerns. Compl. ¶ 78 n.6. Triumph is wrong, but this is irrelevant here, because "States may often adopt laws addressing even 'imperfectly understood' health risks associated with goods sold within their borders." *NPPC*, 598 U.S. at 381.

[12] Triumph has not alleged that pig farms are part of its FMIA regulated "establishment," nor could it. In another court, it essentially admitted its upstream supplier farms operate distinctly: "hog-procurement contracts [are] negotiated at arms' length," and Triumph does not "control[ ] the separate business operations of its members' independent farms." *In re Pork*, No. 0:18-cv-01776, Doc. 3165 at 4 & 6; *see also id.* at 16-17 (farms "shall not be subject to the control or direction of" Triumph, "including, but not limited to, the details and means by which the results of the [farmers] are to be accomplished").

arrangements are not federal "requirements." *See Hardeman v. Monsanto Co*., 997 F.3d 941, 957 (9th Cir. 2021) ("To establish requirements that can preempt state law . . . agency action must have the force of law."); *Carson v. Monsanto Co*., 92 F.4th 980, 993 (11th Cir. 2024) (similar).

Triumph relies on one FMIA provision to claim the FMIA regulates upstream pig farmers: its statutory definition of "adulteration." Compl. ¶ 39. But the FMIA is clear that "adulteration" refers to *carcasses and meat only*, not live pigs: "[t]he term 'adulterated' shall apply to any carcass, part thereof, meat or meat food product . . ." 21 U.S.C. § 601(m).[13] Live pigs cannot be "adulterated." Moreover, the USDA determines adulteration *on-site* at slaughter "establishment[s]," during inspections; not at pig-raising farms where USDA has already disclaimed authority. 21 U.S.C. § 603(a).[14] The FMIA regulates "pork inspection," not "pork production," and "'Congress has yet to adopt any statute that might displace . . . laws regulating pork production.'" *Triumph II*, 156 F.4th at 52 (quoting *NPPC*, 598 U.S. at 368).

Triumph also argues that its adoption of inventory management measures to segregate Proposition 12-compliant meat is a state "requirement." Compl. ¶¶ 157, 158, 165, 203. Nonsense. Triumph identifies no Proposition 12 text requiring this, and none exists. *Cf. Triumph I*, 742 F. Supp. 3d at 70 ("slaughterhouses are not even required to segregate noncompliant pork from compliant pork"); *aff'd Triumph II*,

---

[13] Triumph claims the FMIA's definition of "adulteration" includes multiple references "'to the *live animal*'," but only identifies *one* (and only one exists). Compl. ¶ 39 (emphasis in original); 21 U.S.C. § 601(m)(2). That reference simply notes that *meat* will be considered adulterated "if it bears or contains (by reason of administration of any substance to the live animal or otherwise) any added poisonous or added deleterious substance . . ." 21 U.S.C. § 601(m)(2)(A). Adulteration is determined at the slaughterhouse, not the upstream farm. *Cf. Éleveurs*, 870 F.3d at 1151 n.6 ("Although 21 U.S.C. § 453(g)(2)(A) makes a passing reference to 'live poultry,' it does so only in the context of explaining circumstances in which a final poultry product could be deemed adulterated.").

[14] Triumph similarly cites residue sampling that occurs "on site" at slaughterhouses, not on-farm. Compl. ¶ 40.

156 F.4th at 52 (adding, "[p]roducers have used segregation and tracing mechanisms for years to provide consumers with premium pork products that follow organic, non-GMO, specific breeds, and other unique specifications") (internal quotation omitted). Triumph's choice to adopt these measures is not a state "requirement." *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005) (a "requirement," for purposes of preemption, is a "rule of law that must be obeyed," not a state law that may "motivate[ ] an optional decision").

