PATRICIA BALL ALBERTS
CA #229333
L. SCOTT OLIVER
CA #174824
Husch Blackwell LLP
355 South Grand Avenue
Suite 2850
Los Angeles, CA 90071
Telephone: (213) 337-6550
Facsimile: (213) 337-6551
patricia.alberts@huschblackwell.com
scott.oliver@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
RYANN A. GLENN
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com

Attorneys for Plaintiff
TRIUMPH FOODS, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRIUMPH FOODS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and ERICA PAN, in her official capacity as Director of the California Department of Public Health,<br><br>Defendants. | Case No. 2:25-CV-09063-CAS-AJR<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO INTERVENORS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>The Honorable Christina Snyder<br><br>Date: March 2, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 8B (8th Floor)<br>Trial Date: Not Set<br>Action Filed: September 23, 2025 |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 2

    I.    Background Of FMIA .......................................................................... 2

    II.   California's Regulation Of The Interstate Pork Industry .................... 2

LEGAL STANDARD ...................................................................................... 4

ARGUMENT .................................................................................................... 4

    I.    Intervenors' Rule 12(c) Motion Is Premature. ..................................... 4

    II.   Triumph Has Article III Standing. ....................................................... 5

    III.  The Complaint Adequately Alleges FMIA Preemption. ..................... 7

            A.    Proposition 12 is Within the Scope of the FMIA. .................... 8

            B.    The Complaint Alleges that Proposition 12 Impacts Triumph's Operations. ........................................................... 11

            C.    The Complaint Alleges how Proposition 12 Adds To, or Differs From, the Requirements Set Forth in the FMIA. ........ 12

            D.    The Complaint Alleges that Proposition 12 and its Regulations are Preempted by the FMIA's Labeling Provision. ................................................................................ 16

            E.    The Complaint Alleges that Proposition 12 is Impliedly Preempted. .............................................................................. 17

    IV.  The Complaint Alleges A Dormant Commerce Clause Violation. .......................................................................................... 17

            A.    The Complaint's Slaughterhouse Exception Challenge Adequately Alleges a Dormant Commerce Clause Violation. ................................................................................ 18

            B.    The Complaint's "Lead Time Theory" Adequately Alleges a Dormant Commerce Clause Violation. .................... 19

    V.   The Complaint Adequately Alleges A Due Process Clause Claim. ................................................................................................ 21

    VI.  The Complaint Adequately Alleges An Import-Export Clause Claim. ................................................................................................ 21

i

1

CONCLUSION ............................................................................................... 22

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*,
33 F.4th 1107 (9th Cir. 2022) ............................................................................ 7

5

*Augustine v. United States*,
704 F.2d 1074 (9th Cir.1983) ............................................................................ 7

6

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) .......................................................................................... 6

7

*Bassett v. ABM Parking Servs., Inc.*,
883 F.3d 776 (9th Cir. 2018) ............................................................................ 5

8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 4

9

10

*Berg v. Popham*,
412 U.S. 1122 (9th Cir. 2005) .......................................................................... 4

11

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) ............................................................................ 6

12

13

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) .......................................................................... 4

14

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997) ........................................................................................ 22

15

16

*Casumpang v. Int'l Longshoremen's & Warehousemen's Union*,
269 F.3d 1042 (9th Cir. 2001) .......................................................................... 4

17

*Cavel Int'l, Inc. v. Madigan*,
500 F.3d 551 (7th Cir. 2007) .......................................................................... 10

18

19

*Comptroller of Treasury of Md. v. Wynne*,
575 U.S. 542 (2015) ........................................................................................ 22

20

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*,
476 F.3d 326 (5th Cir. 2007) .......................................................................... 10

21

22

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ........................................................................................ 17

23

*Fleming v. Pickard*,
581 F.3d 922 (9th Cir. 2009) ............................................................................ 4

24

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) .......................................................................................... 7

25

26

*Granholm v. Heald*,
544 U.S. 460 (2005) ........................................................................................ 19

27

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................................................................................. 6, 20

28

*Iowa Pork Producers Ass'n v. Bonta,*
    No. 2:21-CV-09940-CAS (AFMX), 2022 WL 613736 (C.D. Cal. Feb. 28,
    2022) ................................................................................................................ 20

*J.G. v. City of Colton,*
    No. 5:18-CV-02386-RGK-SP, 2019 WL 4233582 (C.D. Cal. July 1, 2019) ....... 5

*Jama v. State Farm Mut. Auto. Ins. Co.,*
    113 F.4th 924 (9th Cir. 2024) .......................................................................... 6

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................ 5

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ...................................................................................... 18

*National Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ..............................................8, 9, 10, 11, 12, 16

*S. Dakota v. Wayfair,*
    585 U.S. 162 (2018) ...................................................................................... 18

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................................ 5

*Stiles v. Wal-Mart Stores, Inc.,*
    No. 214CV02234MCECMK, 2017 WL 3783091 (E.D. Cal. Aug. 31, 2017),
    *on reconsideration,* No. 214CV02234MCECMK, 2018 WL 3093501 (E.D.
    Cal. June 20, 2018)......................................................................................... 5

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
    588 U.S. 504 (2019) ...................................................................................... 18

*Triumph Foods, LLC v. Campbell,*
    715 F. Supp. 3d 143 (D. Mass. 2024) ............................................................ 19

*Tyler v. Hennepin Cnty., Minnesota,*
    598 U.S. 631 (2023) ........................................................................................ 6

*United States ex rel. Relator LLC v. Riviera Fin. LLC,*
    No. 2:22-CV-04783-RGK-PD, 2025 WL 1421265 (C.D. Cal. Feb. 6, 2025) ...... 5

