IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

---

TRIUMPH FOODS, LLC,

      Plaintiff,

      vs.

ROB BONTA, et al.,

      Defendants.

DOCKET NO.
2:25-CV-9063-CAS

Los Angeles, California
March 2, 2026
10:03 a.m.

---

**TRANSCRIPT OF HEARING PROCEEDINGS**
**MOTION FOR SUMMARY JUDGMENT**
**MOTION TO DISMISS**

**BEFORE THE HONORABLE CHRISTINA A. SNYDER**
**UNITED STATES DISTRICT JUDGE**

*JANET DAVIS, RDR, FCRR, CRR*
*Federal Official Court Reporter*
*2120 Capitol Avenue, Room 2226, Cheyenne, WY  82001*
*307.433.2154 * jbd.davis@gmail.com*

*Proceedings reported by realtime stenographic reporter;*
*transcript produced with Computer-Aided Transcription.*

APPEARANCES:

For the Plaintiff:          Husch Blackwell LLP
                            BY:  MICHAEL T. RAUPP
                            4801 Main Street, Suite 1000
                            Kansas City,  MO  64112
                            BY:  PATRICIA E. BALL ALBERTS
                            300 South Grand Avenue, Suite 1500
                            Los Angeles, CA  90071
                            BY:  RYANN A. GLENN
                            14606 Branch Street, Suite 200
                            Omaha, NE  68154


For the Defendants:         California Department of Justice
                            BY:  JAMES R. BOWEN
                            300 Spring Street, Suite 1702
                            Los Angeles, CA  90013


For the Intervenor         Humane World for Animals
Defendants Humane          BY:  MELISSA R. ALPERT
World for Animals,         1255 23rd Street NW, Suite 450
et al.:                    Washington, D.C.  20037


For the Intervenor         Greenfire Law PC
Defendants The Center      BY:  JESSICA L. BLOME
for a Humane Economy,      2748 Adeline Street, Suite A
et al.:                    Berkeley, CA  94703

<u>I N D E X</u>

<u>ORAL ARGUMENT</u>                                                <u>PAGE</u>

MOTION FOR SUMMARY JUDGMENT
    Mr. Raupp                                                      5
    Mr. Bowen                                                     17
    Ms. Alpert                                                    24
    Mr. Raupp                                                     28
    Mr. Bowen                                                     30

4

(Proceedings commenced 10:03 a.m., March 2, 2026.)

COURTROOM DEPUTY:  Calling calendar Item 2, CV25-9063, Triumph Foods, LLC, versus Rob Bonta, et al.

Counsel, please state your appearances.

MR. RAUPP:  Good morning, Your Honor.  Michael Raupp, Ryann Glenn, and Patricia Alberts on behalf of plaintiffs.

THE COURT:  Good morning.

MR. BOWEN:  Good morning, Your Honor.  James Bowen on behalf of defendants.

THE COURT:  Good morning.

MS. ALPERT:  Good morning, Your Honor.  Melissa Alpert on behalf of Humane World for Animals, et al., intervenors.

THE COURT:  Good morning.

MS. BLOME:  Good morning, Your Honor.  Jessica Blome for Defendant Intervenors Animal Wellness Action, et al.

THE COURT:  Good morning.

Okay.  I believe you have the tentative.  My apologies that it came late, but I'm ready -- if you're ready, otherwise, if you need more time, we'll go to the next matter and come back to you.

MR. RAUPP:  Plaintiff is ready to proceed, Your Honor.

THE COURT:  Okay, Mr. Raupp.

MR. BOWEN:  Same with defendants, Your Honor.  Thank you.

THE COURT:  All right.  Who wishes to be heard?  I

5

assume you, Mr. Raupp.

MR. RAUPP:  Yeah, we would, Your Honor.  You want me to begin, go first?

THE COURT:  Probably you should.

MR. RAUPP:  Yeah, that makes sense.  Okay.  I'm good with that.

Yes.  We received the tentative.  I wanted to address, I think, a handful of points on -- I'll go kind of sequentially through the claims, as Your Honor did in the tentative.  Of course happy to address any specific questions that Your Honor has.

