PATRICIA BALL ALBERTS
CA #229333
L. SCOTT OLIVER
CA #174824
Husch Blackwell LLP
355 South Grand Avenue
Suite 2850
Los Angeles, CA 90071
Telephone: (213) 337-6550
Facsimile: (213) 337-6551
patricia.alberts@huschblackwell.com
scott.oliver@huschblackwell.com

MICHAEL T. RAUPP (*pro hac vice*)
CYNTHIA L. CORDES (*pro hac vice*)
RYANN A. GLENN (*pro hac vice*)
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com

Attorneys for Plaintiff
TRIUMPH FOODS, LLC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRIUMPH FOODS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and ERICA PAN, in her official capacity as Director of the California Department of Public Health, <br><br> Defendants | Case No. 2:25-cv-09063-CAS-AJR <br><br> **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF[1]** <br><br> **(ACTION SEEKING NATIONWIDE RELIEF)** <br><br> The Honorable Christina Snyder <br> Trial Date: Not Set <br> Action Filed: September 23, 2025 |

---

[1] Plaintiffs are filing this Amended Complaint pursuant to the leave granted by the Court on March 2, 2026. ECF 62. Plaintiffs have amended the causes of action and relevant factual allegations for its Due Process and dormant Commerce Clause claims, as limited by the Court's Order. Plaintiffs have included the remainder of its allegations and claims from its original Complaint (ECF 01) for appellate preservation purposes only.

1

Plaintiff Triumph Foods, LLC ("Triumph" or "Plaintiff"), by and through its counsel of record, for its Amended Complaint for Declaratory and Injunctive Relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Erica Pan, in her official capacity as Director of the California Department of Public Health ("Pan") (collectively, "Defendants"), respectfully states to the Court as follows:

## INTRODUCTION

1.     The United States Congress expressly designated a clear set of rules to govern the procurement, inspection, processing and sale of animals entering the food chain in any state in this country. Those rules begin with the type and category of animal on a farm that a processor can procure (also known as a "slaughterhouse"). The rules then extend to which animals can enter the processing facility, flow through the inspection and processing of the animal, and do not end until the meat is delivered and sold. Congress' rules are outlined in the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 601–695, implemented and regulated through the U.S. Department of Agriculture's Food Safety and Inspection Service ("FSIS").

2.     Yet, California has established a new set of rules, banning the sale of pork from these federal establishments altogether—with the threat of criminal and civil sanctions—unless the federally regulated establishments contract for, purchase, and process California's dictated group of preferred pigs for pork sales in California.

2

AMENDED COMPLAINT

This new set of rules is California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 12" or the "Act").

3.     Proposition 12's impact on these pork processing establishments is immeasurable, banning the sale of USDA-approved pigs and requiring the processing of USDA-approved pigs separately within the facility under the guise of protecting the "health and safety" of Californians.

4.     The federal statute governing meat production has specific terms for the pigs and meat deemed unfit for sale and consumption: "condemned" and "adulterated." Proposition 12 creates a new classification of what pigs qualify as "condemned" and what pork qualifies as "adulterated" for purposes of sales into California, disrupting operations throughout the entire processing establishment.

5.     This California mandate on federally regulated pork processing facilities is preempted and unconstitutional. Without relief from these violations, other states will continue to follow suit, mandating their own unique food preferences and implementing state-by-state rules, continuing interference with the entire Nation's food supply chain.

6.     Specifically, and well over a hundred years ago, Congress enacted the FMIA, which contains an express preemption clause that "sweeps widely" and "prevents a State from imposing any additional or different—even if nonconflicting—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S.

3

AMENDED COMPLAINT

452, 459–460 (2012). Plaintiff expressly preserves its express preemption claim for appellate review.

7. The FMIA makes it clear that the federal government expansively regulates the production and processing of certain kinds of animals, including pigs, destined for interstate commerce. It does so for the safety and stability of our country's food supply chain, as well as the humane treatment of the pigs within the FMIA establishment's premises, facilities, and operations.

8. Yet, despite Congress and the Supreme Court making it clear that laws like Proposition 12 cannot interfere with FMIA establishments' premises, facilities, and operations, the same interest groups that promoted the California ballot initiative unanimously struck down in *Harris* are back at it again, this time enacting legislation and regulations even more broad and expansive than those rejected in *Harris*, shaking up operations across the country in violation of the FMIA.

9. In addition to imposing additional and different obligations on FMIA establishments that are not required by the FMIA, Proposition 12 and its regulations create significant obstacles to accomplish the goals that Congress effectuated by enacting the FMIA.

10. Specifically, Proposition 12 interferes with the production of safe and healthy pork for the Nation. As a result, in addition to the FMIA's express preemption clause, the FMIA also impliedly preempts Proposition 12 and its regulations. Whether express or implied, this pervasive interference with a federally

4

AMENDED COMPLAINT

regulated space is not allowed under the Constitution's Supremacy Clause. Plaintiff expressly preserves its implied preemption claim for appellate review.

11.     Furthermore, in a blatant attempt to dodge federal preemption claims under the FMIA, California expressly provides an exception for in-state processors to sell non-compliant product directly from their federally inspected facilities—an exception that out-of-state processors cannot enjoy. California also provided a decade of lead time for its in-state processors to comply with the Act. This differential treatment is discriminatory and invalid under the dormant Commerce Clause of the United States Constitution.[2]

12.     Proposition 12 and its regulations also inflict a host of due process violations upon Triumph and other FMIA establishments, subjecting FMIA establishments and individuals therein to criminal liability without proper notice and for vaguely defined conduct, which will inevitably lead to deprivations of property and liberty based on little more than a state official's unmitigated discretion. The Regulations promulgated to implement Proposition 12—including their undefined "reasonable suspicion" standard for seizures and the absence of any predicate standard governing CDFA's border inspection program—are independently and facially vague, and are unconstitutionally vague as applied to Triumph.

---

[2]In a separate challenge to Massachusetts' Question 3, which contains the identical exemption referenced here, the District of Massachusetts held the exemption in favor of in-state processors was unconstitutional in violation of the dormant Commerce Clause. *See Triumph Foods, LLC v. Campbell*, 715 F. Supp. 3d 143, ECF No. 125, Feb. 5, 2024 (D. Mass. 2024). While the overall case remains pending on appeal, that ruling remains unchallenged and stands. *See Triumph Foods, LLC v. Campbell*, No. 24-1759 (1st Cir.).

AMENDED COMPLAINT

13. Proposition 12 and its regulations also impose such significant burdens on out-of-state processors to overhaul their daily operations that it violates the Constitution's Import-Export Clause by imposing a duty for out-of-state processors (like Triumph) to access the California marketplace. Plaintiff expressly preserves its Import-Export Clause claim for appellate review.

14. California's unabashed attempt to unilaterally impose sweeping changes across the national pork-production industry, subject out-of-state individuals and FMIA establishments to criminal penalties, and disrupt the interstate pork market responsible for feeding the country, is strictly prohibited under the Constitution. Proposition 12 and its regulations must be declared unconstitutional, and California must be permanently enjoined from any enforcement of Proposition 12.

## PARTIES

15. Triumph Foods is a pork processor and distributor, regulated under the FMIA by the U.S. Department of Agriculture ("USDA") and the Food Safety and Inspection Service ("FSIS"). It is headquartered in St. Joseph, Missouri, and largely receives its supply of pigs from its farmer owners and other independent pig farmers. Triumph processes pigs into pork and the pork is sold directly and indirectly to customers in California. Triumph is also known as a "slaughterhouse" and is one of the largest distributors of pork products in the Nation's supply chain. Triumph contracts with the farmers to obtain, inspect, buy, and process their pigs to create

AMENDED COMPLAINT

pork products. The title to the pork Triumph processes is transferred to customers within the borders of California through Triumph's downstream distribution partners.

16.     Defendant Bonta is the Attorney General of the State of California. Bonta is responsible for the enforcement of Proposition 12 and is sued in his official capacity.

17.     Defendant Ross is the Secretary of the California Department of Food and Agriculture, which is responsible for implementation of Proposition 12. Ross is sued in her official capacity.

18.     Defendant Pan is the Director of the California Department of Public Health, which is responsible for implementation of Proposition 12. Pan is sued in her official capacity.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this complaint for declaratory and injunctive relief pursuant to Fed. R. Civ. P. 57, 28 U.S.C. § 2201, and 28 U.S.C. § 1331.

20.     The Court has authority to enjoin enforcement of Proposition 12's sales ban under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND OF FEDERAL REGULATION OF THE INTERSTATE MEAT PROCESSING INDUSTRY

AMENDED COMPLAINT

22. In 1906, Congress enacted the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 601–695, which established an "elaborate system" of purchasing and inspecting live animals and carcasses in order "to prevent the shipment of impure, unwholesome, and unfit meat and meat-food products." *Pittsburgh Melting Co. v. Totten*, 248 U.S. 1, 4–5 (1918).

23. The FMIA has dual goals: "safe meat and humane slaughter." *Harris*, 565 U.S. at 456; *see also* 21 U.S.C. § 602.

24. Reflecting this purpose, the FMIA contains an express preemption clause: "requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter may not be imposed by any State . . . ." 21 U.S.C. § 678. Importantly, Congress chose not only to preempt state regulation at the facilities themselves, but also any state regulation affecting the full operations across the entire FMIA-regulated establishment.

25. As the Supreme Court has already found, the FMIA "sweeps widely" and "prevents a State from imposing any additional or different—even if nonconflicting—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Harris*, 565 U.S. at 459–460; 21 U.S.C. § 678.

AMENDED COMPLAINT

26. Through the FMIA, Congress designated the U.S. Department of Agriculture ("USDA") and its Food Safety and Inspection Service ("FSIS") as the regulatory body and federal agencies to monitor meat processing.

27. The USDA and FSIS are similarly charged with ensuring that pork processors comply with federal law so that meat is "safe, wholesome, and properly labeled." *See, e.g.*, 21 U.S.C. § 602.

28. Ensuring that pigs do not enter and pork is not delivered from a plant that is at risk for "foodborne illness" is a role specifically assigned to the USDA and FSIS through the Congressionally enacted statutory requirements imposed by the FMIA. *See* 21 U.S.C. §§ 601–695.

29. To become a pork processor that is allowed to process, sell, and ship pork products into and through interstate commerce, the pork processor must be inspected and approved by FSIS through an Application for Federal Inspection and, following inspection, through receipt of a Grant of Inspection. 9 C.F.R. §§ 304.1–304.3. The facility and its operations then become an "FMIA establishment."

30. In the United States, there are approximately 1,118 pork processing facilities inspected and approved by the FSIS; California has 34 of them. *FSIS Inspected Establishments*, available at https://www.fsis.usda.gov/inspection/fsis-inspected-establishments (last visited September 22, 2025).

31. The FSIS is identified as "part of a science-based national system to ensure food safety and food defense. FSIS ensures food safety through the

9

AMENDED COMPLAINT

authorities of the FMIA, the Poultry Products Inspection Act, as well as humane animal handling through the Humane Methods of Slaughter Act." *See About FSIS | Food Safety and Inspection Service*, https://www.fsis.usda.gov/about-fsis   (last visited September 21, 2025).

32.    In addition, the FMIA express preemption clause also preempts "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those" imposed under the FMIA. 21 U.S.C. § 678.

33.    The FMIA requirements for the FMIA establishments' operations begin with the processors' requirements of what pigs they procure from farms, dictate which pigs may enter the processing facility, extend through the processing line, and continue well after the pork leaves the plant. The FMIA, together with its regulations and FSIS directives, govern all of this.

### Pig Procurement

34.    Because the FMIA sets threshold requirements of what qualifies as a pig that will be "condemned" or otherwise would process to pork that is "adulterated," the FMIA establishments' operational teams contract with farms for pigs that will meet these USDA requirements to safely enter the plant for processing. 21 U.S.C. §§ 604, 606, 601(m)(1)–(9).

35.    Triumph, like most plants, has a specific operational department which handles the contracts and the procurement of the USDA qualifying pigs from the farms.