Moreover, even if Proposition 12 *did* require Triumph to adopt procedures to trace compliant pigs—which it does not—that would be expressly *permitted* under the preemption clause's recordkeeping exception, which allows states to "impose recordkeeping and other requirements," if "consistent" with the FMIA. 21 U.S.C. § 678. Traceability requirements are not "[in]consistent" with the FMIA. *See Triumph I*, 742 F. Supp. 3d at 71 ("As the FSIS already requires, a slaughterhouse must be able to identify where its pork meat came from"). And Triumph alleges that it has already implemented these segregation procedures, but not that it is out of compliance with the FMIA. *See* Compl. ¶¶ 156, 165.

### 2. Proposition 12 is Not Expressly Preempted under the "Labeling" Provision of the Preemption Clause

Triumph also alleges Proposition 12 is preempted by the FMIA's ban on "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under [the FMIA]." 21 U.S.C. § 678; Compl. ¶¶ 173-79. Triumph does not allege that Proposition 12 requires pork manufacturers to use a specific label. *See generally* Compl. Instead, it simply claims that "most" FMIA establishments[15] "label or mark [ ] in some fashion" Proposition 12-compliant meat to facilitate meat segregation. Compl. ¶ 178. Triumph does not allege that any Proposition 12 language mandates the use of such labels, and it cannot. (Indeed,

---

[15] It is unclear whether this even includes Triumph.

were that the case, surely *all*, not merely "most," facilities would allegedly engage in such labeling.)  As already explained *supra* § IV.B.1.c, the voluntary adoption of a recordkeeping procedure is not a state *requirement*, and is also covered by the FMIA's recordkeeping exception.

### 3.    Proposition 12 Implementing Regulations Are Not Expressly Preempted

Triumph also asserts that the FMIA preempts various regulations implementing Proposition 12. These arguments are equally meritless as Triumph's attacks on the Proposition 12 statute, debunked *supra.* They also have no bearing on the validity of the underlying *statute* itself.

First, Triumph insists the regulations are preempted by the FMIA's operations preemption provision because they impose "recall" requirements and affect "seals" on USDA-approved pork. Compl. ¶¶ 71, 120, 192-194, 203. But Triumph identifies no "federal requirements" that would preempt these alleged regulations. It cites no sealing requirement under the FMIA, *see* Compl. ¶ 71 (referencing the National School Lunch Program instead); and it neglects to mention that the federal government can only request *voluntary* recalls,[16] which by definition do not "carry[ ] the force of law," *see Hardeman*, 997 F.3d at 957. Moreover, each of these alleged ills involve Triumph's "far-flung commercial activities," not the "slaughterhouse's site-based activities" that are the focus of the FMIA's preemption clause. *National Meat*, 565 U.S. at 463.

Second, Triumph claims that the regulations are preempted by the FMIA's labeling preemption provision in two ways. One, the regulations' inspection provisions allegedly allow California regulators to "add . . . markings and tags" to

---

[16] Understanding FSIS Food Recalls, USDA, https://www.fsis.usda.gov/food-safety/safe-food-handling-and-preparation/food-safety-basics/understanding-fsis-food-recalls (last accessed Nov. 3, 2025) ("food recall involving FSIS regulated products *is a voluntary action* by a company to remove adulterated or misbranded product from commerce") (emphasis added).

suspicious pork products during investigations. Compl. ¶¶ 178-184. But investigatory tags are not "labels." Under the FMIA, a "label" "means a display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article." 21 U.S.C. § 601(o). A regulatory tag is not a "label" intended for "display" to consumers, but instead, a temporary reference for internal recordkeeping related to a compliance investigation. Two, Triumph alleges that regulations requiring transshipped meat (*i.e.*, meat "not destined for commercial sale in California") to be accompanied by shipping documents identifying the meat as non-compliant are "[l]abel" requirements. Compl. ¶ 111. But shipping documents are expressly *not* labels under the FMIA: FMIA regulations describe "bills of lading, and receiving and shipping papers" as *records*, not as labels. *See* 9 C.F.R. § 320.1(b) (including these materials among other "records"). And, as previously noted, the FMIA's preemption clause expressly permits concurrent state recordkeeping requirements, so long as they are consistent with the FMIA.