**Statutes**

21 U.S.C. § 601(m) ........................................................................... 13, 15
21 U.S.C. § 602 ...................................................................................... 17
21 U.S.C. § 603 ...................................................................................... 13
21 U.S.C. § 604 ...................................................................................... 13
21 U.S.C. § 607 ................................................................................ 14, 16
21 U.S.C. § 678 ........................................................................2, 8, 13, 15
21 U.S.C. §§ 672-673 ............................................................................. 14
21 U.S.C. 610(c)(1).................................................................................. 15
Cal. Health & Safety Code § 25990(b)(2) .................................................... 3
Cal. Health & Safety Code § 25990-25994 .................................................. 2

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

Cal. Health & Safety Code § 25991(e)(1) ................................................. 3
Cal. Health & Safety Code § 25991(e)(3) ................................................. 3
Cal. Health & Safety Code § 25991(o)...................................................... 18
Cal. Health & Safety Code § 2599l(b) ....................................................... 2
Cal. Health & Safety Code §§ 25990-25993.1 .......................................... 3
Cal. Health & Safety Code §§ 25990-25994 ......................................... 2, 18
U.S. Const. art. I, § 8, cl. 3..................................................................... 17

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................... 4
Fed. R. Civ. P. 12(c) ................................................................................ 5

**Regulations**

9 C.F.R. § 309.1..................................................................................... 13
9 C.F.R. §§ 301.2, 309.1-.19................................................................... 13
9 C.F.R. §§ 317.8, 325.1-.21................................................................... 13
Cal. Code Regs. tit. 3, §§ 1322-1327.3.................................................... 4
Cal. Code. Regs. tit. 3, § 1322.8(d) ................................................... 13, 14
Cal. Code. Regs. Tit.3, § 1322.7(c) ................................................... 14, 17

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

## **INTRODUCTION**

Intervenors'[1] motion is premised on a misreading of the Federal Meat Inspection Act ("FMIA") and attempts to dispute facts in the Complaint—a tactic wholly improper at this procedural stage when those facts must be accepted as true. Intervenors have previously (unsuccessfully) disputed Triumph Foods' standing, disregarding the fact that without Triumph Foods' facility and daily adjusted operations to comply with Proposition 12, there would be no compliant pork delivered to California consumers. Such facts easily meet the bar for Article III standing, and further establish FMIA preemption (express and implied), discrimination under the Dormant Commerce Clause, and constitutional violations under the Due Process and Import-Export Clauses. Intervenors' attempted diversion to couch Proposition 12 as an animal welfare law regulating only farm activity ignores the text of the statute, its implementing Regulations, as well as the purpose of the statute as presented to voters concerning, expressly avowing the law's alleged positive impact on food safety.  Food safety *is* a federal issue. The Complaint's detailed allegations are more than sufficient—and certainly not "mere conclusions"—to defeat dismissal under both Federal Rule 12(b)(6) and a prematurely-filed Federal Rule 12(c) motion. The motion should be denied outright.

---

[1]Intervenors consist of Humane World for Animals, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming, Inc., and Animal Outlook.

# BACKGROUND

## I.    Background Of FMIA

Although stated fully in Triumph's opposition to California's motion to dismiss, there are a few items that must be highlighted considering Intervenors' arguments and disregard of the federal system that regulates the meat industry nationwide. The FMIA regulates slaughterhouse operations in interstate and foreign commerce. 34 Stat. 674 (1906); *see also* 34 Stat. 1260 (1907). Further, the Wholesome Meat Act of 1967 substantially amended the FMIA to "provide consumer protection for all citizens, regardless of where their meat originates." H.R. Rep. No. 90-653, pt. 1, at 14 (1967). To further these goals, the FMIA preempts *any* state "requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678.

## II.    California's Regulation Of The Interstate Pork Industry

In November 2008, California passed Proposition 2, a ballot initiative adding §§ 25990-25994 to the California Health and Safety Code. 2008 Cal. Legis. Serv. Prop. 2 ("Proposition 2"); Cal. Health & Safety Code §§ 25990-25994. Proposition 2 prohibited **California farmers** from tethering or confining pregnant pigs in a way that prevented them from "[l]ying down, standing up, and fully extending [their] limbs," or from "[t]urning around freely." *See* Cal. Health & Safety Code §§ 25990, 2599l(b). It had an effective date six years later, January 1, 2015. *See id.*

In 2018, California passed Proposition 12. 2018 Cal. Legis. Serv. Prop. 12 ("Proposition 12"); Cal. Health & Safety Code §§ 25990-25993.1. Proposition 12's purpose was "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California." *See* 2018 Cal. Legis. Serv. Prop. 12 § 1.

Proposition 12 also banned a seller from "knowingly engag[ing] in the sale within the state" of pork meat that the seller "knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Cal. Health & Safety Code § 25990(b)(2). "Confined in a cruel manner" means "[c]onfining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely," *id.* § 25991(e)(1) (the "Turnaround Requirements"), and as of December 31, 2021, "confining a breeding pig with less than 24 square feet of usable floorspace per pig," *id.* § 25991(e)(3) (the "Square Footage Requirements"). Proposition 12 provides an exception for in-state processors to sell non-compliant products directly from their FMIA-regulated facilities, carving out from the definition of "sale" any sale "undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act . . .." *Id.*