I will begin on the statute of limitations.  Plaintiff's view is that the continuing violation doctrine establishes the timeliness of each of the plaintiff's claims.  I think the tentative properly addresses that for several, but I want to speak to the Dormant Commerce Clause claim in particular, the one that the Court noted, the lead time theory in particular.

And I think were the claims and allegations limited to just sort of compliance expenses and things of that nature, I think there -- there would be a more likely statute of limitations issue.

Here, however, we've got the allegations that there was a market imbalance that was created by the lead time impact.  And why I think that matters from a timing perspective

6

is because if you look at, for example, the certification requirements that we talk about throughout the complaint, those requirements were delayed by the State until January 1 of 2024, so especially when we're talking about things like market impacts and market imbalance, the timing of that is critical because until those requirements were in place, of course, you wouldn't appreciate the full impact on the market.

Now, I take the State's point that they disagree with this theory; they don't think that the market imbalance was there. I just believe that that's more appropriately addressed after discovery and at summary judgment. They very well may have an argument, be it on the merits, be it even on statute of limitations, but I do think it is one that is fact bound when you look at those allegations related to the market imbalance and the timing of those different events.

So that would be the point with respect to statute of limitations that we would like considered as well.

THE COURT: Okay.

MR. RAUPP: I will turn to the FMIA express preemption claim.

As Your Honor notes, in our view, this claim is controlled by *Harris* and specifically it's the discussion that you have to look to the effect of the challenged state statute in order to determine whether that statute is preempted or not.

Now, here, to be sure -- and the Court noted --

there's a distinction because in this case Prop 12 directly regulates earlier in the supply chain, directly regulates later in the supply chain, so the farms, the sales.  And their argument is because they don't expressly say anything about that middle step, the processing facilities, this can't be preempted, or, said differently, they argue that anything processors are doing is completely voluntary; they don't have to do any of this.

        But that argument collapses when you look at how this has to work in practice, and more importantly for this procedural posture what's alleged in the complaint, because if the State is truly saying that a processor's actions are voluntary, that they don't have to do anything different whatsoever, what would the market look like in that circumstance?  We would receive hogs from all different sources.  Some of them would be compliant with the statute; some of them aren't compliant with the statute, and if Triumph -- if the processor really had to do nothing differently whatsoever, all of those pigs would be processed together through the -- through the production line just as they are now; there would be no differentiation in the processing line; there would be no differentiation in inspection processes, in packaging, in labeling, in anything, and then we would just distribute pork out like we normally do, undifferentiated.  But, of course, that doesn't work for the

entire regulatory scheme of Proposition 12.

And so our point is that the whole regulatory system, and especially the enforcement of Proposition 12, requires that changes are made at the production facilities.  If that doesn't happen, Prop 12 doesn't work.

And if there's any doubt about that, all you need to do is look at the regulations that the State has passed attendant to the statute itself.  Processors are required to certify that they're compliant with Proposition 12, that they are buying product that is compliant.  They're required to have certification on board the trucks themselves when they enter into the state of California.  The regulations include provisions allowing California to inspect the processor facilities themselves.

So in order for Proposition 12 to work, these changes are required at the production facilities.  And, again, if we go back to the language of *Harris*, because this sort of affects base argument, which is what was central in *Harris* as well and what the Court said unanimously, is if what happens -- is what this statute does is function as a command to the processors, then that implicates the FMIA's express preemption provision.

In addition, the argument that processors can simply choose whether or not to participate in the California market, that argument doesn't work either because, of course, that's true in every preemption case.  It is true in *Harris*.  And that

9

isn't the inquiry.  The inquiry is whether the -- again, as I said, the -- whether the State is basing its right to participate in the market on commands that invade the purview of the FMIA.

And so that's the situation that we're in here because, again, Proposition 12 can't function if there aren't requirements imposed at the production facilities.  Otherwise, you're left with undifferentiated pork product, and the State would have no ability whatsoever to regulate what happens on -- on the back end.