AMENDED COMPLAINT

36.     These contracts are known as Hog Procurement Agreements ("HPAs").

37.     Accordingly, the statutory definition of "adulterated" directly instructs farmers' actions, farming techniques, and the administration of substances with the pigs while the pigs are still on the farms, to ensure the pigs arrive in a form that will qualify for processing. For example, the regulations prohibit the administration of "poisonous or deleterious substances" (21 U.S.C. § 601(m)(1)), "pesticide chemical[s]" (21 U.S.C. § 601(m)(2)(B)), "food additives" (21 U.S.C. § 601(m)(2)(C)), "color additives" (21 U.S.C. § 601(m)(2)(D)), "subjected to radiation" (21 U.S.C. § 601(m)(7)), substances or hormones added for prohibited purposes (21 U.S.C. § 601(m)(8)), any "filthy, putrid, or decomposed substances" or, even more broadly, anything that the farmer has done to make the pig "unsound, unhealthful, unwholesome, or otherwise unfit for human food" (21 U.S.C. § 601(m)(3)).[3]

38.     The prohibited substances and practices apply to what the farmers are doing while the pig is still on the farm, expressly defining which pigs FMIA establishments can purchase for processing and inspection by the USDA at the slaughterhouse, as the establishments can only accept pigs meeting these requirements—both during the ante-mortem and post-mortem phases. 21 U.S.C. § 603; 9 C.F.R. § 302.3.

---

[3]The U.S. Food and Drug Administration ("FDA") also instructs farms on farm antibiotics and feed that may be utilized by farmers for their pigs for use in food-animal production.

11

AMENDED COMPLAINT

39. In fact, the FMIA specifically states these prohibited practices apply "to the live animal or otherwise" when discussing the administration of prohibited substances and practices which deem the pig "unfit for human food." 21 U.S.C. § 601(m)(2)(A).

40. Triumph, like other FMIA establishments, also ensures that its farmers comply with all Food and Drug Administration ("FDA") regulations concerning how the pigs are cared for at the farm through its own contractual requirements with its farmers, thus ensuring that any pig entering the FMIA establishment meets the FDA regulations. For example, Triumph must ensure that its farmers are following FDA drug limit laws because once the pigs arrive at the facility, randomly selected pigs are chosen for testing for drug residue by the USDA officials on site. *See* FSIS Directives 10800.2–10800.3.

41. The FMIA first dictates to its establishments what the farms must do to supply the federal establishment with healthy pigs that will qualify not to be "condemned" but "inspected and passed" and to be processed for pork that is not "adulterated," by specifically defining in the FMIA and the FSIS regulations what qualifies for these excluded categories. 21 U.S.C. §§ 604, 606, 601(m).

42. The FMIA, FSIS, and FDA regulations dictate the requirements that Triumph and FMIA establishments include within the HPAs, and purchases of pigs are only consummated when the pigs arrive and then pass both the ante-mortem and post-mortem inspection processes governed by the FMIA.

**Preliminary Inspections and Ante-Mortem Inspection**

43.    After the qualifying pigs are contracted for and procured according to HPAs that will meet the USDA requirements, the USDA physical inspection process begins outside of the plant to ensure that no pigs enter the facility in violation of those requirements.

44.    Pigs are transported by the farmer to outside the facility via truck or trailer. When the farmer's truck or trailer first arrives, FSIS regulations provide for FSIS-inspected facilities to begin a preliminary phase inspection where they inspect, sort, segregate, and remove unfit animals even before FSIS conducts ante-mortem inspections (9 C.F.R. § 302.3). The unfit animals are sorted out if they will otherwise obviously qualify as "condemned" or would result in "adulterated" pork.

45.    Then, the FSIS performs ante-mortem inspections. 21 U.S.C. § 603(a); *see also* 9 C.F.R. § 309.1, FSIS Directive 6600.1.[4]

46.    Similarly, if the USDA identifies that a pig on a truck is diseased or otherwise meets the qualifying definition of "condemned," then the pig will be euthanized on the truck or segregated from the delivery. *See* 9 C.F.R. § 309.3. Before pigs are even allowed to disembark and unload from a farmer's truck, the USDA is reviewing and inspecting the deliveries of pigs for indications of condemnation or resulting adulteration.

---

[4]Known as the "Voluntary Segregation Program" ("VSP"). FSIS Directive 6100.1; See 9 C.F.R. Part 309; FSIS Directive 6100.1.

13

AMENDED COMPLAINT

47.     After these inspections on the farmers' trucks, the remaining pigs are offloaded into sorting pens that still remain outside the processing area of the FMIA establishment for further ante-mortem inspection by the USDA within the receiving alley.

48.     If not previously disqualified based on the statutory requirements, the pigs then enter the further ante-mortem inspection in the holding pen (or barn), in which the USDA continues observations and sorting.

49.     Pigs that are not immediately identified as condemned and qualify to be euthanized and removed, but are otherwise identified as "suspect," are sorted and set aside to be slaughtered separately from the pigs that pass inspection. 21 U.S.C. § 603(a); 9 C.F.R. §§ 309.1–.19.

50.     Pursuant to this authority, the FSIS has promulgated regulations that specifically detail whether and how to handle pigs being suspected of disease or affected with certain conditions which may meet the definition to qualify to be "condemned": 9 C.F.R. § 309.2; dead, dying, disabled, or diseased pigs, 9 C.F.R. § 309.3; pigs suspected of being infected with specific diseases or other maladies, *see* 9 C.F.R. §§ 309.5, 309.7; how to handle hogs being suspected of having biological residues, 9 C.F.R. § 309.16; and other conditions.

51.     All components of ongoing ante-mortem inspection are for the same purposes—animal care and ensuring that no pig exhibiting signs of disease enters the facility and ends up in the supply chain to the end-consumer. In other words, the

AMENDED COMPLAINT

FMIA extensively regulates what types of pigs may even qualify for entrance into the FSIS-inspected facility, and how those pigs are sorted, segregated, and handled.

### Post-Mortem Inspection

52.     The USDA continues to regulate and inspect the pigs after they have passed ante-mortem inspection, through the slaughter process (monitoring for humane treatment), 21 U.S.C. § 673(b), and after they have entered the FMIA establishment for processing (post-mortem). 21 U.S.C. § 604.

53.     The pigs which qualified for entrance into the processing line—and did not meet the FMIA definition of a pig qualifying to be "condemned"—are now inspected post-mortem to make sure that their meat is not "adulterated." 21 U.S.C. § 601(m).

54.     The USDA continues to inspect at every phase of the pig's further processing, and Triumph's employees assist with these inspections throughout the line by adhering to the USDA's FSIS regulatory requirements. *See generally* 9 C.F.R. § 310.

55.     Specifically, the USDA inspection extends within the FMIA establishment during the entire complex post-mortem inspection phase. During this lengthy phase through the full processing line, USDA inspectors are conducting observations and testing, as well as inspecting and examining the head, viscera, and

carcass for any indication or positive testing of disease, parasites, pathology, or any other signs of qualifying adulteration.[5]

56.    The FMIA mandates that inspectors destroy any of the pigs, carcasses, or parts which cannot be sold into commerce in the presence of the inspector which meet the definition of "adulterated." *Id.*

57.    Title of a particular pig does not transfer from a farmer to a processor and thus, does not qualify as a purchase by Triumph, until the pig and its resulting meat has passed complete and full inspection by the USDA through the full ante-mortem and post-mortem inspections described above.

58.    The sale of the pig from the farmer to the processor is consummated after these USDA condition precedents are met by each pig. At that point, the title passes from the farmer to the processor and the pig is approved for further processing and packing for distribution into interstate commerce, including California.

**Labeling**

59.    In addition to this fulsome and extensive inspection paradigm, the FMIA and FSIS regulatory framework also involves labeling. *See* 21 U.S.C. §§ 606–607.

---

[5]In addition, Inspection Program Personnel ("IPP"), through the FSIS, may decide to test carcasses for inspector-generated sampling under the National Residue Program for meat and poultry products to ensure the farmers were not violating chemical use or exposure requirements at the farm when raising the pigs. *See* FSIS Directives 10800.2–10800.3.

AMENDED COMPLAINT

60.    Not just labeling, but marking, packaging, and ingredient requirements "in addition to, or different than, those made under this chapter may not be imposed by any State" and are expressly preempted under the FMIA. 21 U.S.C. § 678.

61.    To further one of the goals of Congress, the FSIS is charged specifically with developing a labeling policy. The department within FSIS charged with this task is known as the Labeling and Program Delivery Staff ("LPDS"). *See* 9 C.F.R. § 412.1; *see* 21 U.S.C. §§ 606–607.

62.    LPDS functions include, but are not limited to, "performing amenability determinations for FSIS and developing compliance policy guidance for special statements and claims (e.g., animal production raising claims)."[6]

63.    The FMIA also requires food manufacturers to obtain prior approval for labels of meat and poultry products before products may be marketed by either submitting a sketch for approval by the LPDS or through a generic approval by complying with applicable FSIS federal regulations. *Id.*

64.    If a food manufacturer wishes to make a special statement with respect to claims regarding the raising of animals on its label, that special statement and claim must be reviewed by FSIS. 9 C.F.R. § 412.1(e)(1)(iii). No other final label may be used unless approved by FSIS. 9 C.F.R. § 412.1.

---

[6]FSIS Labeling Overview and Generic Label Approval, available at https://www.fsis.usda.gov/sites/default/files/media_file/2021-02/labeling-generic-label-approval.pdf.

17

AMENDED COMPLAINT

65.     The FMIA also regulates the labeling of the pigs during the post-mortem inspection process and if they are "found not to be adulterated shall be marked, stamped, tagged, or labeled as 'Inspected and Passed'; but if found to be adulterated, then the inspectors mark, stamp, tag or label 'Inspected and Condemned.'" 21 U.S.C. § 604.

66.     After processing, the FMIA also regulates the labeling of the pork from those pigs for purposes of communicating to the customer and for the distribution process of the pork in packaging and containers, and if the pork is approved for sale into commerce, then it is also marked "Inspected and Passed." 21 U.S.C. § 607.

67.     The purpose of the FMIA's labeling requirements is to ensure that the adulterated pigs and non-adulterated pigs do not mix, that the adulterated and non-adulterated pork does not mix, and that upon distribution to the customer, the customer is able to see and rely upon the representations of the USDA's handling and inspection that the pork product is in fact healthy, wholesome, and not adulterated.

**Transportation**

68.     The FSIS also oversees the enforcement of regulations connected to the transportation of covered meat products after they leave the FSIS-inspected facility. *See, e.g.*, 9 C.F.R. §§ 325.1–325.

69.     Further, the FMIA and its regulations detail how inspected meat products are to be transported in commerce, including the use of official seals, 9

C.F.R. §§ 325.1, 325.5–.6, and how to handle adulterated or misbranded products, 9 C.F.R. § 325.10.

70.    In addition, FSIS—at its discretion—is authorized to inspect carriers transporting pork products through interstate commerce, regardless of whether the carrier is owned or controlled by an FMIA establishment, as part of the FSIS's general authority to conduct surveillance of meat products traveling through interstate commerce to ensure it is safe for consumption. 9 C.F.R. § 325.1(c).

71.    Moreover, meat being delivered pursuant to the School Lunch Program, which Triumph and many other FMIA establishments participate in to provide high quality pork products to public school systems, require mandated seals on the trucks and containers as specified by the USDA. 9 C.F.R. § 325.16. If the seals are broken, the schools cannot accept delivery. Following this best practice, private customers of Triumph also require intact security seals on the trucks themselves at the point of delivery. If the security seals are broken, the private customers will also reject the Whole Pork Meat product.

### Sales

72.    The FMIA directly regulates the type of processed pork that can be sold and distributed. Indeed, that is the entire purpose of the FMIA. "It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled and packaged." 21 U.S.C. § 602.

AMENDED COMPLAINT

73. Once properly inspected and approved, the FMIA allows the establishments' operational sales teams to sell the pork into the food chain. Those sales are not effectuated, and title is not passed, until the establishment's trucks deliver the pork to the consumer in the receiving customer's state and the customer accepts physical possession. Thereafter, and only at that point, can the pork be "distributed" for human food purposes. *Id.*

**Recalls**

74. FMIA establishments are required to have a written recall plan to govern instances when food becomes adulterated and should be withdrawn from the market. *See* FSIS Final Rule 26929, "Requirements for Official Establishments to Notify FSIS of Adulterated or Misbranded Product, Prepare and Maintain Written Recall Procedures, and Document Certain Hazard Analysis and Critical Control Points System Plan Reassessments" (77 FR 26929).

75. The FMIA regulates the recall process by dictating the components and parameters of what each establishment must have in its Recall Policies and Procedures maintained with FSIS. *Id.*; *see also* FSIS Directive 8080.1.