### 4.    Proposition 12 is Not Impliedly Preempted by the FMIA

Triumph argues that Proposition 12 is impliedly preempted by the FMIA because it "interferes with or is an obstacle to the achievement of Congress's full purpose and objectives in enacting" the FMIA. Compl. ¶ 213. Plaintiffs face a "high threshold" to establish conflict preemption, *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011), especially where—as here—Congress has already defined the FMIA's preemptive reach. "[T]he FMIA contains a narrow inspection and labeling preemption clause, and Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Empacadora*, 476 F.3d at 334 (internal quotation omitted). Triumph does not plausibly clear that threshold. The First Circuit correctly rejected Triumph's similar challenge to Question 3. *Triumph II*, 156 F.4th at 53.

Proposition 12 poses no obstacle to the FMIA's purposes. The FMIA establishes a system of slaughter and meat inspection to ensure that animals are

- 17 -

slaughtered humanely, and that meat which enters the interstate market is "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. Proposition 12 does not interfere with that objective. It does not regulate slaughterhouses at all, let alone pose an "obstacle" to federal inspections.

Triumph argues that Proposition 12 is conflict-preempted because the FMIA delegates "the question of whether Whole Pork Meat is fit and appropriate for human consumption" to the USDA and FSIS. Compl. ¶ 216. This mischaracterizes the FMIA as federalizing interstate commerce in meat. But "Congress did not intend to preempt the entire field of meat commerce under the FMIA." *Empacadora*, 476 F.3d at 334. The FMIA "in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place." *Id.* at 333; *see also Cavel*, 500 F.3d at 554. "The objective of the FMIA is to ensure safe pork enters the market. The FMIA, however, does not require that all safe pork available to the market be able to enter the market." *Triumph I*, 742 F. Supp. 3d at 73 n.4.

The Ninth Circuit considered and rejected a similar argument when foie gras producers alleged that California's ban on the sale of products from force-fed geese was preempted by the PPIA, which regulates poultry meat inspection and contains a similar preemption clause to the FMIA. *Éleveurs*, 870 F.3d at 1153. It held that California's regulation of this cruel animal husbandry practice did not pose an "obstacle" to the PPIA: the subject "feeding practice . . . occurs far away from the official establishments that the PPIA regulates," and California's sales ban did not "interfere[ ]" with the USDA's inspection authority under the PPIA. *Id.* "[W]e should not 'seek[ ] out conflicts between state and federal regulation where none clearly exists.'" *Id.* (quoting *Eng. v. Gen. Elec. Co*., 496 U.S. 72, 90 (1990)).

- 18 -

## C.    **Triumph Has Not Stated a Plausible Claim under the Dormant Commerce Clause**

The Supreme Court already upheld Proposition 12 against a pork industry dormant Commerce Clause challenge, noting that those "petitioners disavow[ed] any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state ones." *NPPC*, 598 U.S. at 370. The Ninth Circuit has also rejected various iterations of dormant Commerce Clause challenges to Proposition 12. *See NAMI*, 825 F. App'x 518, *cert. denied* 141 S. Ct. 2854 (2021); *IPPA II*, 2024 WL 3158532, *cert. denied*, 145 S. Ct. 2866 (2025). Triumph now asserts that this facially neutral law "discriminate[s] in purpose and in effect against out-of-state processors," Compl. ¶ 231, but both of its alleged theories of discrimination are untenable.

### 1.    **Plaintiff's "Lead Time" Theory Fails**

First, Triumph claims that California pork processors benefited from a 'lead time' advantage to comply with Proposition 12, because California's preexisting law, Proposition 2, allegedly already "mandat[ed] California processors to sell products in compliance with the Turn Around Requirements," and gave processors six years to comply. Compl. ¶¶ 237-39.