Although Proposition 2 allowed in-state processors *six years* to find new pigs and make operational conversions to comply, Proposition 12 took effect immediately for out-of-state processors. As a result of Proposition 2, in-state farmers were already compliant with the Turnaround Requirements, and thus the passage of Proposition 12 gave in-state processors a substantial head start to continue business as usual for sourcing of compliant pigs. *See* ECF No. 1 ¶ 243, n.11. The Turnaround Requirements gave out-of-state processors **a mere six weeks** to comply. *See id.* §§ 25990-25993.1; *see* ECF No. 1 ¶ 244. This forced out-of-state processors to choose whether to sell noncompliant pork or withdraw from California entirely. *Id.* ¶¶ 241-44. The Square Footage Requirements were to take effect on December 31, 2021, three years after its approval. *Id.* In effect, in-state processors had nine years to recover from the impact of the Turnaround Requirements before complying with the Square Footage Requirements, while out-of-state processors suffered the sales loss,

1    financial and operational burdens of implementing both within three years. *Id.*[2]

2                                    **LEGAL STANDARD**

3        A party may move to dismiss a complaint for "failure to state a claim upon

4    which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion must be denied

5    when the plaintiff pleads "enough facts to state a claim to relief that is plausible on

6    its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must

7    accept the complaint's allegations as true, construe the pleading in the light most

8    favorable to the pleading party, and resolve all doubts in the pleader's favor. *Berg v.*

9    *Popham*, 412 U.S. 1122, 1125 (9th Cir. 2005).

10        Under Federal Rule of Civil Procedure 12(c), a party may submit a motion for

11   judgment on the pleadings "after the pleadings are closed—but early enough not to

12   delay the trial." "Judgment on the pleadings is properly granted when there is no

13   issue of material fact in dispute, and the moving party is entitled to judgment as a

14   matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

15   A motion under Rule 12(c) is reviewed under the same standard of review as that

16   of Rule 12(b)(6). *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

17   1047, 1054, n.4 (9th Cir. 2011).

18        As for a Rule 12(b)(1) motion, the moving party "should prevail [on a motion

19   to dismiss] only if the material jurisdictional facts are not in dispute and the moving

20   party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's*

21   *& Warehousemen's Union,* 269 F.3d 1042, 1060-61 (9th Cir. 2001).

22                                      **ARGUMENT**

23   **I.    Intervenors' Rule 12(c) Motion Is Premature**

24        Intervenors' motion is purportedly brought under Rule 12(c). Such motions

25   ─────────────────

26        [2]Proposition 12 also required the CDFA and Department of Public Health
     ("CDPH") to jointly promulgate regulations implementing Proposition 12 by
27   September 1, 2019. On May 28, 2021, the CDFA finally published the delayed draft
     regulations to consider for Proposition 12 (the "Regulations"), becoming final on
28   September 1, 2022. *See* Cal. Code Regs. tit. 3, §§ 1322-1327.3.

may not be brought until the pleadings are closed. *See* Fed. R. Civ. P. 12(c); *see also J.G. v. City of Colton*, No. 5:18-CV-02386-RGK-SP, 2019 WL 4233582, at *2 (C.D. Cal. July 1, 2019)("[A] Rule 12(c) motion is properly brought after an answer has been filed"); *United States ex rel. Relator LLC v. Riviera Fin. LLC*, No. 2:22-CV-04783-RGK-PD, 2025 WL 1421265, at *2 (C.D. Cal. Feb. 6, 2025) (same). Thus, "because Defendants have not filed an Answer, their motion brought under Rule 12(c) is improper." *Stiles v. Wal-Mart Stores, Inc.*, No. 214CV02234MCECMK, 2017 WL 3783091, at *7 (E.D. Cal. Aug. 31, 2017), *on reconsideration*, No. 214CV02234MCECMK, 2018 WL 3093501 (E.D. Cal. June 20, 2018). The Court should dismiss any portion of Intervenors' motion that relies on Rule 12(c) as premature.

## II.    Triumph Has Article III Standing

Intervenors' first argument—that somehow, Triumph does not have Article III standing for this suit—plainly fails and ignores the Complaint's allegations that demonstrate the daily operational impact to Triumph.

First, take injury-in-fact. Injury-in-fact means the "invasion of a legally protected interest [that] is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). A "concrete" injury is one that "actually exist[s]," meaning that it is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). Both "[i]ntangible harms and a 'risk of real harm' can be sufficiently concrete" for these purposes. *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018) (citation omitted). A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo,* 578 U.S. at 340.

Here, the Complaint details that Proposition 12 "continuously impacts the operations and facilities of Triumph . . . on a daily basis[.]" ECF No. 1 ¶ 116. It charges Proposition 12 with a "pervasive, continuous, and ongoing disruption of operations" for FMIA establishments, like Triumph. *Id.* ¶ 126. It describes how

Proposition 12's "costly mandates" have "already imposed enormous costs on Triumph[.]" *Id.* ¶ 133. Indeed, Triumph has imposed "new inventory management tools (e.g., stock keeping units, or bar codes), new sorting procedures, and new cold storage locations to keep each type of product separate." *Id.* ¶ 165. The Complaint details how "Proposition 12 impacts the operations and facilities of Triumph" as it requires Triumph to "remove[] USDA-inspected Whole Pork Meat from their operations and facilities [and forces Triumph to] convert[] the USDA-approved pork to adulterated pork if destined for California." *Id.* ¶ 186. These are classic pocketbook injuries, independently sufficient to support Article III standing. *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023); *Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924, 937 (9th Cir. 2024).