THE COURT:  I'm not sure how that argument pertains to express preemption.  Maybe it goes to implied preemption.  I am -- but I'm still not really persuaded because the statutes, as I pointed out, have entirely different purposes.

Go ahead.

MR. RAUPP:  With respect, Your Honor, I would only quibble with one part of that, and that is they don't have entirely different purposes.  While on the one hand, the Court does accurately articulate that prevention of animal cruelty is one provision of the -- of Proposition 12, an express purpose of Proposition 12 is food safety.  And that's entirely the purpose of the FMIA.

So I don't think we can view the animal cruelty portion of this in isolation when, again, it is important to remember, too, that this is a -- this was a proposition passed

by the voters, right, so what the voters were told is that an important application of this statute is food safety.  And that's exactly what the FMIA is designed to do and designed to do so in a uniform fashion across the country.

THE COURT:  I hear what you're saying, but the -- I think the underlying point of Prop 12 is a happier farm animal produces better meat, not unadulterated meat or adulterated meat, which is the problem I have.

MR. RAUPP:  Well, I would say a couple of things to that.

One, Your Honor, I think that would be -- that is a fact question and that would be proper for later portions of the case.  I don't think there's anything in the record that's been submitted on what California meant by food safety when it said it generically and proposed it to the voters.

Secondly, I think *Harris* is instructive on this point, too, because what *Harris* says is if the FMIA -- in the FMIA they could have -- they could have put a contingency in on what happened there with nonambulatory pigs.

So, too, here, if the federal government -- if Congress had the belief that happier pigs on farms led to safer meat, they could have put a provision in the FMIA, but they chose not to.  And it is that choice not to that creates the preemptive effect under the FMIA.

THE COURT:  Okay.  I hear you.  I'm going to reread,

but why don't you move on.

MR. RAUPP: Understood. I appreciate it, Your Honor.

On the implied preemption point, just a very quick point there -- and I think it goes back to that point I was just making about the express purpose of the statute being far broader than just animal cruelty. And, again, on the implied preemption point in particular, I think there's enough there to at least get past a motion to dismiss, because if you look through the detailed allegations in the complaint, again, on this food safety point, of all of the different steps that are taken and required by the FMIA and its regulations to ensure food safety and to ensure, importantly, a uniform system through the country of these food safety provisions, we believe we have enough to at least get through a motion to dismiss on that implied preemption point as well.

THE COURT: Okay.

MR. RAUPP: I'll move to the Dormant Commerce Clause, specifically the slaughterhouse exception, which is the one that was analyzed in detail in the Dormant Commerce Clause portion.

So with respect to the slaughterhouse exception, the argument is that it applies equally on its face and because anyone could take advantage of this provision no matter where they're located. But there's a couple of problems with that.

First -- first, it can't apply equally on its face

because these facilities are all over the country, and so -- and any -- any entity outside of the state of California, if there's a sale made there, of course the California statute doesn't even apply to that sale in the first place.

So I think the relevant inquiry here is for the places in which this statute, Proposition 12, can apply, who has the ability to obtain an exception to this.

And I think, as a matter of logic and as a matter of law, the only entities that can take advantage of that, then, are the entities that are housed within the state of California.

So then that takes us into the -- to the Supreme Court's *Hunt* jurisprudence has been that line of authority that if what is essentially required is a facility to be opened within the state to be on the same footing as in-state processors, that runs afoul of the Dormant Commerce Clause writ large.

And so I think that illustrates the discrimination that's required there. And that's also what Judge Young held in the Massachusetts litigation, so I think those are parallel and I think we should get to the same result.

Now, to be sure, as I said, I think we can plead this just as a direct discrimination claim just as we spoke of here, but I noted in the Court's tentative as well that the -- the invitation to potentially amend to add additional allegations

13

of discrimination writ large in sort of the -- under, I'll call it, *Pike* theory, more a discrimination-based claim. We're happy to plead it in that direction as well because we think we can establish it there, but I just want to make the record clear that we believe that either route is a viable route to a Dormant Commerce Clause theory on this claim.