76. In the event a pork product is deemed adulterated under the FMIA after it leaves the FMIA facility, FSIS guides the FMIA establishment through the process of both determining whether an FSIS recall should be performed, and, if deemed necessary, effectuating the recall. *Id.*

AMENDED COMPLAINT

77.     If the FMIA establishment receives a recommendation to conduct a recall by FSIS but refuses to do so, FSIS may take action in a variety of ways. *Id.* For example, FSIS can issue a public health alert, detain product for up to twenty-one (21) days, seize and condemn products, or even request the Department of Justice to undertake criminal enforcement against the FMIA facility. 21 U.S.C. §§ 672–673.

## BACKGROUND ON PROPOSITION 12

78.     Despite Congress's comprehensive federal oversight over meat production within the country, protein competitors and animal rights organizations such as the Humane Society of the United States falsely informed voters in California that housing conditions of breeding pigs were both inhumane and caused foodborne illness.[7] They used that false narrative to garner ill-informed voter support in California for two ballot campaigns—Prop 2 and Prop 12—to obtain comprehensive nationwide regulation of the interstate pork food supply chain banning the sale of Whole Pork Meat[8] unless certain preferences were met.

---

[7] However, California since acknowledged that no scientific literature links animal housing space allocation, such as cage size, with any type of human food-borne illness, worker safety, environment, viruses and other transmittable diseases, or other human health, or safety benefit. See Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12, Sumner et al., 2011.

[8] "Whole Pork Meat" is defined by Proposition 12 as "any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole pork meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives." Cal. Health & Safety Code Ann. § 25991.

**Ballot Initiative of Proposition 2**

79.     On November 4, 2008, California enacted California Health and Safety Code Section 25990 through ballot initiative Proposition 2, which compelled in-state pig farmers to house their breeding pigs in a manner that permitted the animals to "turn around freely, lie down, stand up, and fully extend their limbs" (subject to limited exceptions) known as the Turn Around Requirements. Cal. Health & Safety Code § 25990(a).

80.     Prop 2 provided in-state producers more than six years to comply with the Turn Around Requirements, as the effective date was set at January 1, 2015. *Id.* While there were only a few California pig farmers, and not near enough to supply the California pork demand, in-state California farmers began conversions for the future implementation of this new state law.

**Ballot Initiative of Proposition 12**

81.     Ten years later, on November 6, 2018, California enacted another amendment to California Health and Safety Code Section 25990–25993 through ballot initiative, Proposition 12. Cal. Health & Safety Code §§ 25990–25994.

82.     But this time, California reached outside the state and enacted and applied the same Turn Around Requirements for out-of-state pig farmers, such that any processor selling pork into California would need to obtain pigs only from farmers who housed their breeding pigs in compliance with Turn Around Requirements.

83.     Unlike the restrictions on California farmers, who had now enjoyed over a ten-year runway, the Turn Around Requirements went into effect almost immediately for out-of-state farmers, just weeks after the enactment on December 19, 2018, and remain in effect now. Cal. Health & Safety Code § 25991(e)(1).

84.     Proposition 12 also added a second set of requirements for both in-state and out-of-state farmers, also requiring Whole Pork Meat sold within California to be the meat of a breeding pig or the meat of immediate offspring of a breeding pig that was housed with at least 24 square feet of usable floorspace per breeding pig (the "Square Footage Requirements"), with a specified effective date of "after December 31, 2021." Cal. Health & Safety Code § 25991(e)(3).[9]

85.     Together, the Turn Around Requirements and the Square Footage Requirements are known as the "Prop 12 Requirements." Both separately and together, each set of requirements creates new categories of what qualifies as a pig which must be "condemned" or otherwise pork which is "adulterated" for an FMIA establishment's pork sales into California.

86.     Proposition 12 is both a criminal and civil statute. The statute imposes criminal exposure on any person or entity found to be in violation of the Prop 12 Requirements, or any provisions of the Act or its regulations, including penalties

---

[9]Specifically, Prop 12 states that a business owner "shall not knowingly engage in the sale within the state" of "[w]hole pork meat that the business owner . . . knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner." Cal. Health & Safety Code Ann. § 25990(b)(2).

23
AMENDED COMPLAINT

against individuals and entities for criminal misdemeanor convictions, a fine of up to $1,000 and/or 180 days imprisonment. Cal. Health & Safety Code § 25993.

87. Importantly, these criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12, as well as any individual who "engage[s] in a sale" of non-compliant Whole Pork Meat in California. Cal. Health & Safety Code §§ 25990(a) and (b)(2).

88. The California Penal Code further permits prosecution of individuals outside the state of California who aid and abet those engaged in the sale of meat in violation of Proposition 12.

89. Indeed, under California Penal Code Section 27(a)(1), "being without this state, cause or aid, advise or encourage, another person to commit a crime within [California], and are afterwards found therein" ... "are liable to punishment under the laws of [California]."

90. Under California Penal Code Section 31, any person aiding and abetting in the commission of a misdemeanor may be charged as a principal of the crime.

91. The California Penal Code also permits prosecution of individuals outside the state of California who conspire to engage in the sale of meat in violation of Proposition 12.

92. Under California Penal Code Section 182, if two or more persons conspire to commit "any act injurious to the public health, the public morals ... or

24

AMENDED COMPLAINT

the due administration of the laws," they could be punished by imprisonment in county jail for up to one year or by a fine not exceeding $10,000 or by both the imprisonment and fine.

93.    Under California Penal Code Section 184, "[n]o agreement amounts to a conspiracy, unless some act, beside such agreement, be done within [California] to effect the object thereof, by one or more of the parties to such agreement ...."

94.    Proposition 12 does not define what it means for an individual to be "engaged in" a sale within the State of California, and by Proposition 12's plain language, an out-of-state processor is potentially subject to criminal prosecution for being "engaged in" the chain of sale of non-compliant Whole Pork Meat in the State of California. Cal. Health & Safety Code §§ 25990(a) and (b)(2).

95.    Additionally, the sale of non-compliant Whole Pork Meat qualifies as unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code. It provides that violators are separately subject to a $2,500 fine per violation under the state Consumer Protection Act. Cal. Health & Safety Code § 25993.

96.    Unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500)

AMENDED COMPLAINT

of Part 3 of Division 7 of the Business and Professions Code. Cal. Bus. & Prof. Code § 17200.

97.     The California Business and Professions Code permits the California attorney general, any district attorney, county counsel, city attorney, city prosecutor, and even any person who can meet standing requirements to file a lawsuit to enforce the provisions of the chapter. Cal. Bus. & Prof. Code § 17203.

**Promulgation of Proposition 12 Regulations**

98.     Proposition 12 also required that the CDFA and Department of Public Health ("CDPH") jointly promulgate rules and regulations to implement Proposition 12 and provide adequate notice of compliance requirements to those subject to Proposition 12 by September 1, 2019.

99.     While this criminal and civil law went into effect—and the CDFA clearly stated it could be enforced at any time—the CDFA did not adhere to this statutory mandate.

100.   The threat of enforcement of the Act remains imminent, as any district attorney, local prosecutor, or the Attorney General's office can criminally indict those selling—or those involved in the food supply chain—into California. Further, the risk of civil enforcement and private-party claims under the California Business & Professions Code were and also remain imminent, ongoing risks.

101.   On May 28, 2021, the CDFA finally published the delayed draft rules and regulations to consider for Proposition 12, one year and nine months past the

AMENDED COMPLAINT

voters' statutory deadline (the "Regulations"). The Regulations became final on September 1, 2022. *See* Cal. Code Regs. tit. 3, §§ 1322–1327.3.

102.   Like the underlying statute, the Regulations were imposed to reach the entirety of the pork supply chain, starting with the farmer that processors contract with to supply pigs, to the meat processor, to the pork distributor, and culminating with the retailer.

103.   This requires Triumph and other out-of-state FMIA-regulated facilities to change their procuring, purchasing, sorting, inspecting, processing, labeling, marking, and transporting at all levels of their establishments and within their operations, from the time the pigs are on the farms to the moment the product is trucked and delivered to customers. These changes are implemented on a daily, continuing basis directly because of Proposition 12 in order for these out-of-state FMIA-regulated facilities to gain access to the California marketplace.

**California's Registration Requirements for FMIA Establishments**

104.   Under the Regulations, any out-of-state pig farmer that is keeping, maintaining, confining, and/or housing a breeding pig for purposes of producing Whole Pork Meat, from the breeding pig or its immediate offspring, for human food for commercial sale in California, shall hold a valid certification issued pursuant to Chapter 5 of the Regulations as a certified operation as of January 1, 2024. *See* Cal. Code Regs. tit. 3, § 1322.1(b).

27
AMENDED COMPLAINT

105.   These farmers—both large farms and family farms—were and remain contracted with Triumph and the other FMIA establishments.

106.   In addition, every FMIA establishment regulated by FSIS from which Whole Pork Meat is sold, distributed, or otherwise supplied to the location of an end-user must, in effect, also:

(1) submit to audit and certification by CDFA or a CDFA-approved third-party certifier on an annual basis;

(2) apply and be approved for registration with CDFA; and

(3) agree to provide the CDFA and/or a certifying agent ongoing, continual "entrance and access to the premises and business records of the facility for purposes of inspection and audit." Cal. Code Regs. tit. 3, §§ 1322.2, 1322.3(b).

107.   While the Regulations attempt to carve out FMIA establishments from "mandatory registration," if the FMIA establishment does not engage in the required annual audit and registration, the alternative is for the FMIA establishment to force its customers to engage in additional resource-intensive steps to maintain an audit trail of the FMIA establishment's facility, including requiring the FMIA establishment's customers to obtain written certifications, maintain records at the customer site of the physical location of the sales, and provide records that can be inspected by the CDFA about the FMIA's facility. Cal. Code Regs. tit. 3, § 1322.8(b).

108.   This leaves Triumph—or any FMIA establishment—with the option of two punitive choices: to waive its Fourth Amendment rights, get an up-front audit, and allow the CDFA or private certifiers ongoing, continual access for entrance and access inside the FMIA-regulated facility for its own, separate and additional inspections; or to force its customers to engage in additional, burdensome steps, deterring the customers from buying pork from these FMIA facilities.

109.   Furthermore, any annual "registration" under Proposition 12 expires 12 months from the date of issue. Cal. Code Regs. tit. 3, § 1322.2. Triumph is registered with the CDFA and must renew its registration annually.

### California's Labeling Required Inside the FMIA Facility

110.   Prop 12 and its Regulations require that if an FMIA establishment is shipping Whole Pork Meat into California for purposes of transshipment, export, donation, or sale to federal agencies or on tribal lands, and such meat is not destined for commercial sale in California, all documents of title, shipping invoices, bills of lading, and shipping manifests shall, upon entrance into the state and during transportation and storage within the state, be marked with the statement "For Export," "For Transshipment," or "Not Prop 12 Compliant." Cal. Code Regs. tit. 3, § 1322.4. This is a requirement for each shipment of pork into California.

### California's Search and Seizure of FMIA Establishment's Product

111.   The CDFA will then intercept, stop, and inspect any product that enters the state for any reason, or no reason at all. Cal. Code Regs. tit. 3, § 1322.6(b). This

accordingly places ongoing and continuous requirements on the FMIA establishment to ensure compliance with Proposition 12 and its Regulations.

112. The CDFA may then tag and seize any product that they have "reasonable suspicion" is in violation of Prop 12 Requirements. Cal. Code Regs. tit. 3, § 1322.7(c).

113. The Regulations provide no definition, criteria, or standards governing what constitutes "reasonable suspicion" in this enforcement context—no factual predicates, documentation requirements, or limiting principles are established to guide CDFA officials in exercising this authority.

114. This expressly includes USDA-inspected, approved, and labeled product on the same "containers," "sub-containers," "lot," or "load" of Whole Pork Meat once it arrives at the border of or in California, while still in the possession of the FMIA establishment if it enters the state on the FMIA establishment's carrier delivery truck.

115. California has directly represented in the statutory language itself that Proposition 12's purpose is to intervene to "protect the health and safety of California consumers" and prevent the "increased risk of foodborne illness." Proposition 12, § 2, as approved by voters, Gen. Elec. (Nov. 6, 2018).

116. Proposition 12 continuously impacts the operations and facilities of Triumph and FMIA establishments generally on a daily basis—removing USDA-inspected Whole Pork Meat from their operations and facilities, and then effectively

30

AMENDED COMPLAINT

converting the USDA-approved pork to designated adulterated pork, unable to be consumed by any customer due to changes in labeling and due to spoilage issues that ultimately result because of the Regulations' impact on FMIA establishment trucks attempting to deliver Whole Pork Meat within California. *See* Cal. Code Regs. tit. 3, § 1322.7.