This Court has already heard and rejected several "lead time" challenges to Proposition 12. In 2019, the North American Meat Institute asserted virtually the same "lead time" argument. This Court found the claim "premature," but noted it was "less than sanguine about the merits." *NAMI*, 420 F. Supp. 3d 1014, 1029 & n.9 (C.D. Cal. 2019) (Snyder, J.), *aff'd*, 825 F. App'x 518 (9th Cir. 2020). In 2021, Triumph's current lawyers parroted that claim on behalf of the Iowa Pork Producers Association. This Court rejected the claim outright, finding that a "statute that treats all private companies exactly the same is not discriminatory," and that any alleged discrepancy "in the past" was not "sufficiently discriminatory to enable plaintiff to

state a claim under the dormant Commerce Clause." *IPPA I*, 2022 WL 613736, at *14 (internal quotations omitted).

Triumph's rerun "lead time" claim here is even less viable, because it entirely mischaracterizes Proposition 2. Proposition 2 did not apply to "processors": it only regulated California *farmers*, barring them from keeping certain animals in intensive confinement.[17] Proposition 2 did not include a sales ban.[18] Triumph's claim that Proposition 2 mandated California processors to comply with the Turn Around Requirements, Compl. ¶ 238, is simply false. California processors had no requirements under Proposition 2, and thus no conceivable "lead time advantage." If the Iowa Pork Producers Association's lead time argument was meritless and stale, surely Triumph's resurrection of the argument two years later based on a misreading of Proposition 2 must also fail.

### 2.      Plaintiff's "Slaughterhouse Exception" Theory Fails

Triumph also argues Proposition 12 gives "in-state processors" an "unfair advantage" because they "may sell noncompliant Whole Pork Meat from their FMIA regulated facility if the buyer takes possession of the product at that facility." Compl. ¶¶ 233-35. Triumph appears to reference Proposition 12's definition of "sale," which excludes "any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act," and defines sales as "occur[ing] at the location where the buyer takes physical possession of an item." Cal. Health & Safety Code § 25991(o).[19]

---

[17] Text of Proposed Laws (2008), *supra* n.5, Proposition 2 §§ 25990, 25992(e) (exception for "[d]uring . . . slaughter").

[18] *Id.*

[19] Proposed Defendant-Intervenor animal protection organizations can attest that this exemption was drafted to avoid unnecessary litigation over meritless preemption claims, without undermining the objectives of the law, because it was their understanding that few, if any, sales occur on slaughterhouse premises. This exemption was not included to protect the business interests of in-state

Triumph has not plausibly alleged that this exception is discriminatory under the dormant Commerce Clause. "Discrimination means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. . . . This differential treatment must be as between persons or entities who are similarly situated." *Day v. Henry*, 152 F.4th 961, 970 (9th Cir. 2025) (internal quotations omitted). But Triumph has not alleged that California has any "similarly situated" slaughterhouses, *i.e.*, slaughterhouses processing meat on Triumph's scale sufficient to compete with Triumph for pork processing. *See generally* Compl. It has not alleged that California slaughterhouses, even collectively, process a volume of pork sufficient to benefit from an alleged "shift in market share." *Id*. ¶ 249. And it has not alleged that any California slaughterhouses sell pork on-site at their slaughterhouses at all, let alone non-compliant pork. *See generally* Compl. To the contrary, Triumph's allegations indicate that California slaughterhouses *do not* sell non-compliant pork on-site because they are *already* compliant with Proposition 12. *Id*. ¶ 241 ("On November 6, 2018, . . . California farms and processors [were] now in compliance" with the turnaround requirements); *see also id.* 243 n.11 ("California processors are largely supplied by California in-state farms," which are already Proposition 12-compliant). Therefore, Triumph's "slaughterhouse exception" theory of discrimination cannot rise "above the speculative level," based on its own allegations. *Twombly*, 550 U.S. at 555.[20]

slaughterhouses—a theory that is preposterous on its face in light of the groups' missions to *protect* farm animals, not benefit their slaughterers.

[20] If the Court nevertheless determines that the slaughterhouse exception is discriminatory, the proper remedy is severance of the exception, consistent with the intent of California voters; just as the district court held in Massachusetts. *See* Text of Proposed Laws (2018), *supra* n.1, at Proposition 12 § 9 (severability clause); *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821-22 (1989); *Triumph Foods, LLC v. Campbell*, 715 F. Supp. 3d 143, 154 (D. Mass. 2024).