But these compliance costs are not Triumph's only sufficient allegations of injury-in-fact. Triumph has alleged that Proposition 12 disadvantages it relative to its competitors. *See* ECF No. 1 ¶ 11 (describing an exception only available for in-state processors, and that Proposition 12 provided in-state processors more time to comply with Proposition 12); ¶ 235 (describing the "unfair advantage" that Proposition 12 gives to in-state entities, relative to out-of-state entities); ¶¶ 248-49 (Proposition 12 gives in-state processors "express advantages over out-of-state processors like Triumph" as well as "an ongoing, continuous shift in market share to the benefit of in-state processors, and to the detriment of out-of-state processors such as Triumph"). Courts have *routinely* held there is standing to challenge a state law when the law affects the ability to conduct commerce—even if incidentally—on terms coterminous with its competitors. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988) (custom duties which allegedly "put [plaintiff's] films at a competitive disadvantage in the international marketplace" were sufficient for injury-in-fact under a dormant Commerce Clause challenge); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273 (1984) (finding standing where a state law "had both the purpose and effect of discriminating in favor of local products"); *Hunt v.*

*Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) (a state law that "rais[ed] the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected" violated the dormant Commerce Clause).

Seeking to complicate what is otherwise a simple standing question, Intervenors gesture to several docket citations indicating that Triumph uses a third-party to market its pork. *See* ECF No. 49 at 6-7. First, Intervenors provide zero authority for how the Court could even consider these docket citations, which are not referenced in the Complaint. But even if the Court were to consider them,[3] this hyper-technical distinction simply makes no difference to the standing inquiry in light of the injuries affecting Triumph directly. As a matter of law, using a third-party to sell product does not stop a producer of a product from having standing to challenge a ban of that product. *See e.g., Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1120 (9th Cir. 2022) (finding that seller had standing to challenge a state law that banned its product even though its product was sold and delivered through a third-party). And this is for the obvious reason that "cognizable injury from unconstitutional discrimination against interstate commerce does not stop at [whomever] a State ultimately discriminates[.]" *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997).

At bottom, whether Triumph uses another party to market its products or not, a ban of its products will harm its ability to sell those products now and in the future. Thus, it has standing, and the Court should reject any contention otherwise.

## III.    The Complaint Adequately Alleges FMIA Preemption

Intervenors' argument that the Complaint fails to allege that Proposition 12 is

---

[3] If the Court is inclined to consider matters outside of the pleadings on the issue of its standing for this suit, the Court should permit Triumph the opportunity to provide evidence that Triumph is undoubtedly engaging in the pork processing market in California, and is thus negatively impacted by Proposition 12. *See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

preempted by the FMIA fares no better. The FMIA's express preemption clause preempts "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678. Thus, the question of whether Proposition 12 is preempted requires the Court to make the following three key determinations:

- Does Proposition 12 contain requirements that are within the scope of the FMIA?
- Do those requirements concern the premises, facilities, or operations of an FMIA-inspected slaughterhouse?
- Are those requirements additional to, or different from, the FMIA's provisions?

Summarily stated, Intervenors argue that each element for FMIA preemption is inapplicable here; and even if these elements were met, there is a "recordkeeping exception" that saves Proposition 12. In making this argument, however, Intervenors ignore the *direct allegations in the Complaint* and impermissibly contort the so called "recordkeeping" exception. The Court should reject any argument that the Complaint fails to state a claim of FMIA preemption.

### A.    Proposition 12 is Within the Scope of the FMIA.

Intervenors' argument with respect to the "scope" of the FMIA is that the FMIA is concerned only with onsite conditions at a slaughterhouse, whereas Proposition 12 concerns only pig farms, which are upstream from the slaughterhouse. *See, e.g.*, ECF No. 49 at 9-11. Binding Supreme Court precedent rejects this argument.

Indeed, *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012), should be familiar to Intervenors.[4] There, the Supreme Court analyzed a California regulation

---

[4]Intervenors attempted to save the law in *Harris* as well, as the Humane Society of the United States, Farm Sanctuary, Inc., Humane Farming Association

concerning how a slaughterhouse handles a nonambulatory pig, ultimately preventing the carcass of such an animal from being processed and sold within California. 565 U.S. at 460-61. Like Proposition 12, the law banned the purchase, sale, or receipt of a nonambulatory animal or meat from such animals. *Id.* at 462-63. The *Harris* defendants argued the statute could not be preempted by the FMIA because it was only the *sale* of the product that was banned, which occurred "prior to delivery, away from the slaughterhouse itself"; thus, the sales ban did "not involve a slaughterhouse's 'premises, facilities, and operations.'" *Id.* at 462. They further argued the sales ban was not preempted because "[o]nce meat from a slaughtered pig has passed a post-mortem inspection, the [FMIA] 'is not concerned with whether or how it is ever actually sold'" and thus could not affect any onsite operations of the facility. *Id.* at 463. In short, the argument there (recycled here) was that the state law "avoids the scope of the [FMIA], by altogether removing nonambulatory pigs from the slaughtering process" and because the law is "designed to ensure the humane treatment of pigs." *Id.* at 465-66.

The Supreme Court unanimously rejected these arguments. It reasoned that "[t]he idea—and the inevitable effect—of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Id.* at 464. The sales ban was more than just an incentive or motivator; it "functions as a command to slaughterhouses to structure their operations in the exact way the [state law] mandates" and "regulates how slaughterhouses must deal with non-ambulatory pigs on their premises." *Id.* Further, the Supreme Court rejected argument that the law in *Harris* avoided the FMIA's scope because it was designed to ensure humane treatment of pigs, rather than the safety of meat. *Id.* at 466. As a result, the state law was preempted, and to hold otherwise would allow "any State

and Animal Legal Defense Fund were Respondents in *Harris*, also represented by the same counsel here. *Id.*

[to] impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.*

The Supreme Court further rejected the argument that "states are free to decide which animals may be turned into meat" and that the FMIA was not concerned with the types of meat that came into a slaughterhouse. *Id.* at 465 (quotation omitted). The Supreme Court instead reasoned that "one vital function of the [FMIA] and its regulations is to ensure that some kinds of livestock delivered to a slaughterhouse's gates will *not* be turned into meat"; and while "[u]nder federal law, nonambulatory pigs are not among those excluded animals," that was "to say only that [the state law] requirements differ from those of the FMIA—not that [the state law] requirements fall outside the FMIA's scope." *Id.* at 465-66. One could just as easily replace "nonambulatory pigs" with "non-compliant Prop 12 pigs" and the analysis applies just as equally. Thus, Intervenors' argument should be rejected.