THE COURT: Okay. Noted.

MR. RAUPP: I appreciate it. I will move to the due process claim briefly.

So here the tentative's analysis, and understandably, focuses on the language of the -- the language of the statute, and that's where the due process concern arises.

That being said, I think the important distinction here is -- are the allegations that it is the statute coupled with the regulations that the State has passed. And I think it is important that no court has analyzed the due process implications of any of the regulations that have been passed yet.

And let me put a little bit of a finer point on it as it relates to specifically what the Court said in the tentative, that the courts that have looked at the "engaged in the sale" language have said, Of course, what we think that means is the people that ultimately sell.

Okay. If that were it, I think that's one thing. But if you look at, then, what the State has adopted -- and I

14

alluded to some of these regulations earlier -- the State is reaching back much farther in the supply chain in terms of where they're regulating, again, requiring compliance of these processing facilities, all of the -- all of the regulations that they've adopted that impact directly the processing facilities.

That's the incongruence that results from, on the one hand, what the courts have said about what that "engaged in the sale" language means, and, on the other hand, what's being applied to these -- these, you know, sort of middle of -- middle-of-the-supply chain processors.  So I think that's the distinction there.

THE COURT:  All right.  Could I interrupt?

Just so we're speaking to the same point, could you identify the regulations or the group of regulations you think are material to the --

MR. RAUPP:  Sure.  So I think we definitely -- and I'm going to get you the specific paragraphs of the complaint, if I can pull it up here.

If you look at paragraphs 107 through 110, those are the CDFA regulations for FMIA establishments, and then 99 through 104 also identifies those additional regulations.  And I think that's it.  But if there are others -- and let me go to the due process section as well.

Yeah.  If you look at paragraphs 261 within the due

process claim, and then it looks like those go through to at least 265 -- no, there's some on 268 and 9 -- it really goes through -- starting at 261 through the balance of the due process claim is where those regulations are identified.

THE COURT:  Okay.  Thank you.

MR. RAUPP:  Finally, just on the import-export clause, as we identified in the complaint, we're pleading that for preservation purposes, so we understand the Court's ruling on the import-export claim.

THE COURT:  Okay.

MR. RAUPP:  And then -- now, the only other point that I wanted to make -- and I mentioned this earlier with respect to the Dormant Commerce Clause claim, the Court's indication that there may be potential additional allegations that would help from a -- from an amendment perspective, the Court identified potentially on the due process claim as well, I think we've stated it as it exists in the petition.

But to the extent we need to put a finer point on these regulatory implications between the statute and the regulations or the as-applied nature of that to the processing facilities in particular, we're happy to do so.

THE COURT:  Okay.  Well, that's what -- up to you. I'm going to hear, obviously, from the State and the intervenors, but I know sometimes in these cases it is the preference of the plaintiff to move the case along to the

16

appellate court, and so --

MR. RAUPP:  You know, Your Honor, I will be candid.  I mean, I think that appellate proceedings, regardless of where the final judgment ends up in this case, are probably inevitable.

That being said, I think there are certain things that we've discussed this morning, not just -- perhaps it is just with respect to amendment -- I don't know where the Court will ultimately land on its tentative, but that do move this case past a motion to dismiss, and we think easily so.

And I do think if you look at, for example, the Massachusetts litigation, several of those claims, albeit a truncated discovery process, were at least adjudicated on the merits after, you know, certain discovery and fact-finding occurred.

And I think that's helpful to understand particularly the impacts that the Dormant -- on the Dormant Commerce Clause claims and also on the preemption aspects too.

So, no, I don't view this just as a vehicle to get to the Court of Appeals.  I think our clients want their day in court, and they believe that there are several of these claims that withstand a motion to dismiss, and that's where we ought to be.

THE COURT:  Okay.  I appreciate that.

Mr. Bowen, are you up next?

MR. BOWEN:  Yes, Your Honor, I'm happy to present.  I will just respond to a few things my colleague raised.  I will go in a similar order in case it is helpful.