117.   When a tagging or seizure notice is issued, the FMIA establishment is paralyzed and cannot "disturb, move, divert, or offer for sale" the USDA-approved product to any customer or location unless the CDFA gives direction to do so. Cal. Code Regs. tit. 3, § 1322.8(d). This means the CDFA suspends the product from not just entering the state of California, but also from going to any other state in the country, or even returning to the FMIA establishment, which still has legal possession and title of the product.

118.   An FMIA establishment may request a formal hearing in order to have their product released for sale. Cal. Code Regs. tit. 3, §§ 1322.6(e), 1322.7(e). "[A] respondent may request an informal hearing to contest a notice of adverse determination that seizes or places a hold on covered product pursuant to sections 1320.7, 1321.7, and 1322.7 of this Chapter." Cal. Code Regs. tit. 3, § 1327.1.

119.   Further, "[t]he request for an informal hearing shall be submitted to the Department by electronic mail, facsimile, or by phone within three (3) business days from the date of receipt of the notice of adverse determination." Cal. Code Regs. tit. 3, § 1327.1. Then, "[t]he decision [from the hearing] shall be in writing, issued

31
AMENDED COMPLAINT

within three (3) business days after the conclusion of the hearing, and shall be effective immediately upon issuance." Cal. Code Regs. tit. 3, § 1327.1. At any of these junctures, the USDA-approved whole pork product would spoil.

**California Disruption of FMIA Establishment Sealing**

120.   To inspect the truck during these seizures within California, the CDFA will access the FMIA establishment's carrier truck, breaking the seal to access the product, and rendering it undeliverable to any USDA Food Programs recipient or other California end-user who requires USDA sealing of product prior to delivery. *See* FNS Instruction Shipment and Receipt of USDA Foods, found at https://www.fns.usda.gov/usda-foods/shipment-receipt-goods-instruction-709-5.

121.   This too leads to spoilage issues and food waste because the product must be returned to the FMIA establishment and cannot be utilized for human consumption.

**California Labeling on USDA-Approved and Labeled Product**

122.   Once Whole Pork Meat products are transported into California, the CDFA may also affix a warning tag or notice directly to the containers of Whole Pork Meat that CDFA suspects may have been "produced, packaged, stored, labeled, marked, identified, transported, delivered, or sold in violation of the requirements" of Proposition 12. *See* Cal. Code Regs. tit. 3, § 1322.7. This is true even though the USDA has already inspected, approved, and labeled these containers as USDA-approved and healthy for sale into interstate commerce.

AMENDED COMPLAINT

123.   Again, because of California's stated purpose that Proposition 12 is intended to intervene to "protect the health and safety of California consumers" and prevent the "increased risk of foodborne illness," when forcing FMIA-regulated establishments to label the accompanying documents "Not Prop 12 Compliant," it is directly interfering with the USDA's message that the pork is inspected and approved, and healthy for consumption.

124.   Both the USDA's markings for being inspected and approved and the Regulations' required labeling on delivery documentation are done continuously inside the FMIA establishment prior to shipment outside of the facility. These labeling actions are also allowed without any adjudication but just based on undefined "reasonable suspicion." *See* Cal. Code Regs. tit. 3, § 1322.7(c). The Regulations provide no guidance as to what documentation, records, or circumstances would establish or dispel "reasonable suspicion" in the CDFA's border enforcement context.

125.   The Regulations state that "[a]ny whole pork meat for which a hold notice is issued shall be held by the person having control of the whole pork meat and shall not be disturbed, moved, diverted, or offered for sale except under the specific directions of the Department." Cal. Code Regs. tit. 3, § 1322.7(d).

### Nationwide Economic Disruption

126.   In addition to the pervasive, continuous, and ongoing disruption of operations for an FMIA establishment, Prop 12 also has other impacts.

AMENDED COMPLAINT

127. California, like all states, purchases its pork from multiple suppliers. Due to the highly competitive pork industry, not to mention antitrust constraints, there is no practical or risk-free way, without running afoul of antitrust laws and regulations, for pork competitors to cross-coordinate or allocate their sales by geographic market.

128. This leaves each processor left to try to fulfill its portion of sales to the state on its own.

129. No one processor can fulfill the demand for California, or any other specific state, and the competitors cannot organize together to do so. Furthermore, if certain processors were able to become single-state suppliers, this would only further eliminate competition and result in local market concentration and likely drive up pricing. This has caused massive disruption and burden to out-of-state pork processing efforts due to the infiltration of California's standards in pork processing facilities across the Nation. It has also caused a market-share shift in favor of in-state producers and processors.

130. Proposition 12 and its Regulations, in effect, deny market access to out-of-state pork processors.

131. Through the Act, California is seeking to unilaterally force changes across the national pork processing industry to conform to California's standards.

132. Proposition 12 also threatens the public supply of pork within California, which is necessary to satisfy the needs of the businesses and state

AMENDED COMPLAINT

facilities, including hospitals, schools, prisons, and other public agencies utilizing federal funding and contracts.

133. Proposition 12 will and already has imposed costly mandates that substantially interfere with commerce among the states in pig and Whole Pork Meat markets. And it has already imposed enormous costs on Triumph and other FMIA-regulated establishments, which has and will ultimately lead to a direct impact on the price of pork for all Americans, the vast majority of whom had no say in Proposition 12.

134. Economic research has established that the implementation of Proposition 12 imposed adverse fiscal impacts on residents in California as well as consumers nationwide. California residents comprise a large market of pork consumers who have faced higher pork prices following implementation of Proposition 12. *See* Daniel A. Sumner, Robin Goldstein, Jarrett D. Hart, Hanbin Lee, William A. Matthews & Josue Medellin-Azuara, *Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12*, University of California, Davis and the UC Agricultural Issues Center (July 2, 2020) (prepared for the California Department of Food and Agriculture).

135. Preliminary data suggests that Proposition 12 has caused an average retail price increase of twenty percent for the pork products impacted by Proposition 12. *See, e.g.*, Pork prices may reflect uncertainty around Prop 12, University of California Agriculture and Natural Resources (March 26, 2024),

35

AMENDED COMPLAINT

https://ucanr.edu/blog/food-blog/article/pork-prices-may-reflect-uncertainty-around-prop-12.

136. If enough states pass laws like Proposition 12, Triumph and other FMIA establishments will be forced to further ration their products, stifling the Nation's food supply chain.

**The Slaughterhouse Exception and Its Burden on Interstate Commerce**

137. Proposition 12 defines a "sale" as occurring "at the location where the buyer takes physical possession of" the Whole Pork Meat. Cal. Health & Safety Code § 25991(o).

138. Critically, Proposition 12 expressly excludes from the definition of "sale" "any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act." Cal. Health & Safety Code § 25991(o) (the "Slaughterhouse Exception").

139. Under this Slaughterhouse Exception, a California FMIA-inspected slaughterhouse may sell noncompliant Whole Pork Meat—i.e., pork derived from breeding pigs that do not meet Proposition 12's Turn Around Requirements or Square Footage Requirements—directly from the slaughterhouse's premises in California to a buyer who takes physical possession at that facility, without violating Proposition 12.

140. California has approximately 34 FMIA-inspected establishments, all of which are geographically located within the state and are therefore capable of

utilizing the Slaughterhouse Exception for on-site sales of non-compliant Whole Pork Meat.

141.   Triumph is an FMIA-inspected establishment located in St. Joseph, Missouri. Triumph has no slaughterhouse operations or FMIA-inspected facilities in the State of California.   Accordingly, Triumph, and other out-of-state FMIA-inspected establishments, cannot receive the benefit of the Slaughterhouse Exception on the face of the statute.

142.   Even if the Slaughterhouse Exception were not discriminatory in purpose, the burden it imposes on interstate commerce – measured by the total compliance cost and operational disruption differential borne exclusively by out-of-state FMIA-inspected establishments relative to in-state FMIA-inspected establishments who benefit from the exception – is clearly excessive in relation to any putative local benefit, in violation of the *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) balancing test.

143.   Triumph processes the pork in Missouri and predominantly loads the pork it holds title to onto trucks for transport into California for delivery to the end-user buyer.

144.   As a result, any sale effectuated by Triumph of Whole Pork Meat that enters California necessarily occurs outside of an FMIA-inspected establishment in California. Because Triumph's only FMIA-inspected establishment is located in Missouri, Triumph is therefore structurally and categorically incapable of availing

AMENDED COMPLAINT

itself of the Slaughterhouse Exception for any California sale *unless* Triumph constructs a new brick and mortar FMIA establishment *in* California.

145.   The Slaughterhouse Exception thereby creates a regulatory asymmetry in which California's in-state FMIA-inspected establishments may sell noncompliant Whole Pork Meat on-site at their California facilities without liability, while out-of-state FMIA-inspected establishments like Triumph are subject to the full weight of Proposition 12's compliance requirements for every transaction in which their pork enters California and transfers title to a buyer in California.

146.   This asymmetry imposes a significant and substantial burden on interstate commerce.

147.   For example, out-of-state FMIA establishments like Triumph must ensure that all California-bound pork is sourced exclusively from pigs meeting the Turn Around Requirements and Square Footage Requirements, and that such distinction is maintained throughout all phases throughout the entire supply chain. In-state California FMIA establishments that sell noncompliant pork on-site at their facilities face none of those compliance costs or legal risks for such transactions.

148.   The burden on interstate commerce does not stop at the processor, however. A 2024 USDA Office of the Chief Economist study compared retail pork prices and volumes in California and the rest of the United States for a period preceding Proposition 12 (October 2019 – June 2023) and for 8 months after its partial implementation date (July 2023 – February 2024).  The study attributed the

following price increases in California to the impact of Proposition 12: 41% increase in pork loin prices, 17% increase in pork rib prices, 17% increase in pork shoulder prices, 16% in bacon prices, and 20% increase in fresh ham prices. *See* Written testimony of Ms. Holly Cook, Economist, National Pork Producers Council, "An Examination of the Implications of Proposition 12," United States House Committee on Agriculture (July 23, 2025), *citing* Hawkins, H., Arita, A., and Meyer, S. (2024). Proposition 12 Pork Retail Price Impacts on California Consumers. (ARE Update 27(3): 5–8). University of California Giannini Foundation of Agricultural Economics.

149.   The cited study also showed a sharp decline in pork volume sales in California and a 2-3% decline in California's share of national fresh pork sales during that same time period. *Id.*

150.   Specifically for the out-of-state FMIA processors like Triumph who do not receive the benefit of the Slaughterhouse Exception, USDA Secretary, Brooke L. Rollins submitted written testimony to Congress concerning the economic impact on processors and interstate commerce.  Ms. Rollins provided that "ERS modeling suggests that such segmentation [non-compliant and compliant pork] may increase transaction and distribution costs by $0.07 to $0.11 per pound on compliant pork, compounding inflationary pressure."  In essence, Ms. Rollins provided that "Prop 12 has led to partial segmentation in the national pork market."

https://agriculture.house.gov/uploadedfiles/chrg-119hhrg61829.pdf, last visited March 10, 2026, citing letter from USDA Secretary Ms. Rollins dated July 21, 2025.

151. These compliance costs and operational disruption burdens are substantial, ongoing, and exclusive to out-of-state processors who are FMIA-regulated establishments. Triumph has been required to: (a) renegotiate Hog Procurement Agreements to source only Proposition 12-compliant pigs for California-destined pork; (b) implement and maintain daily segregation procedures and new inventory management systems to separate Proposition 12-compliant pigs and pork from non-compliant pigs and pork throughout the processing line; (c) incur the expense of registering with the CDFA and submitting to annual audits; (d) bear the risk of border inspections, product seizures, and potential spoilage of highly perishable pork products held by the CDFA; and (e) maintain separate cold storage and tracking systems for Proposition 12-compliant product.

152. These costs and operational burdens are borne entirely by out-of-state, FMIA-inspected establishments competing for the California market, while in-state FMIA-inspected establishments retain the ability—under the explicit terms of the Slaughterhouse Exception—to sell noncompliant Whole Pork Meat on-site at their own California facilities without legal exposure under Proposition 12 for such transactions.

153. The Slaughterhouse Exception thereby shifts competitive market share toward California's in-state FMIA-inspected establishments relative to out-of-state

AMENDED COMPLAINT

FMIA-inspected processors like Triumph by effectively reducing the compliance cost burden on in-state sellers for any transactions occurring on their California premises, while leaving out-of-state FMIA-inspected processors to bear the full weight of the compliance regime for all California-bound transactions.

154. This market-share shift has already occurred and is ongoing. The differential compliance burden on out-of-state FMIA-inspected processors has reduced their competitive position in the California pork market relative to in-state processors who retain the ability under the Slaughterhouse Exception to sell noncompliant pork without liability for on-site transactions.