### D.   Triumph Has Not Stated a Plausible Claim under the Due Process Clause

Triumph's Due Process challenge largely repeats arguments that have already been rejected by this Court, the Ninth Circuit, and the First Circuit. "[T]o satisfy due process, a penal statute must define the criminal offense to (1) 'provide a person of ordinary intelligence fair notice of what is prohibited' and (2) not be 'so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *IPPA I*, 2022 WL 613736, at *5 (citing *United States v. Williams*, 533 U.S. 295, 304 (2008)). As fully explained in the State's Motion to Dismiss, Dkt. 36-1 at 11-15, Proposition 12 is not unconstitutionally vague. It plainly describes the prohibited conduct, with clear standards for compliance.

The terms "engage in" and "in California commerce" are not vague. Indeed, the Ninth Circuit already held, for this same law, that the term "'engage in' is widely used and readily understood. Generally, to 'engage in' an activity means to 'take part in' that activity. . . . Upstream entities, by virtue of being upstream, are not engaging in the ultimate sale in California; rather, they are engaging in earlier, separate sales." *IPPA II*, 2024 WL 3158532, at *4; *see also Triumph II*, 156 F.4th at 54 (similar holding).[21] Triumph's vagueness complaint about the Turnaround Requirements, Compl. ¶¶ 277-78, was similarly rejected by the First Circuit, which held that Question 3's materially-identical provision "clearly states the standard that pig farms must follow to comply with this requirement" and is "not unconstitutionally vague." *Triumph II*, 156 F.4th at 55. Triumph's assertions about alleged risks of arbitrary enforcement and alleged delays in regulation promulgation also fail to raise viable Due Process claims, for the reasons explained by the State. *See* Dkt. 36-1 at 13-15.

---

[21] Triumph's assertion that this could reach "even the FSIS inspectors" or others with knowledge of a sale strains credulity and the English language. Compl. ¶ 264. To knowingly *engage* in a sale is quite obviously not the same as knowing *of* "the type of pork being sold into the state." *Id.*

**E.      Triumph Has Not Stated a Plausible Import-Export Clause Claim**

As it unsuccessfully tried in Massachusetts, *see Triumph II*, 156 F.4th at 55, Triumph argues that Proposition 12 violates the Import-Export Clause by imposing several "duties." *See* Compl. ¶¶ 287-91. But, as the First Circuit correctly held, "the application of the Import-Export Clause is limited to products imported from foreign countries, not other states." *Triumph II*, 156 F.4th at 55 (citing *Tenn. Wine & Spirits Retail. Ass'n v. Thomas*, 588 U.S. 504, 516 (2019)). Triumph's footnote citation to the dissenting opinion of a single Justice in *NPPC*, Compl. at 51 n.12, does not change that settled law.

**V.      CONCLUSION**

For the foregoing reasons, Proposed Defendant-Intervenors' motion for judgment on the pleadings should be granted.

Dated:  December 3, 2025                    RILEY SAFER HOLMES & CANCILA LLP

                                                          */s/ Bruce A. Wagman*
                                                          Bruce A. Wagman (CSB No. 159987)
                                                          BWagman@rshc-law.com
                                                          RILEY SAFER HOLMES & CANCILA LLP

                                                          *Counsel for Proposed Defendant-Intervenors*

- 23 -

1

**CERTIFICATE OF COMPLIANCE**

2          The undersigned, counsel of record for Proposed Defendant-Intervenors,

3    certifies that this brief contains <u>6,878</u> words, which:

4          <u>X</u> complies with the word limit of L.R. 11-6.1

5

6    Dated:  December 3, 2025                RILEY SAFER HOLMES &
7                                            CANCILA LLP

8                                            <u>/s/ Bruce A. Wagman</u>
9                                            Bruce A. Wagman (CSB No. 159987)
                                             BWagman@rshc-law.com
10                                           RILEY SAFER HOLMES &
                                             CANCILA LLP

11                                           *Counsel for Proposed Defendant-*
12                                           *Intervenors*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28