Intervenors also argue that this case is similar to a slew of cases upholding wholesale bans of certain types of meat. But those cases are readily distinguishable, because Proposition 12 is *not* a wholesale pork ban. Both *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007), and *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir. 2007), involved wholesale bans on horsemeat, not bans on how horsemeat was produced. As a result, the laws could not have plausibly *added* additional or different requirements to the operations of an FMIA-inspected slaughterhouse, as they would never process horsemeat at all. Accordingly, the Court distinguished these cases in *Harris*, reasoning: "When such a ban is in effect, no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance." *Harris*, 565 U.S. at 467. Here, the exact opposite is true: the sales ban applies to only a subset of pork, and thus a facility must change its operations as if the non-compliant pork meat was "adulterated," as Triumph processes and distributes Proposition 12-noncompliant pork.

In sum, Intervenors disregard binding precedent holding that the FMIA's preemptive effect "sweeps widely" and thus "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Harris*, 565 U.S. at 459-60. Here, Proposition 12 does the exact same thing. As explicitly detailed in the Complaint, "Prop 12's requirements for pigs on the farms, and the sales ban of the processed pork in California, regulations and interferes— through both additional and different requirements—with the sweeping scope of FMIA establishments' operations on a daily, continuous basis." ECF No. 1 ¶ 144. If there is any doubt as to the factual veracity of these allegations, a motion to dismiss, or a motion for judgment on the pleadings, is not an appropriate place for it.

**B.    The Complaint Alleges that Proposition 12 Impacts Triumph's Operations.**

The next element that Intervenors dispute is that Proposition 12's requirements concern the premises, facilities, or operations of an FMIA-inspected slaughterhouse. ECF No. 49 at 11-12. But again, the Court needs only to read the Complaint and apply *Harris* to see where Intervenors' argument goes astray. Again, *Harris* rejected a sales ban that "functions as a command to slaughterhouses to structure their operations in the exact way the [state law] mandates" as preempted by the FMIA. *Harris*, 565 U.S. at 459-60. The Intervenors and proponents in *Harris* also argued that the sales ban didn't explicitly force the slaughterhouse to do anything; instead, it was merely impactful on a slaughterhouse's commercial activities, and that the FMIA does not "usually foreclose state regulation of the commercial sales activities of slaughterhouses." *Id.* at 463 (quotation omitted). But again, the Supreme Court rejected this argument, explaining that "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of

1   the FMIA's preemption provision." *Id.*

2       So too here. The Complaint directly alleges how the sales ban has impacted

3   Triumph. It details how Proposition 12 forces Triumph to "ensure further

4   commingling of Proposition 12 and USDA approved pork does not happen after the

5   processing occurs on the line itself[.]" ECF No. 1 ¶ 165. It alleges that the sales ban

6   "regulates and interferes with" Triumph's "operations on a daily, continuous basis."

7   ECF No. 1 ¶ 144. And it explains how Proposition 12's requirements place new and

8   different burdens on Triumph's operations as required by the FMIA. *See generally*

9   ECF No. 1 ¶¶ 144-210. This Court should not condone California's blatant attempt

10  to circumvent the FMIA in direct contradiction with the U.S. Supreme Court's clear

11  direction in *Harris*.

12      **C.    The Complaint Alleges how Proposition 12 Adds To, or Differs
            From, the Requirements Set Forth in the FMIA.**
13

14      Intervenors' next argument simply disagrees with the factual allegations in

15  the Complaint. As alleged therein, Proposition 12 adds to, or differs from, the

16  requirements set forth in the FMIA in several ways: specifically, "the on-site ante

17  and post-mortem provisions of the FMIA, the transportation and distribution

18  provisions of the FMIA, the labeling provisions of the FMIA, and the recall

19  provisions of the FMIA." ECF No. 1 ¶ 147. And despite Intervenors' contentions

20  otherwise, the Complaint details in explicit detail the federal requirements that

21  Proposition 12 adds to, or differs from. And although these were set out in Triumph's

22  opposition to California's motion to dismiss, several points are worth repeating.

23      First, the Complaint discusses Proposition 12's impact on the FMIA's

24  regulation of operational contracts with Triumph's farmers, which contain terms

25  requiring pigs to be raised and housed consistent with the FMIA requirements

26  imposed on slaughterhouses for hog procurement. *Id.* ¶¶ 148-152. The FMIA

27  directly governs what types of pigs can come into the establishment, and excludes

28  any pig with a condition that is unhealthy, unwholesome, or unfit for human food.

21 U.S.C. § 601(m); *see* 9 C.F.R. §§ 301.2, 309.1-.19. Yet, under Proposition 12, pigs cannot enter the facility to be processed for pork for sale into California, even if the FMIA and FSIS statutory definitions are met.

Second, Proposition 12 imposes additional and different requirements from the FMIA's preliminary and ante-mortem inspections. USDA-appointed inspectors examine and inspect the pigs before pigs enter the establishment to determine which pigs are safe to slaughter. 21 U.S.C. § 603; *see* 9 CFR § 309.1. Yet, Proposition 12 creates new categories within the FMIA's "condemned" and "adulteration" definitions by requiring Triumph to screen out pigs ante-mortem for processing for sales into California. *See* ECF No. 1 ¶¶ 153-58.