I think with regard to the statute of limitations argument about allegations of market imbalance, I mean, I think we -- we agree with the Court's tentative and note in our papers it is not really plausibly alleged.

But I think, more fundamentally, I heard counsel say that was impact of the lead time issue, and that's exactly what the case law says is not sufficient.  It has to be a discrete violation.  I think to the extent it escapes *Byrd* and comes into the zone of *Flint*, that's what it has to be.  And, really, if it continues to be that kind of an impact, there is a bar of statute of limitations.

I think that also would encompass the slaughterhouse exception issue, which I think the term is a bit loose because it is really one definition in the term "sale" as it is.  As counsel is noting, the entire definition deems a sale to occur at the point where the buyer takes physical possession, and Proposition 12 only applies within the state to begin with, so the full definition of sale doesn't apply to any FMIA-regulated facilities.

So I guess sort of leapfrogging that a bit, since it is already there, I think that the slaughterhouse exception itself does place the plaintiff on equal footing with

18

out-of-state producers because it doesn't apply to them either way.

I think that -- pivoting back to sort of the FMIA express preemption argument, I think ultimately -- I agree with the tentative here as well. I think there's -- there's nothing really they've identified, either in the papers or today, that is a legal requirement of Proposition 12 that's within the scope of the FMIA and within the scope of the clause and that is either in addition to a different ban or otherwise conflicts with it.

I think *Harris* may warrant a bit of discussion just given counsel's reliance on it. I think, you know, ultimately that's a different law that dealt with a California statute that told the producers what they had to do within the slaughterhouse. I think Justice Kagan notes throughout that that there was -- I think this is pages 460 to 462 or so -- that there was provisions of that statute that told how the slaughterhouse had to treat the animal when it became nonambulatory at the facility, which "doesn't infrequently happen on the slaughterhouse floor," I think were her words, and also discussed what needed to be done if it was at the time of delivery, which happened at the time it was received at the slaughterhouse.

And, really, this is completely different than a law that says you can't sell a certain type of product within the

19

state because we're not reaching into the slaughterhouse and saying, You have to do X, or, You have to do Y.

I think that the tentative is correct, and, as we argued, this is really a lot of business operations and business preferences that Proposition 12 does not demand that they're really grafting onto it in a way to sort of conjure up this preemption claim.

But if you get down to what the statutes say you have to do and even the regulations say you have to do, they're sort of two ships passing in the night.  They don't really offend each other's scope.

I think the other thing to note here about the segregation argument, I mean, it is not a strict legal requirement.  I credit that, you know, in certain circumstances you may receive things at the same facility.  I mean, strictly speaking, you could have two facilities that do different processing:  One does noncompliant; one does compliant.  I am not saying -- I don't fight the idea you may process both at a facility one way, but in terms of what is a legal requirement or not, that's an example of one that's not required.

And as we note in our papers, it is something that's routinely done.  There's organic processing, non-GMO.  There's something called ractopamine free, I think, in some countries for exports.  So this is not something that's unusual and has not been previously been thought to offend the FMIA.

20

I do want to add about the food safety issue that counsel raised.  That's not what Prop 12 gets at.  And one good example of this -- I think Your Honor has it right on the head, you know, that more humanely raised animals make better meat, but it is not a food safety issue.

The regulation I would cite is 3 California Code of Federal Regulations, Section 1322(f)(4) which permits you to donate noncompliant meat to nonprofits, which can include schools, food pantries.  And the idea that that would be somehow poisonous or putrid in the way that adulterated is defined under the FMIA is just absurd.  I mean, it is just not plausible.

The other thing that I would add in terms of the certification being the key point for the statute of limitations -- and I'm sorry for jumping around.  My handwriting is horrible, so I'm just sort of going with my notes -- but I don't understand that to be a really material backing of any of these claims.  Again, I think at the end of the day what they're challenging is the statute in the ether, particularly as to the Commerce Clause claims.

I guess pivoting to the sort of assertions that there's a lot of fact problems here, I think to the extent we're talking about purposes of legislation, that's not a fact issue; that's something that can be put before the Court on a motion to dismiss briefing, request for judicial notice, and

21

that's considerable as a statutory interpretation matter.