155. This is further supported by a recent USDA study, indicating there is a gap between the amount of Proposition 12 compliant pork coming into California and how much pork residents are eating. The study concluded that the presence of noncompliant pork in the marketplace was a definite possibility. *See* Hannah Hawkins, Shawn Arita & Seth Meyer, *Proposition 12 Pork Retail Price Impacts on California Consumers*, 27 ARE Update 5, 5–8 (2024).

156. There is no legitimate local benefit that justifies this differential treatment. The Slaughterhouse Exception does not advance Proposition 12's stated goals of preventing animal cruelty or protecting California consumers' health and safety; to the contrary, it expressly permits noncompliant Whole Pork Meat—derived from breeding pigs confined in conditions that the Act characterizes as cruel—to be sold within California, so long as the sale happens to occur on-premises

AMENDED COMPLAINT

at a California FMIA establishment. The exception was drafted not to advance any animal welfare or public health purpose, but solely to sidestep federal preemption concerns while simultaneously creating a dormant Commerce Clause discrimination issue. That litigation-avoidance rationale does not constitute a legitimate local interest justifying a significant burden on interstate commerce.

**FIRST CAUSE OF ACTION**

**EXPRESS PREEMPTION BY FEDERAL MEAT INSPECTION ACT**
**(Preserved for Appellate Review)**

157. Plaintiff incorporates the facts set forth in Paragraphs 1–156 as though fully set forth herein.

158. Application of Proposition 12 and its Regulations to FMIA establishments, like Triumph, violates the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

159. The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "supreme Law of the Land." A state may not enact a statute that conflicts with a federal law.

160. The FMIA has an express preemption clause. The FMIA express preemption clause states that "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia ...." 21 U.S.C. § 678.

42

AMENDED COMPLAINT

161.  In addition, the FMIA express preemption clause also preempts "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those" imposed under the FMIA. 21 U.S.C. § 678.[10]

162.  As the Supreme Court held when evaluating the express preemption clause of the FMIA, the clause "sweeps widely" and "preempts a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–460 (2012).

163.  The FMIA has many requirements with respect to the premises, facilities, and operations of FMIA-inspected facilities.

### *Proposition 12's Additional and Different Requirements on the FMIA Establishment*

164.  Prop 12's requirements for pigs on the farms, and the sales ban of the processed pork in California, regulates and interferes—through both additional and different requirements—with the sweeping scope of FMIA establishments' operations on a daily, continuous basis.

---

[10]Although there is a carveout with respect to "articles required to be inspected . . . for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment," 21 U.S.C. § 678, Prop 12 does not reflect any such purpose. This is because Proposition 12, in fact, does not prevent any foodborne illnesses. This is shown by the lack of any scientific literature supporting such an argument, and even Proposition 12 itself, which allows for non-compliant Whole Meat Pork products to be mixed in with combination meat products, such as hotdogs. Cal. Health & Safety Code § 25991(u). If Proposition 12 were truly a health law, it would not allow for such products to be consumed as a combination meat product.

43

165.   Whereas the FMIA clearly defines what pigs cannot be purchased or processed and what pork cannot be sold, by clearly defining what constitutes a "condemned" pig (21 U.S.C. § 606) or "adulterated" pork (21 U.S.C. § 601(m)), Prop 12 directly dictates to the FMIA establishment the pigs it can buy, the pork it can process and the pork it can sell.

166.   A simple review of the FMIA and Prop 12 shows the breadth of California's attempt to have the "inevitable effect" of making sure that slaughterhouses "remove" the prohibited non-compliant pigs from the production process or to "keep them out of the process from the beginning." *Harris*, 565 U.S. at 464.

167.   Prop 12's Requirements are in addition to and different from the on-site ante and post-mortem provisions of the FMIA, the transportation and distribution provisions of the FMIA, the labeling provisions of the FMIA, and the recall provisions of the FMIA.

### *FMIA's Operational Contracts with Farms*

168.   Triumph, like most FMIA establishments, contracts for pigs from farmers via Hog Procurement Agreements ("HPAs"), and these are a part of a slaughterhouse's operations, as obtaining the pigs is vital to keep the plant running and processing pork. The officer at the establishments entrusted with handling procurement and obtaining HPAs is one of the most important and instrumental positions within the operations of the FMIA establishment.

AMENDED COMPLAINT

169.   The FMIA directly governs what types of pigs an FMIA establishment can allow to come into the establishment for processing from the farms, including if the pigs were administered any improper substances or additives that may impact the pig's health or that the Secretary believes makes the pig unfit for human food, or otherwise unhealthy, unwholesome, or unfit for human food. 21 U.S.C. § 601(m).

170.   Thus, when Triumph contracts with its farmers, it requires compliance with these detailed FMIA and related FSIS requirements on the farms—i.e., medications utilized, withdraw times, disease prevention—to ensure that the farmer's supply of pigs entering the facility has met these threshold requirements prior to physical inspection at the facility.

171.   Triumph relies on these HPA contractual commitments to ensure that the establishment maintains processing at full capacity and the pigs are able to enter the facility and be processed into pork.

172.   Yet, under Prop 12, pigs that do not meet California's additional categories for what must qualify as "condemned" or "adulterated" cannot enter or be processed for pork for sale into California, even if the required FMIA and FSIS requirements of these statutory definitions are met.

### *FMIA's Preliminary and Ante-Mortem Inspections*

173.   The FMIA mandates that the Secretary appoint inspectors to examine and inspect the pigs before pigs can even enter the establishment to determine which pigs are safe to slaughter and set aside which of those must be slaughtered separately.

45

AMENDED COMPLAINT

21 U.S.C. § 603. The preliminary and ante-mortem inspection procedure begins on the farmer's trucks to determine which are qualified or not qualified to enter the facility.

174. Yet, Prop 12 creates new categories of the FMIA's "condemned" and "adulteration," thereby requiring Triumph and other FMIA establishments to screen out pigs for processing for sales into California on a daily, continuous basis.

175. Now, pigs not raised in compliance with Proposition 12 must be refused; or at the very least, pigs raised in compliance with Proposition 12 must be separated, and kept separated, from conventional pigs prior to, during, and after the processing process that occurs within the processing facility. Otherwise, the Proposition 12 pigs and the conventional pigs that the Act has predetermined need to be "condemned" as the pork will be "adulterated" for California, and will become unknowingly intermixed prior to entry into the processing facility or throughout the processing line after entering.

176. Whereas these pigs pass USDA ante-mortem inspections, they do not for purposes of the pork processed for sale into California. California attempts to "categorically remove" an entire portion of pigs that the federal government determined successfully passed pre-mortem inspection and examination.

177. Prop 12 pigs are sorted separately, placed in separate pens, and the FMIA establishments and the FSIS inspectors must stop the processing line to allow

for empty spacing and hooks to allow entrance of the pigs which meet the additional California requirements into the plant for processing.

178. Now, Triumph's inspectors are required to sort and separate out the non-compliant pigs from California's Prop 12 pigs, from the moment the pigs arrive at the establishment through the production process—requirements that nowhere appear in the FMIA or its regulations.

### *FMIA's Post-Mortem Inspections*

179. Similarly, the FMIA mandates that the Secretary appoint inspectors to examine and inspect the pigs post-mortem, again inspecting the pigs after they are slaughtered and during subsequent processing for any signs or testing of substances which should not be present or disease which render them adulterated. 21 U.S.C. § 604.

180. Yet, Prop 12 creates new categories of pigs—that otherwise are fully FSIS inspected and passed—that now cannot be processed for sales into California. Whereas these pigs would pass post-mortem inspections, they do not for purposes of pigs to continue to be processed for California. Pigs which fulfill these post-mortem requirements for the FMIA are either removed from the line or never allowed to enter on the line because the establishment knows they will not pass, for purposes of processed pork for California because under California's additional categorical standard, they are "adulterated" and prohibited from any sales into California.

AMENDED COMPLAINT

*Transfer of Title to FMIA Establishment*

181.   The FMIA establishment's purchase of a pig is final only after the pig is inside the FMIA establishment, harvested, and inspected and approved by USDA officials. In other words, the sale of the pig occurs within the premises of the FMIA establishment on the processing line itself.

182.   Yet, once again, whereas the FMIA would authorize the FSIS Inspectors to stamp the pig as approved for sale—triggering the final sale and transfer of title—so the FMIA establishment could proceed to further processing and packaging, the FMIA establishment cannot now complete that sale for the pig if purchasing it for pork sales into California.

183.   Thus, the FMIA establishment is left with the choice not to put it on the line at all or redirect its operations for sales to other states, as even if the pig carcass passes the USDA ante and post-mortem inspections, it cannot continue to be processed for California.

184.   Again, Proposition 12, through its sales ban, dictates to USDA establishments what pigs must be "condemned" or otherwise cannot enter for processing for California as the pork from those pigs will constitute being "adulterated" for California and must be disqualified from the sale inside the plant. California has predetermined for the FSIS-regulated facility that the FSIS-inspected and -approved pigs and pork are actually adulterated, unfit for human consumption, and cannot be distributed to California.

AMENDED COMPLAINT

185.  To ensure further commingling of Proposition 12 and USDA-approved pork does not happen after the processing occurs on the line itself, Triumph has imposed new inventory management tools (e.g., stock keeping units, or bar codes), new sorting procedures, and new cold storage locations to keep each type of product separate.

186.  This, again, is in addition to what the FMIA and its implementing regulations require the FMIA establishment to perform to ensure safe and healthy meat is available for interstate commerce shipment.

187.  Furthermore, since Proposition 12 is a criminal law, and since it effectively requires USDA inspectors to adjust their inspection processes, USDA inspectors will have knowledge of what is compliant with Proposition 12 and what is not. Thus, if an establishment ships non-compliant meat to California, they would be potentially exposed to state prosecution for simply performing their federally regulated jobs.

### *FMIA's Transportation Regulations*

188.  Once the pork is processed, packaged, and labeled, it is loaded onto carrier trucks outside of Triumph's FMIA establishment.

189.  The FMIA establishment already must comply with USDA sealing requirements for its containers inside the carrier trailers, as well as on the exterior of the carrier trailer itself. *See, e.g.*, 9 C.F.R. §§ 317.8, 325.1–325.21.

190. However, Proposition 12 Regulations' inspection requirements facilitate and can only be accomplished by California officials breaking such seals for inspection and potentially tagging product as non-compliant with Proposition 12.

191. For example, if the CDFA decides to inspect Triumph's vehicle transporting Whole Pork Meat into California, including its cargo, the security seal will be broken on the trailer carrying pork products into California. Any trailer that contains a broken seal must then be rejected by the purchaser. Any rejected cargo must be sent back to Triumph's facility in Missouri, resulting in healthy, USDA-passed and -inspected cargo being wasted and downgraded into renderings for animal feed or discarded.

192. And this process occurs during Triumph's continued operations, as Triumph maintains title to the pork products until its carrier delivers the product to the end-user at the place of delivery.

### *FMIA's Labeling Regulation*

193. The FMIA also governs how meat products are to be labeled prior to them leaving the facility for interstate commerce shipment. The FMIA expressly preempts "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under" the FMIA. 21 U.S.C. § 678.

194. The FMIA requires that the USDA inspectors, after inspection is complete, label the pigs slaughtered or the pork product "Inspected and Passed." 21 U.S.C. § 607.

AMENDED COMPLAINT

195.   No other labels may go onto packages unless explicitly approved by the USDA. 9 C.F.R. § 412.1. The FMIA's regulations also define "labeling" as "[a]ll labels and other written, printed, or graphic matter ... upon any article or any of its containers or wrappers, or ... [a]ccompanying such article." 9 C.F.R. § 301.2.

196.   The FMIA requires any such special statements to be approved by the FSIS. If an establishment places a new label, especially one indicating compliance with other laws (i.e., Prop 12 compliant), that must be reviewed by FSIS.

197.   Indeed, FSIS acknowledges it has received labels with claims related to Proposition 12, and FSIS considers those claims to be special claims requiring FSIS label approval before they can be used on labels in commerce. FSIS will not permit these statements on pork labels without further explanation on the label itself, as the label must explain the meaning of the claim with supporting documentation to be submitted with the request for label approval.

198.   First, requiring an FMIA establishment to process pork for California with its own set of requirements, and not label the pork packaged as such at the end of the processing line, is an unreasonable expectation. Most facilities must label or mark it in some fashion so it is not mixed in with the pork the USDA has approved, but which California law disallows.