Third, Proposition 12 requires Triumph to create new categories of pigs in contradiction to the FMIA's post-mortem provisions. USDA inspectors examine and inspect the pigs post-mortem and during subsequent processing. 21 U.S.C. § 604. Yet, Proposition 12 creates new categories of adulterated pigs that now cannot be processed for sales into California. *See, e.g.*, ECF No. 1 ¶¶ 159-160.

Fourth, Proposition 12 imposes additional changes to title transfer operations already governed by the FMIA. Whereas the FMIA authorizes FSIS inspectors to approve a pig for sale as "USDA passed," the FMIA establishment must now take additional steps for pork sales into California. *See, e.g.*, ECF No. 1 ¶¶ 161-167.

Fifth, Proposition 12 imposes additional transportation requirements on the FMIA establishment. The establishment must comply with USDA sealing requirements for its containers and the carrier trailer itself. *See, e.g.*, 9 C.F.R. §§ 317.8, 325.1-.21; ECF No. 1 ¶ 169. However, Proposition 12's border inspection requirements can only be accomplished by California officials breaking such seals for inspection and potentially tagging product as non-compliant with Proposition 12. *See* Cal. Code. Regs. tit. 3, § 1322.8(d); *see* ECF No. 1 ¶¶ 168-172.

Sixth, the FMIA already governs how meat products are labeled. 21 U.S.C. § 678. USDA inspectors, after inspection is complete, must label the pork product

"Inspected and Passed." 21 U.S.C. § 607. No other labels may go onto packages unless approved by the USDA. 9 C.F.R. § 412.1.2. But now, Proposition 12 expressly adds—while the pork is still in the FMIA establishment's possession and custody—additional markings and tags to USDA-approved meat. *See* Cal. Code. Regs. tit. 3, § 1322.7(c); ECF No. 1 ¶¶ 173-181.

Seventh, Proposition 12 differs and adds to the FMIA's treatment of seizures and tagging. The CDFA will intercept, stop, and tag any product that they have "reasonable suspicion" is in violation of Proposition 12. Cal. Code Regs. tit. 3, § 1322.7(c). This includes USDA inspected, approved, and labeled product. When a tagging or seizure notice is issued, the FMIA establishment is paralyzed and cannot "disturb, move, divert, or offer for sale" the USDA-approved product to any customer or location unless the CDFA gives direction to do so. Cal. Code. Regs. tit. 3, § 1322.8(d). This means the CDFA suspends the product from not just entering California, but also from going to any other state or even returning to the FMIA establishment. *See, e.g.*, ECF No. 1 ¶¶ 182-188.

Lastly, the FMIA contains detailed requirements for establishments to have written recall plans. 21 U.S.C. §§ 672-673; *see also* FSIS Directive 8080.1. If a pork product is deemed adulterated after it leaves the FMIA establishment, there is a federal process to determine whether a FSIS recall should occur. However, Proposition 12 creates a new classification of adulteration, such that if Triumph were to ship non-compliant pork into California or mix non-compliant pork with Proposition 12-compliant pork, it must effectuate a voluntary recall. This forces FSIS-inspected facilities to create new recall policies in addition to what the FMIA requires. ECF No. 1 ¶¶ 189-195.

Rather than address these allegations, Intervenors generally argue that Proposition 12 does not create a new category of what constitutes "adulterated" product. For one, this is in direct contradiction to the factual allegations in the Complaint. *See, e.g.*, ECF No. 1 ¶ 4 ("Proposition 12 creates a new classification of

what pigs qualify as "condemned" and what pork qualifies as "adulterated"); ¶ 86 (same); ¶ 116 (same) ¶¶ 152-164 (same). Nor is such allegation without legal justification; the federal government's amicus brief in *Harris* (which was cited in the main opinion for a related proposition) made this exact point:

> [T]o some extent the FMIA preempts state judgments about what finished meat and meat products are fit for commerce and human consumption, in that the FMIA defines certain conditions that render such products "adulterated" (21 U.S.C. 601 (m)), bans commerce in adulterated products (21 U.S.C. 610(c)(1)), and authorizes concurrent state enforcement on that subject only when "consistent with requirements under [the FMIA]" (21 U.S.C. 678). **[The state law]'s sale ban could reasonably be characterized as an impermissible effort to add a class of adulteration unrecognized in federal law.**

Br. for United States, 2011 WL 3821398, at *17 (emphasis added). If there is any question about whether Proposition 12 creates such a classification, which has never been litigated before now, it should be tested in discovery, not on a motion to dismiss.

Intervenors also make the specious argument that Proposition 12 cannot add to anything the FMIA requires, because the FMIA's use of adulteration does not apply to live pigs. ECF No. 49 at 14. This ignores the simple fact that Proposition 12 bans the sale of pork *meat* and not live pigs. The *meat* is what has now been determined to be adulterated or otherwise unsafe for California consumers' consumption. *That* issue is squarely within the province of the FMIA.

Intervenors also argue that the inventory management measures adopted by Triumph are not requirements of Proposition 12. It is true that Proposition 12 does not explicitly mandate this segregation; but this doesn't matter for purposes of the preemption analysis. Again, the Supreme Court rejected such arguments tied to whether the FMIA foreclosed state regulation of commercial sales activities of

slaughterhouses, explaining that "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the FMIA's preemption provision." *Harris*, 565 U.S. at 464. Just as the sales ban in *Harris* motivated a slaughterhouse's operational choices, causing it to be preempted under the FMIA, Proposition 12 necessitates that Triumph integrate operational choices of inventory management measures in order to comply with Proposition 12. Of course, there is no other possible way Triumph could comply with Proposition 12 and ensure only "compliant" meat is sold in California.