I think also the other issue I wanted to say about the slaughterhouse exception as well, I understand Your Honor is inclined to grant leave to amend for the *Pike* claim.  I don't think that there really is room for one here, though.  I think there's a couple of reasons that we put in our brief and relate to the Ninth Circuit's decision in *Ross*.

And just to be sort of rapid-fire about it, I think there are three things that opinion holds, and I would point the Court to 6 F.4th 1032 to 1033 for this.  But the Ninth Circuit notes that *While compliance costs do not constitute a sufficient burden on in-state commerce --*

(Reporter requested clarification.)

MR. BOWEN:  So the Ninth Circuit held three things in *Ross* that I think are particularly instructive on this issue.

The first is that laws that increase compliance costs do not constitute a sufficient burden on interstate commerce under *Pike*.

The second is that nondiscriminatory regulation that precludes preferred more profitable methods of operation in a retail market is also not sufficient under *Pike*.

And the third, and I think is very important, the panel notes *Exxon versus Maryland*, 1978 case from the Supreme Court, held that a shift from one interstate supplier to another does not constitute a significant burden.

And so all that matters because what the complaint really gets at is this is precluding Triumph from doing a practice that is more profitable for it and it would prefer; it increases its costs in the sense it has to comply with Proposition 12 when it ordinarily would not; and the last bit, which is really the market shift bit, is really based on an out-of-state shift from a different out-of-state producer to another one because, as they note in the opposition -- this is page 27, Docket 48 -- California imports essentially all of its pork.  So even if all of that did cause any sort of issue, the fact that this is entirely import based means that it is a shift from one out-of-state producer to the next and, as such, it can't sustain a *Pike* claim under *Exxon*.

So that's one issue I think that we would, you know, respectfully disagree with the tentative, but otherwise, I think, moving to the due process claim, which I think is the last bit, I don't understand there really to be much room in those regulations that counsel was referring to for injecting ambiguities that are beyond what's already been briefed.

I would also note that in those ranges, just from a quick look on my computer screen, paragraphs 109, 104, 268, and, I believe, 272 have assertions about what those regulations mean.  I haven't really vetted those for accuracy offhand, but it is a bit of a stretch to say that these are now vague regulations but also say they create these issues because

of how they work.  So I just don't think that's internally consistent with the argument.

And just more broadly speaking, I don't think there's really a theory of due process violation here that remains otherwise.  This was legislation that was passed within the normal course of the initiative process.  That's all the due process you are entitled to in a procedural due process claim.

I would cite *Sampson versus City of Bainbridge*, B-A-I-N-B-R-I-D-G-E, *Island*.  That's 683 F.3d 1051 at 1061.  That's a Ninth Circuit 2012 case for that discussion.  And that case also discusses how it is an exceedingly high bar to prove a substantive due process claim in those circumstances because such government action that implicates economic rights affects -- does not implicate a fundamental right and, therefore, it has to be clearly arbitrary, unreasonable, with essentially no relation to public health, safety, morals of general welfare.  I think Prop 12 meets that burden.

I think the *Eleveurs* case -- and I apologize if I am messing up my French there -- that's E-L-E-V-E-U-R-S -- is very instructive on this point.  It is a very similar law from California, very similar challenges, up and down Ninth Circuit three times and was upheld each time.  And that, I think, has good discussion about the State's interest in preventing animal cruelty in it.

I think that's about all I would submit at this point,

24

and I apologize for the droning on.

THE COURT:  Okay.  Ms. Blome, do you have anything you want to add or --

MS. BLOME:  No, Your Honor, the Animal Wellness Action litigants will rest on the briefing and the tentative.  Thank you.

THE COURT:  Who am I missing?  I'm missing -- one of the other intervenor's counsel.

MS. ALPERT:  Ms. Alpert for --

THE COURT:  Yes, Ms. Alpert.  My apologies.

MS. ALPERT:  Not a problem, Your Honor.  Yeah, I just have a few points to make.