199.   Worse yet, Prop 12 expressly adds additional state regulations which instruct California officials—while the pork is still in the FMIA establishment's

AMENDED COMPLAINT

possession and custody—to add additional markings and tags to USDA-approved meat. Cal. Code Regs. tit. 3, § 1322.7(c).

200.   When this happens, no one, not even the FMIA establishment, can disturb or remove the tag. Cal. Code Regs. tit. 3, § 1322.7(c).

201.   Under these Prop 12 regulations, the California officials can literally enter the FMIA establishment's carrier trucks—all of which are a part of its operations—and label the pork containers, sub-containers, lots or loads with whatever they want.

### *Seizures and Tagging of the FMIA Establishment's Product*

202.   As a result of Proposition 12, the CDFA will intercept, stop, and search for any reason at all, and then seize and tag any product that enters the state that they have "reasonable suspicion" is in violation of Prop 12. Cal. Code Regs. tit. 3, § 1322.7(c).

203.   This expressly includes already USDA-inspected, -approved, and -labeled product on the same "containers," "sub-containers," "lot," or "load" of Whole Pork Meat once it arrives at the border of or in California, that is inspected, approved, and labeled by the USDA, and while still in the possession of the FMIA establishment if it enters the state on the FMIA establishment's carrier truck.

204.   When a tagging or seizure notice is issued, the FMIA establishment is paralyzed and cannot "disturb, move, divert, or offer for sale" the USDA-approved

AMENDED COMPLAINT

product to any customer or location unless the CDFA gives direction to do so. Cal. Code Regs. tit. 3, § 1322.8(d).

205.   This means the CDFA suspends the product from not just entering the state of California, but also from going to any other state in the country or even returning to the FMIA establishment which still has legal possession and title of the product.

206.   Thus, Proposition 12 impacts the operations and facilities of Triumph, removes USDA-inspected Whole Pork Meat from their operations and facilities, and then converts the USDA-approved pork to adulterated pork, unable to be consumed due to changes in labeling and due to spoilage issues that ultimately result because of the Regulations' impact on FMIA establishment trucks attempting to deliver Whole Pork Meat within California. *See* Cal. Code Regs. tit. 3, § 1322.7.

207.   Notably, the FMIA's preemption clause does contain a concurrent jurisdiction exception for inspections, but it only provides for such state inspections when performed "for the purpose of preventing the distribution for human food purposes" if the product is "adulterated or misbranded"; and if such inspection is done "outside of such an establishment[.]" 21 U.S.C. § 678.

208.   These seizures and inspections that CDFA and California are engaged in are not for purposes of preventing the distribution for human purposes of adulterated or misbranded product, as the product does not meet the FMIA's

definition of "adulterated." California is preempted from changing the FMIA's definition of that term by including any additional or different state requirements.

### *FMIA's Recall Regulations*

209. The FMIA contains detailed requirements for FMIA establishments to have written recall plans to withdraw adulterated product from the market. 21 U.S.C. §§ 672–673. *See also* FSIS Directive 8080.1.

210. FMIA establishments are required to have a written recall plan to govern instances when food becomes adulterated and should be withdrawn, or recalled, from the market. *See* FSIS Final Rule 26929, "Requirements for Official Establishments to Notify FSIS of Adulterated or Misbranded Product, Prepare and Maintain Written Recall Procedures, and Document Certain Hazard Analysis and Critical Control Points System Plan Reassessments" (77 FR 26929).

211. In the event a pork product is deemed adulterated after it leaves the FMIA establishment and unsafe to continue into commerce, FSIS helps the FMIA establishment determine whether an FSIS recall should be performed. And if the FMIA establishment receives a recommendation to conduct a recall by FSIS but refuses to do so, FSIS may take action in a variety of ways. FSIS Directive 8080.1.

212. However, Proposition 12 essentially creates a new classification of adulteration, such that if Triumph were to ship non-compliant pork, or mix non-compliant pork with Prop 12-compliant pork, it would need to effectuate a voluntary

AMENDED COMPLAINT

recall or face criminal and civil exposure, when the FMIA would not require any sort of recall.

213.   This forces FSIS-inspected facilities to create and add new policies and procedures for recalling Proposition 12 Whole Pork Meat in what are now understood to be Prop 12 recall plans or provisions, well outside of—and in addition to—what the FSIS requires for the official recall policy, as these California-triggered effectuated "recalls" are only necessary when the Prop 12 Requirements are not met.

214.   Even the slightest error can result in Proposition 12-compliant and non-compliant pigs being mixed before they enter the FMIA establishment, while being processed inside the facility, or during packaging, and, as a result, a plant has to engage in what is an effectuated voluntary recall to pull back and dispose of any and all pork for which the non-Proposition 12-compliant pork has been mixed in.

215.   And this is no hypothetical. For example, non-compliant pigs erroneously designated as compliant were sorted and processed with compliant pigs at delivery to Triumph, and ultimately, the pork products were shipped, "tainting" all the meat processed together and designated as compliant. When the farmer discovered the error and informed Triumph, the product was already in route for delivery, and thus, Triumph had to "recall" and downgrade all the product or face civil or criminal violations, despite that under the FMIA, the meat was approved for sale, safe for consumption, and no recall was otherwise necessary.

216. In sum, the FMIA requires the USDA to complete and effectuate inspection processes at all stages of pork processing to ensure pork products that enter interstate commerce are not unwholesome or adulterated and thus fit for human consumption.

217. Furthermore, pursuant to the FMIA, the FSIS has promulgated dozens of regulations controlling what type of pig can enter into a slaughterhouse in the first place and what pigs can be contracted and purchased for slaughter. *See, e.g.*, 9 C.F.R. §§ 309.2–.16.

218. In doing so, the FMIA expressly preempts state judgments about what pigs can enter the slaughterhouse, be purchased and sold inside the slaughterhouse, and fit for processing into finished meat products that are fit for commerce and human consumption, in that the FMIA defines certain conditions that render such products "adulterated." *See, e.g.*, 21 U.S.C. § 601.

219. Further, the FMIA bans commerce in adulterated products, 21 U.S.C. § 610, and authorizes concurrent state enforcement on that subject only when "consistent with the requirements under [the FMIA]." 21 U.S.C. § 678.

220. However, Proposition 12, in purpose and effect, adds to, or differs from, the USDA's independent determination of which pigs can enter in a plant and pass examination or inspection: (a) that pigs must be adulterated (or otherwise not used for California) if they do not meet the Prop 12 Requirements; and (b) cause segregation of the pigs outside and inside the FSIS-inspected facility if they do not

meet the Prop 12 Requirements, when no such requirements are found within the FMIA.

221. As such, Proposition 12 represents an ongoing impermissible effort to add a class of adulteration unrecognized under the FMIA. It also predetermines what type of pig an FMIA establishment may accept for processing in the first place, and thus runs afoul of the FMIA's express preemption clause, as it adds additional and/or different requirements and regulations to Triumph's premises, facilities, and operations.

222. As a result of Prop 12, Triumph is required to effectuate a daily wholesale change to its operations and facilities to accommodate state laws like Proposition 12.

223. Thus, Proposition 12's new category of adulterated product has a direct effect on the operations of Triumph's FMIA establishment—in direct interference with the FMIA's requirements and regulations in (a) the registration requirements or alternative options of the FSIS establishment; (b) determination of what pigs can be procured by the plant; (c) what pigs can enter the plant; (d) the sorting and segregation process inside the plant; (e) the sorting and segregation process on the processing line; (f) the sorting and segregation process of the packaged pork; (g) the determination and labeling of "inspected and passed;" (h) the safe and direct transportation of the pork on the establishment's trucks; and (i) the distribution of the pork to the customer for the sale.

224. That Proposition 12 falls precisely within the scope of the FMIA's express preemption clause is shown by its justification, which is redundant and tracks to the FMIA's express purposes: "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the State of California."

225. The constitutional violations under the Supremacy Clause are continuous, ongoing and systemic, as Triumph produces pork to be transported throughout interstate commerce and in California on a daily basis.

226. Plaintiff Triumph is therefore entitled to a judgment declaring that the FMIA, 21 U.S.C. § 601 *et seq.*, and its implementing regulations, preempt Proposition 12 and its Regulations as applied to pigs and pork products derived from those pigs regulated by the FMIA.

227. Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

228. Proposition 12 is preempted by the FMIA, so the statute, as well as all of its implementing regulations, are void and invalid.

229. In addition, the Regulations discussed above are also independently violative of the FMIA's express preemption clause and may be separately invalidated accordingly.

AMENDED COMPLAINT

230.   Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiff requests the Court issue permanent injunctive relief enjoining the Defendants from enforcing Proposition 12 and its Regulations.

## SECOND CAUSE OF ACTION

## IMPLIED PREEMPTION BY FEDERAL MEAT INSPECTION ACT
### (Preserved for Appellate Review)

231.   Plaintiff incorporates the facts set forth in Paragraphs 1–230 as though fully set forth herein.

232.   The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law.

233.   A state law conflicts with federal law and thus is preempted when it interferes with or is an obstacle to the achievement of Congress's full purpose and objectives in enacting a federal law.

234.   The federal government of the United States has a critical interest in overseeing the safety and fitness of meat produced for human consumption throughout the Nation.

235.   In response to this critical interest, Congress enacted the FMIA. The FMIA's purposes, among others, are to ensure that meat products are "wholesome, not adulterated," to carry out the "effective regulation of meat and meat food products in interstate commerce," and to "protect the health and welfare of consumers." 21 U.S.C. § 602.

59

AMENDED COMPLAINT

236.   Reflective of this purpose, the FMIA contains several provisions and regulations promulgated therefrom and which are identified above. As a result of this statutory scheme, the question of whether Whole Pork Meat is fit and appropriate for human consumption is a responsibility delegated and assigned to the USDA and FSIS.

237.   The FMIA's extensive and detailed inspection processes reflect the FMIA's emphasis on ensuring uniformity of such inspections.

238.   However, in contravention to the objectives of Congress reflected by these, and other, provisions, Proposition 12 and its Regulations prohibit a business owner or operator from engaging in the sale of Whole Pork Meat that is the offspring of a breeding pig that was not confined in accordance with the Proposition 12 Requirements.

239.   The FMIA or its associated regulations do not set any type of Turn Around or Square Footage Requirements in the raising of breeding pigs or within the definition of what should constitute an "adulterated" product or in determining what is fit for human consumption.

240.   Proposition 12 thus conflicts and operates as an obstacle to the operations at FMIA-inspected facilities including, but not limited to, the following ways: (a) the registration requirements or alternative options of the FSIS establishment; (b) determination of what pigs can be procured by the plant; (c) what pigs can enter the plant; (d) the sorting and segregation process inside the plant; (e)

AMENDED COMPLAINT

the sorting and segregation process on the processing line; (f) the sorting and segregation process of the packaged pork; (g) the determination and labeling of "inspected and passed;" (h) the safe and direct transportation of the pork on the establishment's trucks; and (i) the distribution of the pork to the customer for the sale.

241. Implementation of Proposition 12 predetermines, from the outset and on the alleged basis of protecting the health of consumers, what pigs are fit for purposes of human consumption. Such predetermination takes the matter out of the hands of the duly appointed federal inspectors in charge of making such decisions.

242. This daily, continuous disruption to the FMIA establishment's operations infringes on the Congressionally delegated authority to the USDA by presenting obstacles to the accomplishment of the intended Congressional goals set forth within the FMIA and prevents USDA-passed and -inspected Whole Pork Meat that is regulated by the FMIA from entering the national marketplace.

243. As a result, Proposition 12 presents an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as set forth in the FMIA by inflicting additional inspection, segregation, labeling and shipping requirements onto the FMIA establishment and creating additional classes of adulterated products that do not exist under the FMIA.

244. Therefore, Proposition 12 is preempted by the FMIA under principles of conflict preemption.

AMENDED COMPLAINT

245. The constitutional violations under the Supremacy Clause are continuous, ongoing and systemic, as Triumph produces pork to be transported throughout interstate commerce and in California on a daily basis.

246. Plaintiff Triumph is therefore entitled to a judgment declaring that the FMIA, 21 U.S.C. § 601 *et seq.*, and its implementing regulations, preempt Proposition 12 and its Regulations as applied to pigs and pork products derived from those pigs regulated by the FMIA.

247. Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

248. Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiff requests the Court issue permanent injunctive relief enjoining the Defendants from enforcing Proposition 12 and its Regulations.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE COMMERCE CLAUSE
### (42 U.S.C. § 1983)

249. Plaintiff incorporates the facts set forth in Paragraphs 1–248 as though fully set forth herein.

250. Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Commerce Clause at Article I, Section 8 of the United States Constitution.