Lastly, Intervenors contend that the procedures that Triumph has undertaken to comply with Proposition 12 are allowed under an exemption that applies for recordkeeping, i.e., the portion of the clause that allows states to "impose recordkeeping and other requirements," if "consistent" with the FMIA. 21 U.S.C. § 678. Plainly, the Complaint describes how these procedures are far more than mere "recordkeeping" actions, and thus the Court should reject this contention.

In sum, the Court should reject Intervenors' arguments that the Complaint fails to allege that Proposition 12 does not add to, or differ from, the FMIA and its regulations.

### D. The Complaint Alleges that Proposition 12 and its Regulations are Preempted by the FMIA's Labeling Provision.

Intervenors also contend that the Complaint fails to allege that Proposition 12 is preempted under the marking and labeling portion of the FMIA's preemption clause. Not so. Per the FMIA, USDA inspectors, after inspection is complete, must label the pork product, "Inspected and Passed." 21 U.S.C. § 607. No other labels may go onto packages unless approved by the USDA. 9 C.F.R. § 412.1.2. But now, Proposition 12 expressly permits state authorities—while the pork is still in the FMIA establishment's possession—to add additional markings and tags to USDA-

approved meat. *See* Cal. Code. Regs. tit. 3, § 1322.7(c); ECF No. 1 ¶¶ 173-181. Intervenors' argument would have this Court simply read out this portion of the Complaint, and its factual characterizations of what is a "label" is not properly litigated on the pleadings alone.

### E.     The Complaint Alleges that Proposition 12 is Impliedly Preempted.

The FMIA's intended purposes are to ensure that meat products are "wholesome, not adulterated," to carry out the "effective regulation of meat and meat food products in interstate [] commerce," and to "protect the health and welfare of consumers." 21 U.S.C. § 602. In the above discussion of express preemption (*see* § I(A), *supra*), Triumph identified the "additional and different" requirements arising from Proposition 12, and those requirements also conflict with the FMIA. As a clear example, under Proposition 12, pork that has passed USDA inspection is now otherwise deemed unfit for human consumption within California, and it cannot be sold. *Id.* This is the definition of a conflict. Indeed, if Proposition 12 is lawful, the upshot is a system where an FMIA establishment could be subject to 50 state preferences as to what type of meat is fit for human consumption, thereby forcing FMIA establishments to implement separate segregation and inspection processes to abide by conflicting state laws. This jams up the interstate meat supply chain, undermining the precise aim of the FMIA. *Cf. Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("[I]f one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme.").

## IV.     The Complaint Alleges A Dormant Commerce Clause Violation

The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has inferred "a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on

the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (citation modified). Under this negative command, state laws that discriminate against out-of-state commerce "face a virtually per se rule of invalidity." *S. Dakota v. Wayfair*, 585 U.S. 162, 173 (2018) (citation modified). Indeed, "if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019).

Proposition 12 runs afoul of the dormant Commerce Clause because it discriminates against Triumph, solely *because* Triumph is an out-of-state processor. This discrimination is apparent in two ways. First, Proposition 12 provides a sales exception only available to in-state processors. Second, Proposition 12 provided a greater runway for in-state processors to become compliant with a resultant market shift to the benefit of in-state processors.

### A.    The Complaint's Slaughterhouse Exception Challenge Adequately Alleges a Dormant Commerce Clause Violation.

Intervenors again twist Triumph's theory and would have this Court avoid the plain allegations in the Complaint. Simply put, Proposition 12 contains a sales exception loophole only available to in-state processors. Proposition 12 bans the *sale* of non-compliant pork *within* California. Cal. Health & Safety Code § 25990 (emphasis added). However, Proposition 12 defines "sale" as "a commercial sale by a business that sells any item covered by this chapter, *but does not include any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act*[.]" Cal. Health & Safety Code § 25991(o) (emphasis added). Further still, Proposition 12 states that "a sale shall be deemed to occur *at the location where the buyer takes physical possession*[.]" *Id.* Thus, Proposition 12 does **not** ban sales of non-compliant pork meat within California, **if** the sale occurs at an FMIA-inspected facility, i.e., if the buyer takes possession

onsite.

Necessarily, the only entity capable of taking advantage of this exception are in-state slaughterhouses, because title transfer of pork meat occurs where the buyer takes possession of the product. *See, e.g.*, ECF No. 1 ¶¶ 233-34. Thus, Triumph would need to open its own California facility to take advantage of this exception. As federal courts recognize, this is a black-letter constitutional violation. *See Triumph Foods, LLC v. Campbell*, 715 F. Supp. 3d 143, 153 (D. Mass. 2024), *aff'd*, 156 F.4th 29 (1st Cir. 2025) (holding the "only way Triumph would be able to take advantage of the slaughterhouse exception would be to open its own federally inspected facility within the [state], which the Supreme Court has held violates the Commerce Clause."); *see also Granholm v. Heald*, 544 U.S. 460, 475 (2005) (a requirement to have the same in-state presence to take advantage of a favorable business practice was illegal and thereby struck).

In conclusion, Triumph's theory can be best summarized in answering two questions. Can approximately 1,084 out-of-state processors sell non-compliant pork in California? **No.** Can the 34 in-state processors sell non-compliant pork in California? **Yes.** That is plain discrimination, and to the extent that California disputes the existence of any such advantage, resolving that disagreement is inappropriate at this stage.

## B. The Complaint's "Lead Time Theory" Adequately Alleges a Dormant Commerce Clause Violation.

As detailed in the Complaint, California processors were afforded six years to adapt their processes to accommodate Proposition 2's impact if they intended to sell locally raised pork within California without utilizing the loophole previously described. *See* ECF No. 1 ¶¶ 238-240. It was only then, well after in-state processors were compliant, that out-of-state processors were also subjected to Proposition 12—and yet, they were only afforded *a few weeks* to become compliant. *See* ECF No. 1 ¶ 241. Thus, in-state processors were given years to "update and alter their

operations, contracts, policies and facilities, and maintain their sales relationships with their California customers." ECF No. 1 ¶ 240. In contrast, Triumph was forced to "scramble" with a resultant "loss of customers . . . as the processors tried to find farms will[ing] to make the investment costs to convert" to product Proposition 12 compliant pork. ECF No. 1 ¶ 242.