So regarding the FMIA preemption arguments that plaintiff is alleging, the First Circuit already heard and rejected basically all of these arguments.

The plaintiff's theory of *Harris* is that *Harris* stands for the proposition that any state law that has some effect on the slaughterhouse is, therefore, preempted by the FMIA, but that is not the holding in *Harris*.  *Harris* specifically divides and draws a line between laws that have some impact on the slaughterhouse but are not actually aimed at the FMIA-regulated activities, namely the slaughter, the inspection processes. And so, for instance, it explained that commercial activities of slaughterhouses are not generally preempted by the FMIA under the express preemption provision or laws that operate out

of remove from the activities most closely regulated by the FMIA such as -- in that case they're talking about the horse meat cases.  Like the horse meat cases, Proposition 12 also operates out of remove from the slaughterhouse because the compliance with the law is determined entirely based on activity that is outside of the slaughterhouse, upstream of the slaughterhouse.  And by the way, the foie gras case kind of had a similar logic in it even though it was a different provision.

The -- I believe that the reason that plaintiff is making this argument is because they're relying on that language in *Harris* about a sales ban, you know, a state law can't disguise an otherwise improper law by calling it a sales ban.  But this is not the kind of law that is operating in that way, so the law in *National Meat* was, of course, a law that was directed at slaughterhouses, FMIA-regulated slaughter decisions.  This is a law that is not directed or aimed at the slaughterhouse at all.  It is aimed at upstream animal cruelty on a farm.

And just to clarify, plaintiff also makes this argument about segregation, which, by the way, the First Circuit and the District of Massachusetts also did not find persuasive because, of course, the plain text of Proposition 12, like the law in that case, does not require slaughterhouses to do anything.

I think it is instructive to note that they are not

pleading that the changes on their -- on their slaughterhouse floor allegedly have anything to do with the FMIA.  They're not pleading that the USDA is being forced to make a different adulteration decision.  They have some legal conclusions in there that Proposition 12 compliance is somehow related to adulteration, which it isn't and which is an entirely legal question.  But they're not alleging that USDA inspectors have to make different calls, because they don't.

Finally, regarding the FMIA -- finally, I believe I heard plaintiff say something alluding to their argument in the briefing about if FMIA doesn't preempt, there's going to be a patchwork; there's going to be 50 different state laws; the slaughterhouses are not going to be complying, and it is going to be completely implausible.

First, they haven't plausibly alleged that because the laws at issue they've been dealing with are very similar, but, more importantly, that is not a problem of the FMIA; that is a problem for Congress.  If plaintiff believes that there is something that as a policy matter is bad for their business operations, then they can go to Congress, much like the court in *Ross* said.

Plaintiffs in that case, you know, had -- obviously had a problem with Proposition 12, and the court said -- the court concluded perhaps plaintiffs are here because they think it would be easier to convince the Supreme Court and the

judiciary than to convince Congress.  But the Supreme Court found in *Ross* -- or discussed in *Ross*, since it wasn't specifically briefed, but there is no preemptive law that would stand in the way of state regulations of food products.  There is no nationally preemptive federal regulation of all meat counters.

Plaintiff was trying to point to the FMIA to do that, but the FMIA's plain language cannot hold that.  The FMIA is a regulation about slaughterhouse inspection, and it -- and it regulates slaughterhouse inspection and it preempts state laws that are aimed at slaughterhouse inspection and slaughter activities in FMIA-regulated facilities, not state laws that are aimed entirely outside of the slaughterhouse at in-state sales and at upstream cruelty on the farm.

And, finally, with respect to the Dormant Commerce Clause, because plaintiff pointed to the Massachusetts case, I would just note that the allegations in the Massachusetts case were different than the allegations here on this particular point in that there is -- here there's a whole set of lead time arguments that say every in-state processor is already compliant, but then at the same time they're alleging that there is this, somehow, benefit to the California slaughterhouses to sell noncompliant meat, even though under their own allegations the California slaughterhouses aren't selling noncompliant meat anyway.

28

That set of facts related to lead time for the processors was not an issue in the Massachusetts case, so that's distinguishing.

THE COURT:  Thank you.

Mr. Raupp, what do you have to say in reply?

MR. RAUPP:  Let me just make a few points, if I may, Your Honor.

I want to go directly to the FMIA express preemption claim.  I -- you know, I think the argument from the State was that we're using these regulations to conjure up a preemption claim.  I mean, if that's the case, then -- and these truly are voluntary decisions that are being made -- if that's the case, then we ought to be able to process pork just as we had before and distribute it in an undifferentiated manner and then the State could regulate however it sees fit.

But, of course, that's not -- that can't work and still regulate under Proposition 12.  The only way the statute can be enforced is if changes are required to be made at the processing facilities.

Now, they say we don't direct exactly what those are. They could open up a new facility; they could do it lots of different ways, but, again, we're dealing with some of the broadest express preemption language found in federal law.  It is not just conflict preemption language.  Remember the language is "different than or in addition to."  So if they're

creating additional requirements, something that has to happen at these facilities, that violates the FMIA. If they're placing additional conditions on what has to happen for -- for the product to -- from when it enters the facility to when it leaves, if they're changing what has to happen -- and the answer to that question has to be yes because we can't do things -- we can't have business as usual as we did before. That's not voluntary.

Finally, on the -- on the food safety point, I do think that to the extent -- I mean, I don't disagree that in the abstract there could be some of that that's submitted on judicial notice or whatever it may be, but I think as we get into what the legislative purpose was, I don't think there is a sufficient record to make that determination now. And I think the important fact is that food safety is at issue here. This isn't just a -- just an animal wellness law. Food safety is expressly in there, and that has to come into play at some level.

The only other point I'll make is on the slaughterhouse exception. At the end of the day the question is who has the ability to sell noncompliant pork. And the only entities that do are facilities within the state of California. And that's -- it is the same analysis that was done in Massachusetts, and as a matter of law it has to be right here.

So those are the points I'd make in rebuttal. If the

30

Court has any other questions, I would be happy to address anything further.

THE COURT:  I think you've covered it.

Anyone else?

MR. BOWEN:  If you will permit it, Your Honor, I could respond real briefly to those points.

THE COURT:  Sure, Mr. Bowen.

MR. BOWEN:  I would say that as far as, you know, just the first point about there needing to be changes in the business and we can't perform business as usual anymore, the focus is what the FMIA tells you what you need to do versus what Proposition 12 tells you you need to do, not whether or not they need to change the business at all.  So I think the focus there is a bit incorrect.

And I think ultimately what we're saying is that these regulations, you know, may have certain ways in which you may need to change your business practices, but that's not something that's running afoul of the FMIA.  That may just be you need to change your business in a certain way to avail yourself of the California market.

The second point, I continue to believe about legislative purposes not being sufficient in this case, I think that is plaintiff's burden as the challenger to the statute and ultimately could have submitted material that supports these claims in connection with their opposition, and they didn't.

Just the last bit with the slaughterhouse exception, I would say all FMIA facilities have the ability to sell noncompliant pork.  The question is, you know, where does that occur?  It occurs on the FMIA-regulated facility, whether in or out of state, and I think it is as simple as that and, therefore, it doesn't discriminate against interstate commerce.

THE COURT:  Okay.  I think I have everyone's arguments in mind.  I'm not persuaded I will change my tentative, but let me go back and reconsider it in light of your arguments, and I will try to have something for you sooner rather than later.  But thank you very much for all of your hard work on this.

MR. RAUPP:  Thank you, Your Honor.  Appreciate your time.

MR. BOWEN:  Thank you, Your Honor.

(Proceedings concluded 10:43 a.m., March 2, 2026.)

**C E R T I F I C A T E**


I, JANET DAVIS, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Diplomate Reporter, Federal Certified Realtime Reporter, and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true and correct transcript.


Dated this 11th day of March, 2026.


/s/ *Janet Davis*

_____

*JANET DAVIS, RDR, FCRR, CRR*
*Federal Official Court Reporter*