AMENDED COMPLAINT

251. Proposition 12 and its Regulations violate the Commerce Clause, as they discriminate in purpose and in effect against out-of-state processors.

### *The Slaughterhouse Exception*

252. Under the Act and its Regulations, a sale that is undertaken at an establishment at which an inspection is provided under the FMIA is exempted from the Act's prohibitions of a "sale" involving noncompliant Whole Pork Meat. Upon information and belief, this was included in a manifest attempt to avoid claims of FMIA preemption.

253. As a result, in-state processors within California may sell noncompliant Whole Pork Meat from their FMIA-regulated facility if the buyer takes possession of the product at that facility, creating a loophole for in-state processors.

254. In comparison, out-of-state processors cannot have the sale of any noncompliant Whole Pork Meat be excluded from the definition of a "sale" at their facilities because they are not located in California and must transport into the state from out-of-state facilities.

255. The Act and the Regulations confer an advantage to in-state processors over out-of-state processors, forcing out-of-state processors to comply with the Act for sales into California while leaving in-state processors without the requirement for California processors' sales, creating an unfair advantage for in-state processors.

256. This loophole for California, expressly found within the Act and its Regulations, subjects out-of-state processors to an undue, unfair, and discriminatory disadvantage on the face of the Act and its Regulations.

257. The Slaughterhouse Exception also imposes a substantial and significant burden on interstate commerce by subjecting out-of-state processors to regulatory obligations—including full operational compliance with the Turn Around Requirements and Square Footage Requirements for all California-bound pork—from which California's in-state FMIA establishments are exempt for any pork sold on-site at their establishments.

258. This differential regulatory exposure is not merely theoretical. In-state California FMIA establishments, to the extent they process and sell non-compliant pork directly to buyers at their facilities, face no legal exposure under Proposition 12 for those transactions. Out-of-state FMIA-regulated processors like Triumph that supply California's market bear the full compliance cost and operational burden of ensuring that all pork destined for California is produced from pigs meeting the Turn Around Requirements and Square Footage Requirements across their entire supply chain.

259. These compliance costs and operational burdens are substantial and ongoing. Triumph has been required to: (a) renegotiate Hog Procurement Agreements to source only Proposition 12-compliant pigs for California-destined pork; (b) implement and maintain daily segregation procedures and new inventory

AMENDED COMPLAINT

management systems to separate Proposition 12-compliant pigs and pork from non-compliant pigs and pork throughout the processing line; (c) incur the expense of registering with the CDFA and submitting to annual audits; (d) bear the risk of border inspections, product seizures, and potential spoilage of highly perishable pork products held by the CDFA; and (e) maintain separate cold storage and tracking systems for Proposition 12-compliant product.

260.   These costs and operational burdens are borne exclusively by out-of-state FMIA-inspected processors competing for the California market, while in-state FMIA establishments retain the ability—under the explicit terms of the Slaughterhouse Exception—to sell noncompliant Whole Pork Meat on-site, free from liability.

261.   The Slaughterhouse Exception thereby shifts competitive market share toward in-state California processors relative to out-of-state processors like Triumph by relaxing Proposition 12's compliance requirements for in-state sellers while imposing the full weight of those requirements on out-of-state sellers.

262.   This market-share shift is concrete and measurable. The Slaughterhouse Exception reduces the competitive cost and operational burden on California's in-state FMIA establishments for any sales occurring at those facilities, while leaving out-of-state processors—who account for the vast majority of the pork supplied to California—to bear the entire cost and operational burden to ensure compliance for all California-bound transactions.

263.   There is no legitimate local benefit that justifies this differential treatment. The Slaughterhouse Exception's stated rationale—avoiding FMIA preemption concerns—does not constitute a legitimate health, safety, or animal welfare justification. The exception was not drawn to advance any animal welfare objective; it was drawn precisely because the drafters acknowledged that imposing requirements on on-site FMIA establishment sales would create federal preemption issues. The resulting exemption advantages in-state economic actors at the expense of out-of-state competitors without any offsetting animal welfare or public health benefit, since noncompliant pork may still be sold within California under the exception.

264.   Furthermore, the local benefits of Proposition 12's overall framework—to the extent they exist—do not justify the specific discriminatory burden created by the Slaughterhouse Exception, which does not advance animal welfare goals but instead operates as a preferential carve-out for in-state industry participants.   This excessive burden in comparison to the lack of local benefit violates the *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) balancing test.

265.   The Slaughterhouse Exception's burden on interstate commerce is not merely incidental or trivial. It creates a structurally asymmetric regulatory regime in which out-of-state FMIA-inspected processors are fully subject to the Act's requirements while in-state FMIA-inspected processors are exempt simply due to

their geographic location within California—a disparity that directly affects the competitive position of out-of-state processors in California's pork market.

### *Discriminatory Lead-Time for Compliance*

### (Preserved for Appellate Review)

266. Proposition 12 has also run afoul of the Commerce Clause in its discriminatory treatment of in-state and out-of-state processors in terms of the time afforded to become compliant with Proposition 12's Requirements.

267. California enacted Prop 2 on November 4, 2008, mandating California processors to sell products in compliance with the Turn Around Requirements. But Prop 2 did not go into effect until January 1, 2015.

268. California gave in-state processors six years to ask farms to convert or find new farmers to supply pigs for each of their plants in compliance with the Turn Around Requirements or otherwise attempt to obtain alternative sales options outside of the state of California.

269. Similarly, California gave in-state processors over six years to update and alter their operations, contracts, policies and facilities, and maintain their sales relationships with their California customers.

270. On November 6, 2018, with California farms and processors now in compliance a decade later, California then enacted Prop 12, which applied Prop 2's same Turn Around Requirements to out-of-state processors. Yet, unlike the six years

AMENDED COMPLAINT

given to in-state processors to comply, Prop 12 went into effect for out-of-state processors immediately, just weeks later, on December 19, 2018.

271.   Triumph and out-of-state processors were left to scramble, engaging in emergency actions to respond to the lack of compliant supply from farms and to force conversions or locate compliant pigs to accommodate California's mandate, all while undergoing the risk and threat of looming criminal enforcement, resulting in start and stop flows of supply to California, and loss of customers in the meantime as the processors tried to find farms willing to make the investment costs to convert.

272.   Processors like Triumph were forced to demand that farmers supplying their pigs convert enough farms immediately to fulfill California's supply needs, terminate or amend pig supply contracts to seek out and obtain new pigs, or otherwise were left to obtain supply from California farmers who had the benefit of enjoying a longer lead-in time.

273.   Additionally, processors like Triumph also had to make emergency operational changes at their FSIS-inspected facilities to accommodate for the flow of animals which would need to be inspected, segregated and processed separately from the non-compliant pigs.

274.   Between the Turn Around Requirements and the Square Footage Requirements, while both expensive and resource-intensive conversions, the Turn Around Requirements are the heaviest lift in terms of cost and time for farming

AMENDED COMPLAINT

conversions. Square Footage Requirements are supplemental or added on to barns already converted for Turn Around Requirements.

275.   Prop 12 also enacted the Square Footage Requirements. Notably, with this requirement now new to in-state processors, California provided a longer lead time, with the Square Footage Requirements not going into effect until December 31, 2021, giving three years for compliance. Plus, Prop 12 also mandated regulations to be promulgated to provide direction and clarity of what would be involved for Square Footage Requirements to aid in these additional conversions.

276.   Whereas out-of-state processors were frantically responding to threatened criminal exposure of the immediately implemented Turn Around Requirements, in-state California processors were once again methodically given three years (plus forthcoming regulations) to obtain pigs from in-state farms which could then comply with the additional Square Footage Requirements.

277.   This at least decade-long head start gave in-state processors express advantages over out-of-state processors like Triumph, because of the associated costs and operational issues (animal welfare and otherwise) related to the transportation of live animals long distances.

278.   Thus, this disparity in lead-in time has led to an ongoing, continuous shift in market share to the benefit of in-state processors, and to the detriment of out-of-state processors such as Triumph.

69
AMENDED COMPLAINT

279. Accordingly, Proposition 12 and its Regulations' ongoing, continuous differential treatment violate the Commerce Clause of the U.S. Constitution.

280. The constitutional violations under the Commerce Clause are continuous, ongoing and systemic, as Triumph produces pork to be transported throughout interstate commerce and in California on a daily basis.

281. Plaintiff Triumph is therefore entitled to a judgment declaring that Proposition 12 and its Regulations violate the Commerce Clause.

282. Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

283. Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiff requests the Court issue permanent injunctive relief enjoining the Defendants from enforcing Proposition 12 and its Regulations.

## FOURTH CAUSE OF ACTION

### VIOLATION OF DUE PROCESS CLAUSE
### (42 U.S.C. § 1983)

284. Plaintiff incorporates the facts set forth in Paragraphs 1-283 as though fully set forth herein.

285. Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as the Act and its Regulations violate the Due Process Clause both on its face and as applied to Triumph Foods.

70

AMENDED COMPLAINT

286. Proposition 12 is a criminal statute. The text of Proposition 12 provides that "any person who violates any of the provisions of this chapter is guilty of a misdemeanor" and subjects those persons upon conviction to a fine of up to $1,000 or by imprisonment for a period not to exceed 180 days.

287. Proposition 12 and its implementing Regulations violate the Due Process Clause, both facially and as applied to Triumph Foods, as the Act and certain Regulations both fail to provide proper notice and are vague, creating risk of arbitrary enforcement in violation of the Due Process Clause.

288. The unconstitutional uncertainty surrounding the language of Proposition 12 and its Regulations is not hypothetical, either, as the Act and its Regulations have created sweeping confusion across the industry and even the CDFA has recognized the uncertainty of the law.

289. CDFA official Liz Cox recently stated "We're really working towards compliance. We understand this is a new program. We understand there was uncertainty. You can't suddenly turn on a light switch and make pork. We're doing our best to educate while we regulate." *See* Corey Munson*, Noncompliant pork concerns arise after Prop 12 rule enacted,* IOWA FARM BUREAU (Apr. 9, 2024), https://www.iowafarmbureau.com/Article/Noncompliant-pork-concerns-arise-after-Prop-12-rule-enacted *(*last visited March 10, 2026).

290. Dr. Cox made this statement in response to an observation from the USDA economic survey showing a gap between Proposition 12 compliant pork

AMENDED COMPLAINT

production and consumption of compliant pork in California, leading many to question whether the industry's understanding of the statutory language and regulatory scheme was consistent. *Id.*

### *Facial and As-Applied Vagueness of the Act*

291. Proposition 12 allows criminal prosecution of business owners and operators, including any "operators" inside the FMIA-regulated and inspected establishments, who knowingly "engage in the sale" of noncompliant Whole Pork Meat in California commerce, including processors like Triumph.

292. The Act does not define who the "operators" are within an establishment.

293. Proposition 12 does not provide clarity on who is deemed to have "engaged in" that sale, specifically whether or not the pork processor, its executives, officers or operators, or even the FSIS inspectors, are construed to have "engaged in" the sale itself in California because they have knowledge of the type of pork being sold into the state.

294. Because of the uncertainty of what it means to be able to comply with a "Turn Around Provision," the processing establishments also do not have clarity of what compliant product actually is, as different sized pigs need different size pens to turn around or move, and they are left to rely on the interpretation and representation of the farmer producers from whom they purchase from.

295.   California's aiding, abetting, and conspiracy statutes further extend the enforcement capabilities of the Act to unknown persons and parties. Specifically, under California Penal Code Section 31, any person aiding and abetting in the commission of a misdemeanor may be charged as the principal of the crime. And under California Penal Code Section 182, any person agreeing to commit a crime and taking overt action in support thereof also faces criminal liability for conspiracy.

296.   Furthermore, out-of-state processors like Triumph were left just weeks to comply after the sales ban pertaining to the Turn Around Requirements was enacted, and as such, out-of-state processors like Triumph did not have adequate notice of, or time to comply before Proposition 12 went into effect.

297.   As noted in the background section of this Amended Complaint, California's failure to promulgate the Regulations for Proposition 12 in a timely manner has also caused Proposition 12 to lack sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or provide a person of ordinary intelligence adequate notice to know what conduct is criminalized and what constitutes a violation of the statute.

298.   Plaintiff has a constitutional right not to be deprived of liberty, as a result of a facially vague Act, and to be free from the risk of imminent criminal prosecution and such consequences without due process as the Act is applied to Plaintiff.

AMENDED COMPLAINT

299.   As referenced in the background section of this Amended Complaint, Proposition 12's implementing Regulations also frustrate the Due Process Clause due to their overarching vagueness, both facially and as-applied to Triumph Foods.

### *Facial and As-Applied Vagueness of the "Sale" Regulations*

300.   Despite the definition of "sale" in the Act expressly occurring where the buyer takes physical possession of the product, the Regulations create a new term and change the relevant definition to define now a "commercial sale," as "to sell, exchange, barter, trade, transfer title or possession, or distribute, conditional or otherwise, in California commerce." Cal. Code Regs. tit. 3, § 1322(f).  Not only is the definition different and broader than the definition in the Act, but no further definition is offered of what these specific terms mean.

301.   Further, CDFA has not provided any instruction as to what "in California commerce" means for a processor or otherwise.

302.   As applied to Triumph, this regulatory vagueness is not merely theoretical. Triumph regularly both sells directly into California but also processes pork that is transported downstream into California by distributors, at which point the title to the pork is transferred from Triumph to the buyers.

303.   Triumph has no clear regulatory guidance as to whether its upstream processing activities constitute "engaging in" a sale "in California commerce" sufficient to subject it to Proposition 12's criminal penalties, compliance requirements, or CDFA enforcement action. The absence of this guidance, combined

74

AMENDED COMPLAINT

with the vague and undefined standards governing CDFA's enforcement authority, exposes Triumph to an ongoing and imminent risk of arbitrary deprivation of property (through seizure and destruction of perishable pork) and liberty (through criminal prosecution) without adequate notice or fair warning.

304.   These due process deficiencies are distinct from and additional to previous holdings that the term "engage in" a "sale" within California is not facially vague as a matter of statutory interpretation. Triumph's due process claims here concern the vagueness of the Regulations' enforcement standards and the absence of meaningful procedural criteria governing CDFA's regulatory scheme and border inspection program.

305.   Under these circumstances, it is vague and ambiguous as to whether Triumph could be subject to liability under Proposition 12 Regulations concerning whether that sale is deemed to be "in California commerce" given its destination is California.

306.   Further, it is vague and ambiguous as to what definition of "sale" CDFA officials will apply – the Act's definition or the Regulations' expanded definition of "commercial sale."

### Facial and As-Applied Vagueness of the "Inspection, Seizure, Hold and Seizure" Regulations

307.   Proposition 12's Regulations governing the CDFA's inspection, seizure, hold, and tagging procedures are independently in violation of the Due Process Clause of the Fourteenth Amendment.

308. The Regulations authorize the CDFA to intercept, stop and inspect any vehicle transporting Whole Pork Meat into California, without any defined standard specifying when such a stop is warranted or what factual predicate is required to initiate an inspection. Cal. Code Regs. tit. 3, § 1322.6(b).

309. The Regulations further authorize the CDFA to seize, hold, and affix a warning tag or notice to any load of Whole Pork Meat upon a finding of "reasonable suspicion" that the product was "produced, packaged, stored, labeled, marked, identified, transported, delivered, or sold in violation of the requirements" of Proposition 12. Cal. Code Regs. tit. 3, § 1322.7(c).

310. The Regulations, however, provide no definition of what constitutes "reasonable suspicion" in this enforcement context—no standards, criteria, or limiting principles are set forth to guide CDFA officials in making this determination, yet simultaneously giving CDFA the authority to seize and destroy property and seek criminal enforcement.

311. The Regulations provide no guidance as to: (a) what documentation, records, or certifications, if any, a CDFA official must review before forming "reasonable suspicion"; (b) what information or circumstances would dispel reasonable suspicion; (c) what standards govern whether a vehicle or shipment is selected for inspection; or (d) what criteria a CDFA official must apply in distinguishing compliant from potentially non-compliant shipments at the border.

312.   This undefined "reasonable suspicion" standard vests CDFA officials with virtually unbounded discretion to stop, inspect, seize, and hold any shipment of Whole Pork Meat entering California, without meaningful criteria to constrain or guide that discretion. This lack of defined standards creates a serious risk of arbitrary, inconsistent, and discriminatory enforcement by CDFA officials applying their own varying interpretations of when "reasonable suspicion" of noncompliance exists.

313.   When the CDFA does decide to issue a hold notice, the product is frozen in place: the FMIA establishment "shall not disturb, move, divert, or offer for sale" the seized product unless and until the CDFA issues specific directions authorizing disposition. Cal. Code Regs. tit. 3, § 1322.7(d). Under the informal hearing procedures, the processor has three business days to request a hearing, and a decision must issue within three business days of the conclusion of the hearing. Cal. Code Regs. tit. 3, § 1327.1. This process results in a minimum of six business days during which highly perishable pork product may be held—exposing Triumph to substantial property loss through product spoilage—without any defined standard governing whether the seizure was lawful in the first instance.

314.   The vagueness of the Regulations is particularly acute in the context of a regulatory scheme applied to Triumph, an out-of-state processor whose product enters California on trucks. Triumph has no ability to know in advance whether a given shipment will be stopped, inspected, or seized. The Regulations provide no

AMENDED COMPLAINT

meaningful notice of what conduct, documentation, or circumstances will trigger enforcement action.

315. This vagueness surrounding what product is allowed to be tagged, searched and seized is further complicated by the allowed exception within the definition of "Whole Pork Meat" itself, which effectively would allow Triumph to ship into California both compliant *and* non-compliant Whole Pork Meat, so long as the non-compliant Whole Pork Meat included combination pork products like hot dogs and pepperoni. As a result, there is significant uncertainty as to how CDFA officials will decide what products to hold, tag and seize if a truck contains both compliant pork products and non-compliant combination pork products.

316. These vagueness deficiencies in the Regulations are facially apparent: no CDFA official, and no pork processor, can determine from the text of the Regulations what level of suspicion, based on what facts, is required before the CDFA may lawfully seize and hold a shipment of pork for up to six business days.

317. An FMIA establishment may request a formal hearing in order to have their product released for sale. Cal. Code Regs. tit. 3, §§ 1322.6(e), 1322.7(e). "[A] respondent may request an informal hearing to contest a notice of adverse determination that seizes or places a hold on covered product pursuant to sections 1320.7, 1321.7, and 1322.7 of this Chapter." Cal. Code Regs. tit. 3, § 1327.1.

318. Further, "[t]he request for an informal hearing shall be submitted to the Department by electronic mail, facsimile, or by phone within three (3) business days

AMENDED COMPLAINT

from the date of receipt of the notice of adverse determination." Cal. Code Regs. tit. 3, § 1327.1. Then, "[t]he decision [from the hearing] shall be in writing, issued within three (3) business days after the conclusion of the hearing, and shall be effective immediately upon issuance." Cal. Code Regs. tit. 3, § 1327.1. At any of these junctures, the USDA-approved whole pork product would spoil.

319.   In other words, California can hold Whole Pork Meat product that the CDFA has "reasonable suspicion" is non-compliant with the Act and Regulations for, at a minimum, six days, effectively leading to the destruction of highly perishable pork product that is not allowed to even be moved to a different state unless authorized by the CDFA.

320.   This arbitrary, vague process and delay in shipment to the end-user results in spoilage of its product itself and great loss, and also imposes direct harm associated with contractual relationships involving Triumph and the buyers of its pork products.

***Continuing Daily Arbitrary Enforcement Risk As Applied to Triumph***

321.   Because Proposition 12 and its Regulations fail to provide a properly defined scope, ongoing constitutional violations also exist within the administrative scheme being implemented for criminal enforcement on a daily basis with CDFA. Vagueness exists surrounding the process of CDFA stops, inspections, searches and seizures that occur at the California border pursuant to the Regulations for a law and regulatory scheme that has not been properly defined.

322. Thus, Proposition 12's Regulations allow for continuous, arbitrary, inconsistent, and discriminatory enforcement by Defendants, by other parties, and law enforcement authorities who are left to determine how and when they can prosecute the Act, or seize and destroy the product while evaluating the option to prosecute. These law enforcement authorities are also left to determine who they should enforce against under the Act and its Regulations.

323. Proposition 12 and its Regulations lack sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or provide persons of ordinary intelligence adequate notice to know what conduct is criminalized and what constitutes a violation of the statute.

324. Plaintiff has a constitutional right to not be deprived of property, as a result of the facially vague Act and its Regulations, and to be free from the arbitrary loss of its pork product without due process as applied to Plaintiff.

325. The constitutional violations under the Due Process Clause are continuous, ongoing and systemic, as Triumph produces pork to be transported throughout interstate commerce and in California on a daily basis.

326. Plaintiff Triumph is therefore entitled to a judgment declaring that Proposition 12 and its Regulations violate the Due Process Clause.

327. Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

AMENDED COMPLAINT

328.   Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiff requests the Court issue permanent injunctive relief enjoining the Defendants from enforcing Proposition 12 and its Regulations.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE IMPORT-EXPORT CLAUSE**
**(42 U.S.C. § 1983)**
**(Preserved for Appellate Review)[11]**

329.   Plaintiff incorporates the facts set forth in Paragraphs 1–328 as though fully set forth herein.

330.   Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating the Import-Export Clause at Article I, Section 10, clause 2 of the United States Constitution.

331.   Article I, Section 10, clause 2 of the United States Constitution states, "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws."

---

[11]While the Clause has historically applied to international trade issues, several Justices have indicated that such a reading "may be mistaken as a matter of constitutional text and history: Properly interpreted, the Import-Export Clause may also prevent States 'from imposing certain especially burdensome' taxes and duties on imports from other States—not just on imports from foreign countries." *Ross*, 598 U.S. at 408 (Kavanaugh, J., concurring and dissenting in part) (citations omitted). This claim is preserved for Supreme Court review.

AMENDED COMPLAINT

332. The Import-Export Clause may be interpreted to prevent states from imposing certain especially burdensome taxes and duties on imports from other states, or in interstate commerce, and not just on imports from foreign countries.

333. The Act and the Regulations, in effect, levy a burdensome duty on out-of-state pork goods because the Act and the Regulations condition the sale of goods within California on the use of California's preferred farming practices in the other states in which sows were raised.

334. In addition, the Act and the Regulations levy a duty on Triumph to require and confirm a valid certification exists under the Regulations for all pigs it obtains that may ultimately be processed and distributed to California.

335. An additional duty on Triumph is imposed through the requirement for Triumph to obtain a valid distribution registration in order to simply conduct business within California as a registered distributor.

336. This distributor registration imposes significant duties on Triumph, including the obligation to allow for inspection of its records, its facilities, and compels the disclosure of confidential business practices within its facilities.

337. The Act and Regulations force Plaintiff to incur a continuous penalty, either through forced ongoing compliance with a regulatory scheme set by a single state to remain active in entire markets or risk exclusion from those markets, including markets that the mid-west pork industry, including the out-of-state pork market, has operated in, sold to, and transacted in, for decades.

AMENDED COMPLAINT

338.   Sufficient justification does not exist to levy such a duty on covered pork products that were derived from breeding pigs not confined in compliance with the Act and the Regulations.

339.   The constitutional violations under the Import-Export Clause are continuous, ongoing and systemic, as Triumph produces pork to be transported throughout interstate commerce and in California on a daily basis.

340.   Plaintiff Triumph is therefore entitled to a judgment declaring that Proposition 12 and its Regulations violate the Import-Export Clause.

341.   Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

342.   Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiff requests the Court issue permanent injunctive relief enjoining the Defendants from enforcing Proposition 12 and its Regulations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court award the following relief:

343.   Issue a permanent injunction prohibiting the enforcement of Proposition 12, its Regulations, policies, practices and customs by Defendants, employees and agents, and all persons acting in privity and/or in concert with them (including private enforcers bringing claims pursuant to the Unfair Competition Law or any other applicable law);

AMENDED COMPLAINT

344.   Enter judgment declaring that Proposition 12 and related Regulations, policies, practices and customs of the Defendants violate the United States Constitution and may not be lawfully enforced, both now and in the future;

345.   Grant Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and Section 1021.5 of the California Code of Civil Procedure; and

346.   Any further relief that the Court deems just and equitable.

Respectfully submitted,

Dated: March 17, 2026.

TRIUMPH FOODS, LLC, Plaintiff.

By: */s/ Michael T. Raupp*
PATRICIA BALL ALBERTS
CA #229333
L. SCOTT OLIVER
CA #174824
Husch Blackwell LLP
355 South Grand Avenue, Suite 2850
Los Angeles, CA 90071
Telephone: (213) 337-6550
Facsimile: (213) 337-6551
patricia.alberts@huschblackwell.com
scott.oliver@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
RYANN A. GLENN
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com

*Attorneys for Triumph Foods, LLC*

AMENDED COMPLAINT