Intervenors cite a district court holding that seemingly rejected a "lead time argument" raised in a previous lawsuit challenging Proposition 12. ECF No. 49 at 25-26. That holding is of limited applicability here, and nonbinding as a matter of law. In that litigation, the challenge did not include a pork *processor's* injury. And that distinction leads to substantive factual and legal differences between the two proceedings. For example, the central argument on behalf of farmers was that the disparity in "lead in" time had allowed California farmers to convert their operations in a cheaper manner. *See* ECF No. 1, ECF No. 23 at 19-20, *Iowa Pork Producers Ass'n v. Bonta*, No. 2:21-CV-09940-CAS (AFMX), 2022 WL 613736 (C.D. Cal. Feb. 28, 2022). In contrast, the difference in lead time here has led to a *shift in market share* away from Triumph, and to the sole benefit of in-state processors. *See* ECF No. 1 ¶ 249. This key allegation makes this case more akin to the Supreme Court cases holding that state regulation that shifts market share to the benefit of in-state industry is discriminatory under the dormant Commerce Clause. *See, e.g.*, *Hunt*, 432 U.S. 333 at 351-52 (holding that a state "statute [with] a leveling effect which insidiously operates to the advantage of local apple producers" was unconstitutional). The same is true here.

Intervenors may dispute that this market share shift did not occur, which can be evaluated through discovery. But Intervenors cannot argue, as a legal matter, that Proposition 12's leveling effect is outside the scope of the dormant Commerce Clause. To the contrary, it is exactly why the dormant Commerce Clause exists, and Triumph should be given the opportunity to prove this claim through discovery.

**V.    The Complaint Adequately Alleges A Due Process Clause Claim**

With respect to Triumph's Due Process Clause claim, Intervenors largely recycle the arguments set forth by California in its motion to dismiss. Consequently, Triumph incorporates by reference its response to California's arguments herein. *See* ECF No. 48 at 25-27. Summarized briefly, Proposition 12 does not define what "engaged in" means, and therefore the reach of Proposition 12 is unclear at best and unlimited at worst, conceivably applying to anyone up and down the entire pork supply chain. Moreover, Proposition 12 does not limit the scope of *who "engaged" in that sale*, either. And these ambiguities are only further compounded by Proposition 12's Regulations, which expressly contemplate enforcement against production facilities *upstream* from the end "sale."

Additionally, Proposition 12 is unconstitutionally vague as it defines "sale" as a "commercial sale"; in turn, the Regulations define a "commercial sale," as "to sell, exchange, barter, trade, transfer title or possession, or distribute, conditional or otherwise, *in California commerce." Id.* § 1322(f) (emphasis added). Whether a sale occurred "in California commerce" presents an entirely new vagueness problem, especially applied to an industry like pork production, where essentially all of California's pork is imported.

In sum, Proposition 12 provides no notice of what is actually criminalized. These ambiguities create a risk of arbitrary enforcement, and if there is any factual dispute about those ambiguities or enforcement risk, it is inappropriate to resolve them now.

**VI.    The Complaint Adequately Alleges An Import-Export Clause Claim**

Intervenors' arguments in response to Triumph's Import-Export Clause claim are similar to California's, and thus again, Triumph incorporates its previous argument herein. But summarized shortly, the theory extends a Supreme Court Justice's reasoning that the Import-Export Clause prohibits any State from imposing "any Imposts or Duties on Imports or Exports, except what may be absolutely

necessary for executing" its "inspection Laws" and not in the narrow manner in which its been previously applied concerning foreign goods. Art. I, § 10, cl. 2. *See, e.g.*, *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 573 (2015) (Scalia, J., dissenting); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 621-637 (1997) (Thomas, J., dissenting). Here, as alleged, Proposition 12 conditions the sale of a good on the use of preferred production practices in another State where the good was grown or made. Thus, Proposition 12 imposes a duty or tax on out-of-state goods through its imposition of a particular method of raising pigs more burdensome and more expensive for out-of-state entities. *See, e.g.*, ECF No. 1 ¶¶ 286-87.

## <u>CONCLUSION</u>

WHEREFORE, Triumph respectfully requests the Court deny the motion.

Dated: February 9, 2026.

TRIUMPH FOODS LLC, Plaintiff.

By: */s/ Michael T. Raupp*
L. SCOTT OLIVER
CA #174824
Husch Blackwell LLP
355 South Grand Avenue, Suite 2850
Los Angeles, CA 90071
Telephone: (213) 356-2968
Facsimile: (213) 337-6551
scott.oliver@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
RYANN A. GLENN
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com

*Attorneys for Triumph Foods, LLC*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Triumph Foods, LLC, certifies that this brief contains 6,981 words, which:

<u>X</u> complies with the word limit of L.R. 11-6.1.

Dated: Monday, February 9, 2026

By: */s/ Michael T. Raupp*

PATRICIA BALL ALBERTS
CA #229333
L. SCOTT OLIVER
CA #174824
Husch Blackwell LLP
355 South Grand Avenue, Suite 2850
Los Angeles, CA 90071
Telephone: (213) 337-6550
Facsimile: (213) 337-6551
Patricia.alberts@huschblackwell.com
Scott.oliver@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
RYANN A. GLENN
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com

*Attorneys for Triumph Foods, LLC*

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS